# EXHIBIT A

Case 2:18-cv-03439-NGG-RLM   Document 50-2   Filed 06/06/19   Page 2 of 76 PageID #: 231



**JULY 18, 2018** Albany, NY

# Governor Cuomo Directs New York State Department of Labor to Issue Guidance on US Supreme Court Janus Decision

## Guidance Outlines Rights of Public Sector Employers and Employees Regarding Collective Bargaining and Union Membership in Wake of Supreme Court Decision

Governor Andrew M. Cuomo today directed the New York State Department of Labor to issue guidance on the recent *Janus* decision. On June 27, 2018, the Supreme Court of the United States issued a decision in *Janus v. AFSCME Council 31* that overturned decades of established law related to a public sector union's right to collect agency fees from non-union members. New York employees and employers alike have had many questions about what has actually changed in the wake of this controversial decision. The guidance clarifies that the *Janus* decision did not change or affect many of the rights of employees and obligations of employers.

"The Supreme Court's Janus decision is a direct attack on organized labor, and as long as I am Governor of New York, we will do everything in our power to protect union members and support the labor movement," Governor Cuomo said. "This guidance will inform employers of their obligations and employees of their rights so they know they remain protected under state law."

The Department of Labor is posting the information publicly and sending to all public employers, including local governments, public hospitals, school districts and colleges.

"While I vehemently disagree with the court's decision in this case, it is important that all New York's employers and workers understand how this impacts them," said New York

State Commissioner of Labor Roberta Reardon. "New York is and always has been, a union state. We have the highest rate of union membership in the country - more than double the national rate, and our strong support of the labor movement will continue despite attacks from the federal level."

"The Supreme Court's Janus decision attacks hardworking men and women across the country," said Lieutenant Governor Kathy Hochul. "In New York, we're standing up for unions and fighting to protect workers' rights. Guidance issued by the State Department of Labor will help public employers and workers understand what the Janus decision means and how it will impact them."

Previously, Governor Cuomo signed an Executive Order to protect union members from harassment and intimidation, which was the first state action taken in response to the Supreme Court's Janus decision. The Executive Order prohibits State entities from disclosing personal contact information for state employees amid reports of individuals and organizations harassing union members or prospective union members.

The *Janus* decision overturned well-established law and practice relating to the right of a union to receive the payment of fair share agency fees from public sector employees who decline union membership. As a result, there has been much confusion and this guidance is intended to provide clarity to employers and employees.

The only change under *Janus* is that public employers may not deduct agency fees from a nonmember's wages, nor may a union otherwise collect agency fees from a nonmember, without the nonmember employee's affirmative consent. All other rights and obligations of public sector employers and employees under state law remain unchanged. For example, unions have, in the past, presented dues deduction cards, or other similar evidence of union membership such as membership lists, to public employers and those employers previously collected union dues from its employees on that basis. The decision in *Janus* does not require a union to obtain new dues deduction cards or obtain other evidence of union membership or remove a public employer's obligation to collect dues from members of a union. Public employee unions are not required to produce dues authorizations cards for members from whom the employer has previously deducted dues. More information is

Case 2:18-cv-03439-NGG-RLM   Document 50-2   Filed 06/06/19   Page 4 of 76 PageID #: 233

available here.

# Contact the Governor's Press Office

📱 **Contact us by phone:**

Albany:  (518) 474 - 8418

New York City:  (212) 681 - 4640

✉ **Contact us by email:**

Press.Office@exec.ny.gov

# EXHIBIT B

Case 2:18-cv-03439-NGG-RLM   Document 50-2   Filed 06/06/19   Page 6 of 76 PageID #: 235

# Payroll Bulletin
## Office of the State Comptroller
### Bureau of State Payroll Services

**Date: July 3, 2018**                              **Bulletin Number: 1660**

| | |
|---|---|
| ***Subject*** | Agency Shop Fees |
| ***Purpose*** | To notify agencies of the discontinuance of Agency Shop Fee deductions. |
| ***Affected Employees*** | All employees paid by the New York State Payroll System (PayServ) who have an Agency Shop Fee deduction. |
| ***Background*** | As a result of the 06/27/18 Supreme Court decision in Janus v. AFSCME, Agency Shop Fee deductions must be discontinued for all affected State employees. |
| ***Effective Date(s)*** | Administration paychecks dated July 11, 2018<br>Institution paychecks dated July 19, 2018 |
| ***Eligibility Criteria*** | Employees with the Agency Shop Fee deduction. |

***Agency Actions***

Agencies should notify employees of the following:

1. Employees who previously had agency shop fees deducted from their paycheck will no longer have this fee deducted.
2. Employees will continue to see their year-to-date (YTD) Agency Shop Fee deduction reflected on their pay stub through the end of the calendar year.
3. Eligible new employees who have not opted to become a union member will see a $0.00 current Agency Shop Fee deduction amount and a $0.00 YTD balance reflected on their pay stub through the end of the calendar year. Eligible employees who opt to become a union member will see the appropriate current and YTD union dues deductions reflected on their pay stub.
4. No other union-related deductions will be affected.

***OSC Actions***

OSC is currently programming changes in PayServ to prevent agency shop fees from being automatically deducted from employee paychecks. Until these changes have been implemented, OSC will reduce all agency shop fees to $0.00 beginning on the paycheck dates noted above.

***Questions***

Questions regarding this bulletin may be directed to the Payroll Deduction mailbox.

# EXHIBIT C

No. 16-1466

IN THE

## Supreme Court of the United States

<br>

MARK JANUS,

*Petitioner,*

v.

AMERICAN FEDERATION OF STATE, COUNTY, AND
MUNICIPAL EMPLOYEES, COUNCIL 31, et al.,

*Respondents.*

ON WRIT OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SEVENTH CIRCUIT

**BRIEF FOR THE STATES OF NEW YORK, ALASKA,
CONNECTICUT, DELAWARE, HAWAII, IOWA, KENTUCKY,
MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA,
NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON,
PENNSYLVANIA, RHODE ISLAND, VERMONT, VIRGINIA AND
WASHINGTON, AND THE DISTRICT OF COLUMBIA
AS AMICI CURIAE IN SUPPORT OF RESPONDENTS**

ERIC T. SCHNEIDERMAN
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD*
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
PHILIP V. TISNE
  *Assistant Solicitor General*
  120 Broadway
  New York, NY 10271
  (212) 416-8020
  barbara.underwood@ag.ny.gov
  *Counsel of Record*

*(Additional counsel listed on signature pages.)*

## QUESTION PRESENTED

In *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), this Court confirmed that the Constitution permits States to adopt the model of collective bargaining that is widely used in the private sector pursuant to federal labor law. Under this model, a union that employees select to serve as their exclusive representative in collective-bargaining negotiations may charge all represented employees—including those who decline to join the union—an "agency fee" to defray the costs of the workplace services provided by the union. In reliance on *Abood*, twenty-three States and the District of Columbia have long authorized public-sector collective-bargaining arrangements that include agency-fee provisions.

Amici States address the following question raised by petitioners:

Whether *Abood* should be overruled, thereby forcing many States to abandon the labor-management arrangements that they have long used to ensure the efficient and uninterrupted provision of government services to the public?

*ii*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE AMICI STATES........................ 1

STATEMENT OF THE CASE .................................... 3

    A. This Court's Longstanding Recognition
    That Private Employers May Require
    Employees to Fund the Workplace-Related
    Activities of a Union Designated to Act as
    Their Exclusive Representative...................... 3

    B. This Court's Determination in *Abood* That
    States May Adopt Labor-Management
    Policies Similar to Those That Have Proved
    Effective in the Private Sector ....................... 5

    C. *Abood*'s Centrality to Public-Sector
    Workforce Management ................................. 7

    D. Petitioner's Challenge ................................... 8

SUMMARY OF ARGUMENT ................................... 9

ARGUMENT............................................................. 10

  THE STATES HAVE A SIGNIFICANT AND
  VALID INTEREST IN PRESERVING *ABOOD*..... 10

I. Agency Fees Are Important to Maintaining
  the Labor-Management Model That Many
  States Rely on to Ensure the Effective and
  Efficient Provision of Services to the Public...... 12

    A. State Laws Authorizing Public-Sector
    Collective Bargaining Were Adopted in
    Response to Devastating Strikes and Labor
    Unrest by State and Local Government
    Employees. .................................................... 12

*iii*

B. In Responding to These Crises, States Looked
to the Labor-Management Model That Had
Already Proven Effective in the Private Sector
under Federal Labor Law. ...........................17

1. An exclusive representative can provide
services in the workplace that reduce
labor unrest and yield other benefits for
employers.................................................19

2. Many States have determined that
agency fees help them secure the full
benefits of exclusive representation. .......23

C. Petitioners' Amici Misrepresent the Role of
Public-Sector Collective Bargaining in
Municipal Bankruptcies...............................28

II. Petitioner's Constitutional Challenge Should
Be Rejected. ......................................................30

A. The First Amendment Affords Public
Employers Flexibility to Manage Their
Workforces. ....................................................30

B. Petitioner's Challenge Is Overbroad Because
It Encompasses Agency Fees for Union
Services to Which He Does Not Object.........33

CONCLUSION ........................................................36

*iv*

## TABLE OF AUTHORITIES

**Cases**                                    **Page(s)**

*Abood v. Detroit Board of Education*, 431 U.S.
   209 (1977) ...................................................... passim

*Allied-Signal, Inc. v. Director, Div. of Taxation*,
   504 U.S. 768 (1992) ............................................ 10

*Association of Surrogates & Sup. Ct. Reporters
   v. State*, 78 N.Y.2d 143 (1991) ............................. 14

*Burlington N. R.R. Co. v. Brotherhood of Maint.
   of Way Employees*, 481 U.S. 429 (1987)................ 4

*Bush v. Vera*, 517 U.S. 952 (1996) ............................ 10

*Communications Workers of Am. v. Beck*, 487
   U.S. 735 (1988) ................................................. 4,24

*Connick v. Myers*, 461 U.S. 138 (1983) ............... 31,32

*DiMaggio v. Brown*, 19 N.Y.2d 283 (1967) .............. 14

*Ellis v. Railway Clerks*, 466 U.S. 435 (1984)........... 24

*Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591
   (2008) ................................................................... 31

*First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666
   (1981) ..................................................................... 4

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......... 1,31,32

*Harris v. Quinn*, 134 S. Ct. 2618 (2014) ............... 7,11

*Hilton v. South Carolina Pub. Rys. Comm'n*, 502
   U.S. 197 (1991) .................................................... 10

*International Ass'n of Machinists v. Street*, 367
   U.S. 740 (1961) ............................................... 4,5,23

*Knox v. Service Emps. Int'l Union*, 567 U.S. 298
   (2012) ................................................................. 7,11

*Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507
   (1991) .............................................................. 34,35

*v*

**Page(s)**

*Locke v. Karass*, 555 U.S. 207 (2009) .......................... 7

*Minnesota State Bd. for Cmty. Colls. v. Knight*,
    465 U.S. 271 (1983) ............................................. 21

*Nat'l Aeronautics & Space Admin. v. Nelson*,
    562 U.S. 134 (2011) ............................................. 31

*National League of Cities v. Usery*, 426 U.S. 833
    (1976) ................................................................... 17

*Navy Charleston Naval Shipyard v. Federal
    Labor Relations Auth.*, 885 F.2d 185 (4th Cir.
    1989) .................................................................... 26

*New State Ice Co. v. Liebmann*, 285 U.S. 262
    (1932) ................................................................... 33

*Oil Workers v. Mobil Oil Corp.*, 426 U.S. 407
    (1976) ................................................................... 25

*Public Workers v. Mitchell*, 330 U.S. 75 (1947) ........ 32

*Railway Clerks v. Allen*, 373 U.S. 113 (1963) ............. 5

*Railway Employees' Department v. Hanson*, 351
    U.S. 225 (1956) ...................................................... 5

*Shelby County v. Holder*, 133 S. Ct. 2612 (2013) ....... 3

*United States v. International Bus. Machs.
    Corp.,* 517 U.S. 843 (1996) .................................. 11

*Waters v. Churchill*, 511 U.S. 661 (1994) ........... 31,32

**Laws**

*Federal*

Ch. 1220, 64 Stat. 1238 (1951) ................................... 4

5 U.S.C.
    § 7106(a)(1) .......................................................... 26
    § 7131 ................................................................... 26

29 U.S.C. §§ 151-169 ................................................. 4

*vi*

**Page(s)**

45 U.S.C. § 151 et seq. ................................................. 3

*State*

Del. Code tit. 19, § 1301 ........................................... 17

Fla. Stat. § 447.201 .................................................. 17

Ill. Comp. Stat.
    ch. 5, 315/2 ..................................................... 13
    ch. 5, 315/6 ..................................................... 8

Iowa Code § 20.1 ..................................................... 17

Kansas Stat. § 75-4321 ............................................. 17

Mich. Comp. Laws § 423.210 .................................. 26

N.Y. Civ. Serv. Law § 200 ....................................... 17

Neb. Revised Stat.
    § 48-802 .......................................................... 17
    § 81-1370 ........................................................ 17

Or. Rev. Stat. § 243.656 ........................................... 17

Vt. Stat. Ann., tit. 3, § 901 ...................................... 18

Wis. Stat.
    § 111.81 .......................................................... 26
    § 111.85 .......................................................... 27
    § 111.845 ........................................................ 27

**Miscellaneous Authorities**

AFSCME, *Steward Handbook* (2013), *at*
    https://tinyurl.com/AFSCME-StewardHandbook ... 20

*Atlanta Buses Running Again*, N.Y. Times, June
    25, 1950, at 50 ................................................... 15

*Bus Strike Imperils Chicago's Transit*, N.Y.
    Times, Aug. 26, 1968, at 25 ................................ 15

*vii*

**Page(s)**

Chapman & Cutler, LLP, *Primer on Municipal Debt Adjustment—Chapter 9: The Last Resort for Financially Distressed Municipalities* (2012), *at* https://tinyurl.com/ChapmanCutler ... 28

Clark, Paul, *The Role of the Steward in Shaping Union Member Attitudes toward the Grievance Procedure*, 13 Lab. Stud. J. 3 (Fall 1988) ................................................................. 20

Connecticut Interim Comm'n to Study Collective Bargaining by Municipalities, *Final Report* (1965) ........................................................................ 18

Cooke, Louise, *Workers' Unrest Interrupts Municipal Service*, St. Petersburg Times, July 15, 1974, at 4-A ........................................... 16

Currie, Janet, & Sheena McConnell, *The Impact of Collective-Bargaining Legislation on Disputes in the U.S. Public Sector: No Legislation May Be the Worst Legislation*, 37 J.L. & Econ. 519 (1994) ..................................... 19

Derber, Milton, *Labor-Management Policy for Public Employees in Illinois: The Experience of the Governor's Commission, 1966-1967*, 21 Indus. & Lab. Rel. Rev. 541 (1968) .................... 18

Donovan, Ronald, *Administering the Taylor Law* (1990) ........................................................................ 16

Edwards, Harry, *The Emerging Duty to Bargain in the Public Sector*, 71 Mich. L. Rev. 885 (1973) ........................................................................ 18

*viii*

Evans, Sydney, et al., *How Stockton Went Bust: A California City's Decade of Policies and the Financial Crisis That Followed* (Cal. Common Sense Report June 2012), *at* http://uscommonsense.org/pdf/12.pdf ................. 29

*Fragrant Days in Fun City*, Time, Feb. 16, 1968, at 33 ..................................................................... 16

Franklin, Ben, *Troopers Patrol Baltimore to Bar Renewed Unrest*, N.Y. Times, July 13, 1974, at 1 ........................................................................ 14

Freeman, Joshua, *Working-Class New York: Life and Labor Since World War II* (2001) ................. 16

Freeman, Richard, & James Medoff, *What Do Unions Do?* (1984) .......................................... 19,21

Gordon, Tracy, et al., *Exuberance & Municipal Bankruptcy: A Case Study of San Bernardino, Stockton & Vallejo, CA* (Goldman Sch. Pub. Pol'y Working Paper Series May 2017 draft), *at* https://tinyurl.com/Gordon-Exuberance .......... 29

Herman, E. Edward, *Collective Bargaining and Labor Relations* (2d ed. 1987) .............................. 21

Herman, E. Edward, *Collective Bargaining and Labor Relations* (3d ed. 1992) .............................. 21

Horowitz, Morris, *Collective Bargaining in the Public Sector* (1994) ............................................ 13

Kearney, Richard, *Labor Relations in the Public Sector* (3d ed. 2001) ........................................ 13,26

Kearney, Richard, & Patrice Mareschal, *Labor Relations in the Public Sector* (5th ed. 2014) ........................................................ 24,27,28

*ix*

Keefe, Jeffrey, *On* Friedrichs v. California
    Teachers Association*: The Inextricable Links
    Between Exclusive Representation, Agency Fees,
    and the Duty of Fair Representation* (Econ.
    Pol'y Inst. Briefing Paper No. 411, 2015), *at*
    www.epi.org/files/pdf/94942.pdf ......................... 24

Lewin, David, et al., Getting it Right: Empirical
    Evidence and Policy Implications from
    Research on Public-Sector Unionism and
    Collective Bargaining (Mar. 16, 2011), *at*
    papers.ssrn.com/sol3/papers.cfm?abstract_id
    =1792942 ........................................................ 13,22

Maryland Dep't of Labor, Licensing &
    Regulation, *Collective Bargaining for
    Maryland Public Employees: A Review of
    Policy Issues and Options* (1996) .............. 14,18,24

Massachusetts Legis. Research Council, Report
    Relative to Collective Bargaining and Local
    Government Employees (1969)............................ 18

Michigan Advisory Comm. Pub. Emp. Relations,
    *Report to Governor* (1967), *reprinted in* Gov't
    Emp. Relations Report, No. 181 (Feb. 28,
    1967) .................................................................. 18

Miller, Glen, & Ned Rosen, *Members' Attitudes
    Toward the Shop Steward*, 10 Indus. & Lab.
    Rel. Rev. 516 (1957) ............................................ 20

New Jersey Pub. & Sch. Emps.' Grievance
    Procedure Study Comm'n, *Final Report*
    (1968) .................................................................. 18

New York Div. of Budget, Budget Report for S.
    6835, *reprinted in* Bill Jacket for ch. 677
    (1977) .................................................................... 8

*x*

New York Governor's Comm. on Pub. Emp.
  Relations, *Final Report* (1966)................... 13,17,19

Niquette, Mark, *Walker's Bill Gives Wisconsin
  Police a Pass on Pension Payments*,
  Bloomberg (Feb. 25, 2011), *at*
  https://tinyurl.com/Niquette-WiscPolice ............ 27

Pennsylvania Governor's Comm'n to Revise the
  Pub. Emp. Law, *Report and
  Recommendations* (1968) ............................... 13,19

Perlmutter, Emanuel, *Welfare Strike Due in
  City Today Inspite of Writ*, N.Y. Times, Jan.
  4, 1965, at 1 ......................................... 16

Pew Charitable Trusts, *The State Role in Local
  Government Financial Distress* (July 2013),
  *at* https://tinyurl.com/Pew-StateRole ................. 29

Smith, Russell, *State and Local Advisory
  Reports on Public Employment Labor
  Legislation: A Comparative Analysis*, 67
  Mich. L. Rev. 891 (1969) ...................................... 18

Snow, Carlton, & Elliot Abramson, *The Dual
  Role of the Union Steward: A Problem in
  Labor-Management Relations*, 33 Syracuse
  L. Rev. 795 (1982)................................... 20

Stetson, Damon, *Fourth Hospital Moves
  Patients*, N.Y. Times, Nov. 23, 1968, at 1............ 16

*Strike Halts Most Public Transit Runs in
  Philadelphia*, N.Y. Times, Mar. 26, 1977, at 8 ... 15

*Strike's Bitter End*, Time, Nov. 29, 1968, at 97........ 15

Sullivan, Joseph, *Mediators Seek to Settle
  Newark Sanitation Strike*, N.Y. Times, Dec.
  29, 1976, at 55 ..................................... 16

*Transit Strike*, N.Y. Times, Jan. 5, 1966, at 33........ 15

xi

*Transit Workers Strike Los Angeles Area Bus System*, N.Y. Times, Aug. 27, 1979, at A15 ......... 15

Turbeville, Wallace, *The Detroit Bankruptcy* (Dēmos Rep. 2013), *at* http://www.demos.org/ sites/default/files/publications/Detroit_Bankr uptcy-Demos.pdf .................................................... 29

U.S. Dep't of Labor Task Force on Excellence in State and Local Government through Labor-Management Cooperation, *Working Together for Public Service: Final Report* (1996), *at* http://digitalcommons.ilr.cornell.edu/key_wor kplace/252/ .................................................... 21,22

U.S. Office of Pers. Mgmt., *Official Time Usage in the Federal Government, Fiscal Year 2014* (2017), *at* https://tinyurl.com/OPMTimeUsageFY2014 ..... 26

Whiteside, Sally, Robert Vogt, & Sherryl Scott, *Illinois Public Labor Relations Laws: A Commentary and Analysis,* 60 Chi.-Kent L. Rev. 883 (1984) .................................................... 8

Ziskind, David, *One Thousand Strikes of Government Employees* (1940) ........................ 13,16

## INTEREST OF THE AMICI STATES

Every day, millions of state and local government employees across the country perform varied functions in the service of varied communities. There is no one-size-fits-all approach for the government employers tasked with managing them. What works to attract and retain police officers in a small rural community is vastly different from what is required to attract and retain sanitation workers in a large urban area, or public school teachers in the suburbs.

Accordingly, this Court has long recognized that States' judgments about how best to manage their workforces warrant deference. *See Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). *Abood* held in relevant part that States may permit collective-bargaining arrangements under which state and local government employees who are represented by a union—including those employees who decline to become union members—may be charged an "agency fee" to cover the costs of the workplace services provided by the union. *Id.* at 221-22. In that context, the government is acting as an employer, and the Court has long recognized that the First Amendment permits government employers to adopt reasonable workforce-management policies to promote efficient and effective operation of the public sector workplace, *see, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 417-20 (2006).

This amicus brief is filed on behalf of the States of New York, Alaska, Connecticut, Delaware, Hawaii, Iowa, Kentucky, Maine, Maryland, Massachusetts, Minnesota, New Mexico, New Jersey, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of

2

Columbia.[1] Amici States employ a wide range of different approaches for managing their workforces, but all have a significant interest in preserving the flexibility to structure public-sector labor relations that *Abood* allows.

As *Abood* recognized, the task of balancing the potentially divergent interests of public employers, public employees, and the public is delicate and difficult. And the stakes are high. In the decades before *Abood*, many States faced paralyzing public-sector strikes and labor unrest that jeopardized public order and safety. The relative success of state labor-relations systems in preserving public-sector labor peace should not be mistaken for evidence that the leeway afforded by *Abood* is no longer needed. To the contrary, that success is evidence that *Abood* works because it confirms that states and local governments have used the flexibility allowed by *Abood* to adopt policies best tailored to meet their needs in achieving labor peace. That flexibility is no less critical today than when *Abood* was decided. Now, as before, labor peace secures the uninterrupted function of *government itself* and is a necessary precondition for the secure and effective provision of government services.

Amici States also have a substantial interest in avoiding the vast disruption in state and local labor relations that would occur if the Court were now to overrule *Abood*'s approval of public-sector collective-bargaining arrangements utilizing agency-fee rules. That ruling is the foundation for thousands of contracts

---

[1] The District of Columbia is not a State, but possesses a strong interest in this matter similar to those of the States. It is included in this brief's references to "Amici States."

3

involving millions of public employees in twenty-three States and the District of Columbia.

*Abood* is permissive, not mandatory. Voters and elected officials in each State—including the States that support petitioner here—remain free to decide what policies should apply in public-sector labor relations for their communities. Petitioner and his amici should not be permitted to constrain those options by constitutionalizing a single approach to public-sector labor relations for all state and local governments nationwide. As this Court has recognized, the Constitution permits States "broad autonomy in structuring their governments" out of respect for the "'integrity, dignity, and residual sovereignty of the States'" and to "'secure[] to citizens the liberties that derive from diffusion of sovereign power.'" *Shelby County v. Holder*, 133 S. Ct. 2612, 2623 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)).

## STATEMENT OF THE CASE

### A. This Court's Longstanding Recognition That Private Employers May Require Employees to Fund the Workplace-Related Activities of a Union Designated to Act as Their Exclusive Representative

Labor-relations law in the United States has long been based on a model of exclusive representation accompanied by agency-fee authorization. The first federal law guaranteeing workers the right to organize was the Railway Labor Act (RLA), 45 U.S.C. § 151 et seq. Enacted in 1926 after decades of labor unrest in the railroad industry, the RLA enabled railroad workers to select a union that would serve as

4

their exclusive representative in dealing with management, and imposed a corresponding duty of fair-representation on the union to represent all employees in good faith and without discrimination. *See Burlington N. R.R. Co. v. Maintenance of Way Employees*, 481 U.S. 429, 444 (1987); *International Ass'n of Machinists v. Street*, 367 U.S. 740, 750-60 (1961). The RLA was later expanded to specifically authorize "union-shop" arrangements that required employees to join the union designated as their exclusive-bargaining representative and to pay an "agency fee," as a condition of continued employment. *See* Ch. 1220, 64 Stat. 1238 (1951) (amending 45 U.S.C. § 152).

Congress adopted a similar model in enacting the much broader National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, the federal statute that comprehensively regulates labor relations for most employees in the private sector. As with the RLA, Congress sought to end labor strife and to reduce the need for labor strikes by encouraging collective bargaining. And Congress once again identified exclusive-representation collective bargaining as the best model for achieving labor peace. *See First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 674-75 (1981). The NLRA also authorized "agency shop" agreements that permitted employees to choose not to join the union that represented them, but required all represented employees to pay fees to the union for the collective-bargaining assistance and other workplace-related services that those employees received. *See Communications Workers of Am. v. Beck*, 487 U.S. 735, 738 & 744-45 (1988).

In a series of decisions beginning with *Railway Employees' Department v. Hanson*, this Court construed

5

the "union shop" and "agency shop" provisions of the
RLA and NLRA as requiring only financial support for
an employee-selected union, not compelled union
membership by objecting employees. 351 U.S. 225, 238
(1956). This Court also determined that compulsory
fees must be limited to compensating the union for
actual collective bargaining and related activities, and
could not be used to fund unrelated political lobbying.
With those limits in place, the Court rejected claims
that the First Amendment prohibited government
legislation authorizing unions to impose a mandatory
financial obligation on represented employees who
chose not to join the union, to defray the union's costs
for collective bargaining and other workplace-related
activities germane to labor-management relations.
*See Railway Clerks v. Allen*, 373 U.S. 113 (1963);
*Street*, 367 U.S. at 749.

## B. This Court's Determination in *Abood* That States May Adopt Labor-Management Policies Similar to Those That Have Proved Effective in the Private Sector

In *Abood*, this Court recognized the important
state interest in avoiding labor strife that could disrupt
government operations and programs. The Court
confirmed that States, acting as employers, should not
be deprived of the ability to pursue labor peace and
stability in the public workforce by adopting labor-
management policies—such as exclusive-representa-
tion collective-bargaining funded through agency-
fees—that federal law has long allowed private
employers to utilize. *See* 431 U.S. at 229-33.

*Abood* involved a First Amendment challenge to a
Michigan statute that authorized collective bargain-
ing for local public school teachers under the same

6

exclusive-representation, agency-fee model authorized by federal law for the private sector. *Id.* at 212-14, 223-24. This Court, in rejecting that challenge, noted that government entities have a strong interest in providing for exclusive representation in light of "[t]he confusion and conflict that could arise" if government employers had to reach multiple, potentially varying agreements with different unions. *Id.* at 224; *see id.* at 220. And the Court further observed that the union's "tasks of negotiating and administering a collective-bargaining agreement . . . often entail expenditure of much time and money." *Id.* at 221. The Court recognized that agency fees address the inherent "free rider" problem created by exclusive representation: that is, employees who are guaranteed union representation may decline to share in the costs incurred by the union, creating the risk that unions will be underfunded and unable to fulfill their intended duties. *Id.* at 221-22.

*Abood* acknowledged that public-sector unionization was controversial as a policy matter and that there was widespread debate and disagreement about the utility of adopting private-sector models to manage public-sector workplaces. *Id.* at 224-25, 229. Partly for that reason, *Abood* deferred to state judgments about appropriate workforce policies to achieve stable public-sector labor relations. The Court noted that the "'ingredients'" of labor peace and stability were too numerous, complex, and context-dependent for judges to second-guess the wisdom of particular state choices. *Id.* at 225 n.20 (quoting *Hanson*, 351 U.S. at 233-34).

*Abood* and multiple later cases establish that the First Amendment permits agency fees to be imposed on public employees who do not wish to join the union

7

designated as their exclusive representative, so long
as objecting employees are not charged for political or
ideological activities unrelated to the union's workplace
services. *See, e.g., Locke v. Karass*, 555 U.S. 207, 213
(2009); *see also Knox v. Service Emps. Int'l Union*, 567
U.S. 298, 302 (2012). To be sure, the Court has conclu-
ded that a State's desire to secure labor peace and
prevent free-riding may not justify the imposition of
an agency-fee requirement on persons who are not
"full-fledged public employees." *Harris v. Quinn*,
134 S. Ct. 2618, 2638 (2014). But the Court has
recognized that different considerations are implica-
ted when a State—acting in its capacity as an
employer—devises rules for managing its own
workers. *Id.* at 2634.

## C.  Abood's Centrality to Public-Sector Workforce Management

*Abood*'s framework is now central to state labor
law. See Appendix, Survey of State Statutory
Authority for Public-Sector Collective Bargaining by
Exclusive Representative. Forty-one States, the
District of Columbia, and Puerto Rico authorize collec-
tive bargaining for at least some public employees,
and all adopt the federal model of exclusive represen-
tation.[2] Twenty-three States and the District of
Columbia also authorize agency fees (also known as

---

[2] These States are Alaska, Arkansas, California,
Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois,
Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,
Massachusetts, Michigan, Minnesota, Missouri, Montana,
Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,
New York, North Dakota, Ohio, Oklahoma, Oregon,
Pennsylvania, Rhode Island, Texas, South Dakota, Utah,
Vermont, Washington, Wisconsin, and Wyoming. See Appendix.

8

"fair share" fees) to provide a mechanism for ensuring that represented employees contribute to the costs of workplace-related services that their exclusive representative provides. The majority of these statutes make agency-fee requirements a permissible subject of bargaining and authorize (but do not require) agency-fee provisions as part of public-sector collective-bargaining agreements.[3] Many state agency-fee statutes were enacted in specific reliance on *Abood*.[4]

## D.  Petitioner's Challenge

Illinois law permits public employees to select a union to act as their exclusive representative and authorizes the union to negotiate the inclusion of an agency-fee provision—called a "fair share" clause—in its collective-bargaining agreement to cover "the costs of the collective bargaining process, contract administration and pursuing matters affecting wages, hours and conditions of employment." 5 Ill. Comp. Stat. 315/6(e); *see also id.* § 315/6(c). Petitioner Mark Janus is employed by the State of Illinois in a bargaining unit that is exclusively represented by Respondent AFSCME

---

[3] These States are Alaska, California (for local and state employees), Connecticut, Delaware, Hawaii, Illinois, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, and the District of Columbia. See Appendix.

[4] *See, e.g.,* N.Y. Div. of Budget, Budget Report for S. 6835, at 3, *reprinted in* Bill Jacket for ch. 677 (1977) (discussing *Abood*); *see also* Sally Whiteside, Robert Vogt, & Sherryl Scott, *Illinois Public Labor Relations Laws: A Commentary and Analysis,* 60 Chi.-Kent L. Rev. 883, 924 & n.264 (1984) (Illinois Public Labor Relations Act was drafted by the Illinois Legislature to comport with *Abood*).

9

Council 31; the collective bargaining agreement covering his employment contains a fair-share clause to help the union defray its costs of collective bargaining and other workplace services. (Joint App'x ("J.A.") 68, 124.) Petitioner is not a member of the union and objects to paying his fair-share fee because he disagrees with the union's "one-sided politicking for only its point of view" and believes the union fails to "appreciate the current fiscal crises in Illinois and does not reflect his best interests or the interests of Illinois citizens." (J.A. 87.)

## SUMMARY OF ARGUMENT

In the 1960s and 1970s, many States experienced devastating public-sector work stoppages that disrupted the delivery of critical government services. In the wake of those disruptions, States reconsidered how best to manage their public workforces to avoid labor unrest. Many States adopted laws permitting public employees to elect an exclusive representative; some States also adopted laws permitting agency-fee arrangements to ensure adequate funding for the exclusive representative.

*Abood* permitted States flexibility to make these judgments, and that flexibility should be preserved. As Amici States' experiences have shown, there is no one-size-fits-all approach to managing the millions of state and local public employees across the country. For some public employers, the services of an exclusive representative funded by agency fees may be unnecessary. For others, those services and the agency fees that support them may be critically important to ensure the delivery of core government services. Jurisdictions can disagree about how best to achieve

10

labor peace, and this Court should continue to respect those judgments as it did in *Abood*.

## ARGUMENT

### THE STATES HAVE A SIGNIFICANT AND VALID INTEREST IN PRESERVING *ABOOD*

*Abood* recognized that States have a significant and valid interest in being able to employ the models of collective bargaining that have proved successful for avoiding strikes in the private sector. And *Abood* deferred to the judgments of States that have chosen to permit use of the core elements of private-sector collective bargaining—exclusive representation and agency fees—to manage labor relations with state and local government employees.

In the decades since *Abood*, States have relied substantially on that decision when crafting their public-sector labor-management systems. Petitioner's attack on *Abood* and its approval of public-sector agency-fee rules threatens the labor-relations systems of twenty-three States and the District of Columbia.[5]

Principles of *stare decisis* have special force where States have relied on this Court's precedent in structuring their laws, because the resulting statutes would be invalidated if the Court's precedent is overruled or altered. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 985-86 (1996) (plurality op.); *Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. 768, 785-86 (1992); *Hilton v. South Carolina Pub. Rys. Comm'n*, 502 U.S. 197, 202-03 (1991). Here, the *Abood* rule is deeply

---

[5] See *supra* n.2, and accompanying Appendix.

11

entrenched, and is the foundation for thousands of contracts involving millions of public employees across the Nation. Even in constitutional cases, the doctrine of *stare decisis* carries such persuasive weight that this Court has "always required . . . special justification" for overruling settled precedent. *See, e.g., United States v. International Bus. Machs. Corp.,* 517 U.S. 843, 856 (1996) (quotation marks omitted).

Petitioner identifies no special justification for overruling *Abood*. Rather, he bases his call to revisit *Abood* on decisions declining to extend *Abood*'s reasoning to new and different contexts. For example, petitioner relies substantially on *Knox v. Service Employees International Union*, which holds that the First Amendment prohibits a union from charging the non-members it represents in collective bargaining a "special assessment or dues increase that is levied to meet expenses that were not disclosed when the amount of the regular assessment was set." 567 U.S. at 303; *see also id.* at 318, 322. Petitioner also relies heavily on *Harris v. Quinn*, which holds that *Abood*'s rationale does not apply where the government seeks to impose an agency-fee requirement on persons who are not "full-fledged public employees," 134 S. Ct. at 2638. Neither of those decisions addresses the different considerations that are implicated when a State—in its capacity as an employer—devises collective-bargaining rules for its own employees. *See Id.* at 2634; *Knox,* 567 U.S. at 311-12.

12

## I.  Agency Fees Are Important to Maintaining the Labor-Management Model That Many States Rely on to Ensure the Effective and Efficient Provision of Services to the Public.

After confronting devastating public-sector work stoppages that caused disruptions in critical government services, many States decided to authorize public-sector employees to select an exclusive union representative, recognizing—as private-sector employers had long understood—that such a representative could provide services in the workplace that would minimize labor unrest. Many States also decided to permit agency-fee arrangements to fund those services, having determined that a secure funding source was important to ensure the union's ability to provide the full range of contemplated workplace services. Even some States that do not generally permit agency-fee arrangements for public-sector unions—including Michigan, which supports petitioner here—have made exceptions for police and firefighter unions in recognition of the especially destructive nature of labor unrest in those fields. These state experiences confirm that exclusive representation supported by agency fees can be an indispensable tool to protect the public from harmful disruptions to government services and programs, and foster efficiency in government workplaces.

### A.  State Laws Authorizing Public-Sector Collective Bargaining Were Adopted in Response to Devastating Strikes and Labor Unrest by State and Local Government Employees.

Public-sector collective-bargaining laws were enacted to protect the public from the harmful effects

13

of public-sector work stoppages and other disruptions in government operations. *See* David Lewin et al., Getting it Right: Empirical Evidence and Policy Implications from Research on Public-Sector Unionism and Collective Bargaining 13 (Mar. 16, 2011). Although strikes and other work disruptions by public workers are now rare, they were common at the time that the majority of States first adopted public-sector collective-bargaining laws. *See, e.g.*, David Ziskind, *One Thousand Strikes of Government Employees* 187 (1940) (documenting 1,116 strikes by employees in all sectors of government service through 1940). Much of the labor unrest occurred because state and local workers wanted "a greater voice" in determining the terms of their employment, and lacked other means to air grievances and settle disputes with management. See N.Y. Governor's Comm. on Pub. Emp. Relations, *Final Report* 42, 55 (1966). States thus realized "that protection of the public from strikes in the public services requires the designation of other ways and means for dealing with claims of public employees for equitable treatment." *Id.* at 9.[6]

Between 1965 and 1970, for example, there were over 1,400 separate work-stoppages by state and local public workers, involving well over a quarter million employees. *See* Richard Kearney, *Labor Relations in the Public Sector* 226-27 (3d ed. 2001); *see also* Morris

---

[6] *See also* Pa. Governor's Comm'n to Revise the Pub. Emp. Law, *Report and Recommendations* 6 (1968) (concluding that the "inability" of public employees to "bargain collectively has . . . led to more friction and strikes than any other single cause"); 5 Ill. Comp. Stat. 315/2 (declaring aim to establish "an alternate, expeditious, equitable and effective procedure for the resolution of labor disputes subject to approval procedures mandated by this Act").

14

Horowitz, *Collective Bargaining in the Public Sector* 115 (1994). In the 1960s, "strikes by public employees" in New York alone were "too numerous to recall or record"; they included "strikes by transit workers, firemen, sanitation employees, teachers, ferry workers, [and] on other occasions, social workers, practical nurses, city-employed lifeguards, doctors and public health nurses, etc." *DiMaggio v. Brown*, 19 N.Y.2d 283, 289 (1967).

Walkouts and other work stoppages occurred despite state laws that directly prohibited public employees from striking or punished them for doing so. *See, e.g., Association of Surrogates & Sup. Ct. Reporters v. State*, 78 N.Y.2d 143, 152-53 (1991) (recounting New York's historical experience). The States found that direct prohibitions on strikes were ineffective and difficult to enforce, and failed to address the root causes of labor unrest. And it quickly became clear that labor unrest in the public sector had the potential to inflict vast public harm and disruption.

- In Baltimore, a 1974 strike by police officers, jail guards, and other municipal workers resulted in widespread "looting, shooting, and rock-throwing," and "fires ran 150 percent above normal." *See* Md. Dep't of Labor, Licensing & Regulation, *Collective Bargaining for Maryland Public Employees: A Review of Policy Issues and Options* 5 (1996) (recounting 1974 strike). State troopers had to patrol the streets to keep the peace. *See* Ben Franklin, *Troopers Patrol Baltimore to Bar Renewed Unrest*, N.Y. Times, July 13, 1974, at 1.

- In 1968, a series of public-school teacher walkouts in New York City resulted in more

15

than one million children being deprived of education for thirty-six school days. Parents had to physically occupy public schools to keep the schools open. Many children were denied key services provided through public schools. For example, while the city typically provided 400,000 free daily lunches to schoolchildren, only 160,000 were provided during the teacher strikes. *See Strike's Bitter End*, Time, Nov. 29, 1968, at 97.

- Between 1940 and 1980, strikes by public transport workers in Cleveland, Philadelphia, Atlanta, Chicago, Los Angeles, and New York City caused vast disruptions. *See Atlanta Buses Running Again*, N.Y. Times, June 25, 1950, at 50 (Atlanta's transit strike); *Bus Strike Imperils Chicago's Transit*, N.Y. Times, Aug. 26, 1968, at 25 (Chicago strike); *Strike Halts Most Public Transit Runs in Philadelphia*, N.Y. Times, Mar. 26, 1977, at 8 (Philadelphia strike); *Transit Workers Strike Los Angeles Area Bus System*, N.Y. Times, Aug. 27, 1979, at A15 (Los Angeles and Cleveland strikes). In 1966, private businesses suffered over $100 million in losses daily during a twelve-day transit strike in New York City. *See Transit Strike*, N.Y. Times, Jan. 5, 1966, at 33. Moreover, because people could not travel to hospitals to donate blood, the city's blood supply fell to a twenty-year low, causing the postponement of nonemergency surgeries. *Id.*

- During this same period, multiple strikes by sanitation workers caused uncollected trash to pile up on city streets, threatening a serious public-health emergency in many cities. *See,*

16

*e.g.*, *Fragrant Days in Fun City*, Time, Feb. 16, 1968, at 33; *see also* Joseph Sullivan, *Mediators Seek to Settle Newark Sanitation Strike*, N.Y. Times, Dec. 29, 1976, at 55 (discussing strike in Newark, N.J.); Ziskind, *supra*, at 91-94 (recounting strikes by sanitation workers across the country).

- In 1965, a strike by 8000 welfare workers in New York City forced two-thirds of the city's welfare centers to close for twenty-eight days and led to the interruption of services to more than 500,000 welfare recipients, many of whom were children or elderly. *See* Joshua Freeman, *Working-Class New York: Life and Labor Since World War II* 205-06 (2001); *see also* Emanuel Perlmutter, *Welfare Strike Due in City Today Inspite of Writ*, N.Y. Times, Jan. 4, 1965, at 1.

- Strikes by workers at state mental hospitals also interrupted critical care for patients with mental illness. In 1968, a strike by mental-health workers at four state-run hospitals in New York forced patients to be sent home and led to a reduction in psychiatric treatment and rehabilitation services. *See* Ronald Donovan, *Administering the Taylor Law* 89-90 (1990); Damon Stetson, *Fourth Hospital Moves Patients*, N.Y. Times, Nov. 23, 1968, at 1. Care was likewise interrupted in Ohio in 1974 when half of the workers at the State's mental hospitals went on strike. *See* Louise Cooke, *Workers' Unrest Interrupts Municipal Service*, St. Petersburg Times, July 15, 1974, at 4-A.

As these examples illustrate, the harm of unresolved public-sector labor disputes can be

17

catastrophic. Public services such as police and fire protection, sanitation, and public-health tend to be provided uniquely by state and local governments, and the absence of those services threatens serious irreparable harm to the public. *See National League of Cities v. Usery*, 426 U.S. 833, 851 (1976), *overruled on other grounds*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). Even where private substitutes exist, state and local programs are often made available at no cost (such as public education) or are heavily subsidized (such as public transportation). As a result, disruption of these services especially threatens the most vulnerable citizens—low-income persons or those who have a special need for government support. The harms of public-sector labor breakdowns are thus difficult to predict or to control, and even short-term disruptions in particular services can have vast social and economic spillover effects.

### B. In Responding to These Crises, States Looked to the Labor-Management Model That Had Already Proven Effective in the Private Sector under Federal Labor Law.

In the wake of these work stoppages, States sought to implement workforce-management strategies that would minimize the potential for interruption of government services.[7] *See, e.g.*, N.Y. Governor's

---

[7] *See, e.g.,* Del. Code tit. 19, § 1301 (collective-bargaining system for public employees is designed "to protect the public by assuring the orderly and uninterrupted operations and functions" of government); Fla. Stat. § 447.201 (same); Iowa Code § 20.1 (same); Kansas Stat. § 75-4321(3) (same); Neb. Revised Stat. §§ 48-802, 81-1370 (same); N.Y. Civ. Serv. Law § 200 (same); Or. Rev. Stat. § 243.656(3) (permitting collective

18

Comm., *supra*, at 9, 42. In undertaking this task, States understandably sought guidance in solutions that had already proven effective in minimizing labor unrest in the private sector—that is, by permitting employees to select an exclusive representative to deal with management.[8] In fact, nearly every State has adopted the exclusive-representation model that Congress permitted for private employees. See Appendix. Many States did so only after careful study by expert commissions charged with examining the underlying reasons for public-sector labor unrest and devising appropriate solutions.[9]

---

bargaining safeguards "the public from injury, impairment and interruptions of necessary services, and removes certain recognized sources of strife and unrest"); Vt. Stat. Ann., tit. 3, § 901 (state employees' labor relations act aims "to protect the rights of the public in connection with labor disputes").

[8] *See, e.g.*, Harry Edwards, *The Emerging Duty to Bargain in the Public Sector*, 71 Mich. L. Rev. 885, 932 (1973) (noting "accelerating" trend among States towards using "private sector principles to guide the development of labor relations in the public sector"); Russell Smith, *State and Local Advisory Reports on Public Employment Labor Legislation: A Comparative Analysis*, 67 Mich. L. Rev. 891, 897, 899, 901, 904 (1969) (noting that various state commissions relied on NLRA and other private-sector models in offering recommendations for public-sector labor relations policy in the State).

[9] *See, e.g.*, Milton Derber, *Labor-Management Policy for Public Employees in Illinois: The Experience of the Governor's Commission, 1966-1967*, 21 Indus. & Lab. Rel. Rev. 541, 549 (1968); *see also* Conn. Interim Comm'n to Study Collective Bargaining by Municipalities, *Final Report* 7-8 (1965); Md. Dep't of Labor, *supra*, at 3-6; Mass. Legis. Research Council, Report Relative to Collective Bargaining and Local Government Employees 8-11 (1969); Mich. Advisory Comm. Pub. Emp. Relations, *Report to Governor* (1967), *reprinted in* Gov't Emp. Relations Report, No. 181 (Feb. 28, 1967); N.J. Pub. & Sch.

19

### 1. An exclusive representative can provide services in the workplace that reduce labor unrest and yield other benefits for employers.

As in the private sector, exclusive representation can advance a public employer's interest in maintaining workforce stability by providing services to workers that minimize labor unrest. One such service, of course, is collective bargaining. Giving workers a voice in the agreement that will govern the terms and conditions of their employment reduces the likelihood that they will resort to strikes and work stoppages to achieve their demands.[10] Another such service is "grievance adjustment." *See Abood*, 431 U.S. at 225-26. Grievance systems vary among workplaces, but the exclusive representative's central role in administering those systems does not. The union's involvement begins before any grievance is filed, by communicating directly with workers about their concerns in the workplace. The union-trained shop steward, who typically fills this role, thus "plays a vital role in effecting peaceful union-management relations" by serving as "a front-line troubleshooter."

---

Emps.' Grievance Procedure Study Comm'n, *Final Report* 6, 15-17 (1968); N.Y. Governor's Comm., *supra*, at 34-35, 41-42; Pa. Governor's Comm., *supra*, at ii, 1.

[10] *See, e.g.*, Janet Currie & Sheena McConnell, *The Impact of Collective-Bargaining Legislation on Disputes in the U.S. Public Sector: No Legislation May Be the Worst Legislation*, 37 J.L. & Econ. 519, 530 (1994) (finding strike incidence highest where parties have "neither a duty to bargain nor dispute-resolution procedures"); Richard Freeman & James Medoff, *What Do Unions Do?*, at 7-10 (1984) (articulating "voice" function of union representation).

20

Carlton Snow & Elliot Abramson, *The Dual Role of the Union Steward: A Problem in Labor-Management Relations*, 33 Syracuse L. Rev. 795, 795 (1982). The steward investigates worker complaints, organizes and documents them, and then initially presents worker grievances to management. *See* AFSCME, *Steward Handbook* 21-39 (2013).[11] The union also typically provides representation throughout the grievance process. Professional union staff appear with the worker for meetings with management and prepare written submissions and oral presentation on the worker's behalf. If the dispute proceeds to formal arbitration or judicial proceedings, the union representative provides services similar to those that an attorney would provide in traditional civil litigation.

Union participation in the grievance process is an obvious benefit to workers. It increases the likelihood of a positive outcome, relieves the worker of a significant financial burden, and provides support through what can be a stressful experience.

But States' experiences show that a union's participation in grievance adjustment is also a significant benefit for employers. The existence of an advocate for workers who is independent of management means that workers are likely to communicate their concerns more freely, which advances organizational efficiency by reducing employee turnover and

---

[11] *See also* Paul Clark, *The Role of the Steward in Shaping Union Member Attitudes toward the Grievance Procedure*, 13 Lab. Stud. J. 3, 3-6 (Fall 1988); Glenn Miller & Ned Rosen, *Members' Attitudes Toward the Shop Steward*, 10 Indus. & Lab. Rel. Rev. 516, 517 (1957) (noting steward's responsibility to "convey information to the members" and to convey "to the officers the attitudes and point of view of members").

21

promoting workplace productivity. *See* Freeman & Medoff, *supra*, at 103-07, 169; *see also* E. Edward Herman, *Collective Bargaining and Labor Relations* 283-86 (3d ed. 1992). Employers benefit from facing a single advocate, whose experience with the workplace and institutional knowledge of the collective-bargaining agreement help facilitate timely and satisfactory dispute resolution. And by serving as the gatekeeper for worker disputes, a union alleviates the administrative burden of organizing, prioritizing, and raising issues in the workplace that would otherwise fall to the employer.

In addition to its role in the grievance process, an exclusive representative provides important services to workers and employers alike through its day-to-day administration of the collective-bargaining agreement. This may sometimes occur through formal means, such as by participating in joint labor-management committees formed under the auspices of a collective-bargaining agreement. (*E.g.*, J.A. 143-144.) In the experience of many States, such committees are an important and effective tool for improving public services. *See, e.g.*, U.S. Dep't of Labor Task Force on Excellence in State and Local Government through Labor-Management Cooperation, *Working Together for Public Service: Final Report*, i, 2 (1996) ("*Task Force Report*").[12] For instance, in Connecticut, a labor-management committee created a workplace safety

---

[12] *See also* E. Edward Herman, *Collective Bargaining and Labor Relations* 311-12 (2d ed. 1987); Freeman & Medoff, *supra*, at 169; *Minnesota State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 291-92 (1983) (recognizing state's "legitimate interest" in system of exclusive representation because it ensures that decisions by public employers will be based on "majority view" of its employees).

22

program that reduced workers' compensation expenses by five-million dollars through a forty-percent reduction in workplace injuries. *Id.* at 15. In Seattle, municipal government officials and a union of public-employee sewer workers worked collaboratively to identify a number of significant cost savings in the maintenance and repair of the City's underground transit tunnel, allowing the city to achieve concrete cost savings while also improving the quality of its transportation infrastructure. *Id.* at 19-20. And in New York City, local government and the sanitation workers' union negotiated to reduce the number of sanitation workers operating a sanitation truck, permitting the city to lower its labor costs by adopting cost-saving technologies. Lewin, *supra*, at 17. Indeed, particularly when faced with a looming economic crisis, government and unions have worked together to develop solutions that are mutually beneficial and ensure the continued provision of indispensable government services.

Administering the collective-bargaining agreement also involves a full range of informal services that the union provides in the workplace every day. These services include core human-resource functions like: (i) advising employees about their pay, benefits, or other contract rights, through published union bulletins and in in-person meetings; (ii) communicating with management to resolve errors in the processing of employee benefits, such as incorrect payroll deductions, leave accruals, or medical benefits reimbursements; (iii) reviewing management's day-to-day personnel decisions, such as setting shift schedules and granting leave requests, for compliance with the collective-bargaining agreement; and (iv) coordinating workplace inspections and worker health and safety

23

trainings mandated by law or the collective-bargaining agreement. The union's informal support of workers in the workplace plays an important role in improving their day-to-day experience and reducing the possibility that daily resentments will metastasize into full-scale labor unrest.

## 2. Many States have determined that agency fees help them secure the full benefits of exclusive representation.

In sum, an exclusive representative provides a wealth of services beyond contract bargaining, and a public employer could rationally conclude that those services can be an important ingredient in minimizing labor unrest and assuring a stable and effective public workforce. To ensure that an exclusive representative is able to provide its services in the workplace, many States' laws permit public employers—state or local—to include agency-fee arrangements in their collective-bargaining agreements. See Appendix. These laws typically do not *require* any public employee to pay an agency fee, or *require* any public employer to include an agency-fee arrangement in its contracts. Rather, States that have enacted such measures have decided to give government employers the flexibility to make that choice based on their own circumstances.

As those States have recognized, agency fees can be important to developing a collaborative labor-management relationship that promotes labor peace and ensures the delivery of high-quality services. First, agency fees are an effective way to address the free-rider problem long recognized to exist in this context. *See, e.g.*, *Street*, 367 U.S. at 765-66.

24

A union needs significant resources to provide the full range of workplace services that States deem helpful for minimizing labor unrest. *See Abood*, 431 U.S. at 221 (recognizing that unions require "[t]he services of lawyers, expert negotiators, economists, and a research staff" to negotiate and administer a collective-bargaining agreement). But experience shows that many employees—even employees who would otherwise join the union—will choose not to pay for such services if they have the option to receive them without charge.[13] This free-rider problem is particularly acute for governments with a history of labor unrest, as it erodes the union's ability to provide the very services that government deems important to securing labor peace. State experiences show that a well-funded union is a more stable advocate for workers and that dealing with such a partner "lead[s] to greater labor peace and stability." Md. Dep't of Labor, *supra*, at 19.

Second, free-riding may itself create labor unrest, in light of the "resentment spawned by 'free riders.'" *Beck*, 487 U.S. at 750. Without agency fees, union members would be required to pay more in union dues—and take home less pay than their colleagues—to subsidize the cost of providing workplace services to non-members. Such inequities create divisions in the workplace that corrode cohesion and morale. *See Ellis v. Railway Clerks*, 466 U.S. 435, 452 (1984). Agency fees eliminate this problem by ensuring that no

---

[13] *See* Richard Kearney & Patrice Mareschal, *Labor Relations in the Public Sector* 79 (5th ed. 2014); *see also* Jeffrey Keefe, *On* Friedrichs v. California Teachers Association*: The Inextricable Links Between Exclusive Representation, Agency Fees, and the Duty of Fair Representation* 4 (Econ. Pol'y Inst. Briefing Paper No. 411, 2015).

25

employees receive "the benefits of union representation without paying for them." *Oil Workers v. Mobil Oil Corp.*, 426 U.S. 407, 416 (1976).

Furthermore, agency fees address the problems of free-riding with only minimal impact on workers' rights of expression and association. Agency-fee arrangements do not require any worker to join a union or donate to a union's political or ideological activities. Nor do they restrict an employee's speech in any way. An employee remains free to speak against a union's political agenda or negotiating positions, and to oppose the government officials responsible for negotiating the union's contract. Agency fees merely require an employee to pay for services rendered. Thus, in practice, Amici States' experience is that the "grievous First Amendment injury," Pet. Br. 12, of which petitioner warns is not a valid practical concern.

Petitioner argues that an exclusive representative does not need mandatory agency fees to function because it can generate sufficient operating funds through other means. *See* Pet. Br. 37-43. The evidence is to the contrary. See *supra* n.13. In any event, this argument fails to recognize that—based on their different experiences—jurisdictions can reasonably disagree about an exclusive representative's proper role in the workplace and the appropriate method to fund those activities.

For example, federal law permits federal public-sector workers to elect a union to serve as their exclusive representative without any attendant requirement that workers join or financially support the union, but that law also severely restricts the scope of issues that can be collectively bargained, and exempts key topics that would be covered by broader

26

state collective-bargaining regimes, such as wages and number of employees. *See* 5 U.S.C. § 7106(a)(1); *see also Navy Charleston Naval Shipyard v. Federal Labor Relations Auth.*, 885 F.2d 185, 187 (4th Cir. 1989). Having prescribed a restricted role, a jurisdiction could rationally conclude—as does the federal government—that agency fees are not necessary to guarantee the exclusive representative's proper functioning. This is especially true because the federal government funds union activities through alternate means, for instance by compensating federal employees for time spent performing union-related functions. *See* 5 U.S.C. § 7131; *see also* U.S. Office of Pers. Mgmt., *Official Time Usage in the Federal Government, Fiscal Year 2014*, at 3 (2017).

Likewise, many jurisdictions with so-called "right-to-work" laws—that is, laws permitting exclusive representation but prohibiting mandatory agency fees—lack the history of labor unrest and disruption to government services that many States experienced before *Abood*. *See* Kearney, *supra*, at 65. A jurisdiction that has not experienced a history of public-sector labor unrest could rationally decide not to fund an exclusive representative's services through mandatory agency fees. But that policy choice does not refute the benefits of different policy choices that other jurisdictions have made based on their own different experiences. Even jurisdictions that do not authorize agency fees for most public-sector workers recognize that a different policy might be appropriate in certain circumstances. For instance, Michigan and Wisconsin prohibit agency fees for some public unions but exempt local police and firefighter unions from that prohibition as a matter of public safety. *See* Mich. Comp. Laws § 423.210(3)-(4); Wis. Stat. §§ 111.81(9),

27

111.845, 111.85; *see also* Mark Niquette, *Walker's Bill Gives Wisconsin Police a Pass on Pension Payments*, Bloomberg (Feb. 25, 2011) (noting Wisconsin governor's comment, in enacting the exemption for public safety employees, that "there's no way we're going to put the public safety at risk"). Thus even the practices of petitioner's own amici call into question petitioner's proposed one-size-fits-all approach.

*Abood* confirmed that States should have the leeway to adopt the labor-relations systems best suited to their individual circumstances and policy judgments. And States have relied on that flexibility. States have enacted more than one hundred statutes governing state and local labor relations, augmented by local ordinances, court decisions, attorney general opinions, and executive orders. *See* Kearney & Mareschal, *supra*, at 64-66.

Petitioner attempts to deprive States, and ultimately voters, of the ability to judge for themselves what labor-management policies are best suited for their public workforces. States like Illinois authorize agency-fee arrangements because a majority of duly elected representatives determined that affording government employers that flexibility was sound policy. Indeed, legislatures in Michigan and Wisconsin—two of petitioner's amici—also decided that, in some situations, public employers must have the ability to include agency-fee arrangements in their collective-bargaining agreements. This Court should view skeptically the efforts of these States and of petitioner himself to subvert the democratic decisions of voters by seeking to constitutionalize a contrary policy of their own preference.

28

### C. Petitioners' *Amici* Misrepresent the Role of Public-Sector Collective Bargaining in Municipal Bankruptcies.

The States supporting petitioner attempt to justify a constitutional ban on agency fees by claiming that public-sector collective bargaining creates heightened risks of municipal bankruptcy. Br. of Amici Curiae States of Michigan, et al. in Support of Pet. ("Pet. States Amici") 11-19. There is, however, no clear correlation between collective bargaining and a municipality's fiscal health.

First, the vast majority of municipalities across the country have permitted collective bargaining for public-sector employees since the mid-1970s, *see* Kearney & Mareschal, *supra*, at 64-66, but only a very small percentage of municipalities—two-hundred-and-sixty-four in total—have filed for bankruptcy after that time, *see* Chapman & Cutler, LLP, *Primer on Municipal Debt Adjustment—Chapter 9: The Last Resort for Financially Distressed Municipalities*, app. C-1 (2012) (municipal bankruptcies between 1980 and 2012). And a number of those bankruptcies occurred in States that do not permit collective bargaining by state and local government employees or severely restrict it. Texas, for example, ranks third among all States in municipal bankruptcies but does not permit public-sector collective bargaining except by police or firefighters. *See id.* at app. C-2; *see also* Kearney & Mareschal, *supra*, at 66. There is thus nothing to support amici's speculation that it is *collectively bargained* public-sector employee benefits that drive municipal bankruptcies.

Second, municipal bankruptcies occur as a result of a complex mix of factors, often unique to each

29

locality's particular history and circumstances, and cannot be explained simply as the product of high public-sector labor costs. Indeed, it is traditionally a decrease in revenues that causes a municipality to seek bankruptcy protection. The bankruptcy of Detroit, for instance, is typically attributed to a myriad of factors that depressed municipal tax receipts, such as declining population, poor economic performance, and reductions in state financial support. *See, e.g.*, Wallace Turbeville, *The Detroit Bankruptcy* 13-21, 33-34 (Dēmos Rep. 2013). And a similar story is true in Stockton and San Bernadino, California, whose financial distress and ultimate bankruptcies were driven largely by a unique vulnerability to the "double whammy of unbridled speculation, followed by steep losses of property value" as a result of the 2008 recession. Tracy Gordon et al., *Exuberance & Municipal Bankruptcy: A Case Study of San Bernardino, Stockton & Vallejo, CA* 15-16 (Goldman Sch. Pub. Pol'y Working Paper Series May 2017 draft).[14] Amici's simplistic narrative gloss that high public-sector labor costs cause municipal bankruptcies thus fails to grapple with—and indeed purposely obscures—the diverse causative factors that produced these complicated fiscal incidents.

Amici's reliance on the purported "public impact" of the cost of public-employee pension plans is also misplaced. *See, e.g.*, Pet. States Amici 13. All States—regardless of whether they authorize collective

---

[14] *See also* Sydney Evans et al., *How Stockton Went Bust: A California City's Decade of Policies and the Financial Crisis That Followed* 2 (Cal. Common Sense. Rep. June 2012); The Pew Charitable Trusts, *The State Role in Local Government Financial Distress* 9-11 (July 2013).

30

bargaining in the public sector—establish the terms and conditions of their public-employee benefit plans by statute. It is the legislature, and not unions, that sets the scope of public-employee pension benefits.

## II. Petitioner's Constitutional Challenge Should Be Rejected.

Petitioner's attempt to avoid paying his fair share for the services of his exclusive representative is grounded in two mischaracterizations of the nature and effect of agency fees. First, petitioner obscures the fact that agency-fee requirements are conditions of public employment that advance the government's interest in managing its workforce. Second, petitioner confuses his objection to funding his exclusive representative's collective-bargaining activities with a broader challenge to all of the services that an exclusive representative provides.

### A. The First Amendment Affords Public Employers Flexibility to Manage Their Workforces.

Petitioner's First Amendment challenge rests centrally on the premise that government may not require a person to support speech absent a compelling interest that is furthered by the narrowest means possible. *See* Pet. Br. 36. But this characterization obscures the fact that agency-fee arrangements are negotiated by the government *acting as an employer to manage its public workforce*. Contrary to petitioner's contention, such a condition of employment is not subject to "strict" or "exacting" scrutiny under the First Amendment.

This Court has long recognized that the First Amendment permits States to adopt reasonable

31

workforce-management policies to promote effective government operations, even if those policies impact a public employee's First Amendment rights. *See, e.g., Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 598-600 (2008); *Garcetti*, 547 U.S. at 417-20; *Waters v. Churchill*, 511 U.S. 661, 671-75 (1994) (plurality op.). As this Court has explained, the Constitution allows the government flexibility to fulfill its "'mission as employer,'" *Engquist*, 553 U.S. at 598 (quoting *Waters*, 511 U.S. at 674-75), and does not require that a government's employment-related measures be "narrowly tailored to a compelling government interest," *Waters*, 511 U.S. at 674-75; *see also National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 153-55 (2011).

"[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate" and the government acting "to manage its internal operation[s]." *Engquist*, 553 U.S. at 598 (alteration and quotation marks omitted); *see also Connick v. Myers*, 461 U.S. 138, 143 (1983) (recognizing "the common sense realization that government offices could not function if every employment decision became a constitutional matter"). First, "[t]he government's interest in achieving its goals as effectively and efficiently as possible" commands greater weight, being "elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters*, 511 U.S. at 675 (plurality op.). Second, the government's "reasonable predictions of disruption" are entitled to "substantial weight . . . even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign [the Court's] review of legislative

32

predictions of harm is considerably less deferential."
*Id.* at 673.

This Court has on many occasions confirmed that
the First Amendment is not a mandate for lesser
public efficiency. The Court has explained that when an
individual "enters government service," he or she
"must accept certain limitations on his or her freedom,"
including limitations that would be imposed in a
private employment setting. *Garcetti*, 547 U.S. at 418.
These limitations may and often do restrict speech or
associational activities that the government could not
limit outside of the employment relationship. *See, e.g.*,
*Connick*, 461 U.S. at 141 (rejecting employee claim
that termination for views expressed in questionnaire
distributed to coworkers violated First Amendment);
*Public Workers v. Mitchell*, 330 U.S. 75, 99, 101 (1947)
(upholding provision of federal statute prohibiting
federal employees from active participation in political
management or political campaigns).

*Abood*'s holding—that public employers may
adopt a model of collective bargaining that utilizes
agency fees in support of exclusive representation—is
fully consistent with these principles and with the
decisions in which the Court has applied them. *Abood*
recognizes that the task of crafting a workable labor-
relations system is complex and difficult, and requires
balancing numerous potentially conflicting interests
in areas where there is widespread debate and no clear
answer. *Abood* accordingly does not mandate that any
State enact any particular labor-relations law. It
leaves States free to devise systems based on their own
history and particular policy choices, and it gives voters
in each State the ultimate say over changes or amend-
ments to labor policy. *See* 431 U.S. at 224-25 & n.20.

33

The federal government's recent change of heart is strong proof that this Court should not constitutionalize one approach to public workforce management. For decades, the federal government defended *Abood* and the principle that the First Amendment affords States flexibility to adopt reasonable workplace management policies, even if federal policy was to the contrary. Now, the federal government has apparently changed its mind. But the strength of *Abood*—and of our federal system—is that it creates space for this kind of disagreement. *See, e.g.*, *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). States whose experiences show the value of exclusive bargaining funded by mandatory agency fees should not be constitutionally bound to the federal policy currently in vogue.

## B. Petitioner's Challenge Is Overbroad Because It Encompasses Agency Fees for Union Services to Which He Does Not Object.

Petitioner's First Amendment challenge conflates an exclusive representative's collective-bargaining activities—which petitioner challenges as unduly political—with the range of other workplace-related functions that an exclusive representative performs. Petitioner's request for a judgment categorically prohibiting the collection of agency fees for any purpose is therefore overbroad.

This Court recognized in *Abood* that requiring public employees to pay agency fees to cover the costs of an exclusive representative's services could impact employees' First Amendment rights. *See* 431 U.S. at 222. And the Court made clear that government's

34

interest as an employer justified this First Amend-
ment injury only so long as those fees were not used
for "ideological causes not germane to [the exclusive
representative's] duties as collective-bargaining repre-
sentative." *Id.* at 235; *see also Lehnert v. Ferris Faculty
Ass'n*, 500 U.S. 507, 519 (1991). Petitioner seeks in
effect to revisit that balancing. Thus, he alleges that
he objects to the "positions that AFSCME advocates
for in collective bargaining" (J.A. 87) and argues that
"bargaining with the government is political speech,"
Pet. Br. 10-11. Petitioner's amici adopt this line of
attack, arguing that an exclusive representative's
collective-bargaining activity "necessarily implicates
matters of public policy." Br. for the United States as
Amicus Curiae Supporting Pet. 15.

But even if this characterization of public-sector
collective bargaining were accurate—and it is not, *see,
e.g.*, AFSCME Resp. Br. 42-45—petitioner's objection
to funding his exclusive representative's collective-
bargaining activities would not justify his request for
a ruling that, as a matter of law, "public employees
cannot be forced to pay any union fees whatsoever,"
Pet. Br. 61. As discussed above (*supra* Point I.B) an
exclusive representative does more than collectively
bargain on behalf of workers; the union can provide a
range of services in the workplace that help to
minimize labor unrest and promote stability in the
workforce. Thus, even if petitioner can prove on remand
the allegation that his exclusive representative's
collective-bargaining activities are unduly political,
that would say nothing about the permissibility of
collecting agency fees to cover other expenses of his
exclusive representative, which petitioner does not
label "political speech." *See Abood*, 431 U.S. at 236

35

(political nature of non-chargeable expenses is a fact
issue); *see also Lehnert*, 500 U.S. at 513.

Petitioner contends that adjusting grievances "is
just as political an act as bargaining for that deal."
Pet. Br. 14. But petitioner's complaint does not frame
an objection to—or even mention—his exclusive
representative's grievance-resolution activities. (*E.g.*,
J.A. 87.) And petitioner's brief does not make a serious
effort to substantiate his conclusion that the range of
activities encompassed by "grievance-adjustment"
constitute speech on matters of public concern. *See
Abood*, 431 U.S. at 232. Nor is that conclusion self-
evident. There is simply no conceivable speech object-
ion, for instance, to a union's receipt and investigation
of a workplace-related complaint—steps taken long
before the union even adopts a substantive position on
the merits of a grievance. And this is true both for the
vast majority of grievances, which implicate only the
rights of the grievant, as well as for grievances with a
potentially broader impact. What is more, grievance
adjustment is only aspect of the non-collective-
bargaining services that an exclusive representative
provides. Petitioner does not articulate, either in his
complaint or his brief in this Court, any First
Amendment objection to paying for an exclusive
representative's informal daily services—for instance,
advising workers about dental benefits or inquiring
with management about incorrect leave accruals for
another coworker.

A public employer could conclude that these
services, and the agency fees that support them, are
necessary to meet the needs of its workforce and to
ensure uninterrupted provision of public services.
This Court should respect those judgments and
preserve governments' flexibility to adopt labor-

36

management policies tailored to the unique circum-
stances confronting their workforces, as this Court did
before in *Abood*.

## CONCLUSION

This Court should decline to overrule *Abood*.

Respectfully submitted,

ERIC T. SCHNEIDERMAN
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD\*
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
PHILIP V. TISNE
  *Assistant Solicitor General*
barbara.underwood@ag.ny.gov

January 2018                    \* *Counsel of Record*

(*Counsel list continues on next page.*)

37

JAHNA LINDEMUTH
  *Attorney General*
  *State of Alaska*
1031 W. Fourth Ave.
Suite 200
Anchorage, AK 99501

GEORGE JEPSEN
  *Attorney General*
  *State of Connecticut*
55 Elm Street
Hartford, CT  06106

MATTHEW P. DENN
  *Attorney General*
  *State of Delaware*
Department of Justice
820 N. French St.
Wilmington, DE 19801

DOUGLAS S. CHIN
  *Attorney General*
  *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

THOMAS J. MILLER
  *Attorney General*
  *State of Iowa*
1305 E. Walnut Street
Des Moines, IA 30319

ANDY BESHEAR
  *Attorney General*
  *State of Kentucky*
700 Capitol Ave., Suite 118
Frankfort, KY 40601

JANET T. MILLS
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME  04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

LORI SWANSON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
  King Jr. Blvd.
St. Paul, MN 55155

38

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
R.J. Hughes Justice Complex
25 Market St.
Trenton, NJ 08625

HECTOR H. BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo St.
Santa Fe, NM 87501

JOSH STEIN
  *Attorney General*
  *State of North Carolina*
Department of Justice
114 W. Edenton St.
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of*
  *Pennsylvania*
Strawberry Square, 16th Fl.
Harrisburg, PA 17120

PETER F. KILMARTIN
  *Attorney General*
  *State of Rhode Island*
150 S. Main St.
Providence, RI 02903

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

MARK R. HERRING
  *Attorney General*
  *Commonwealth of*
  *Virginia*
202 North Ninth St.
Richmond, VA 23219

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
PO Box 40100
Olympia, WA 98504-0100

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
Suite 650 North
441 4th St., NW
Washington, DC 20001

**Appendix**

**Survey of State Statutory Authority for Public-Sector Collective Bargaining by Exclusive Representative***

| | |
|---|---|
| **Alabama** | No statutory authority |
| **Alaska**<br>*Alaska Stat.* | *Public Employees* – §§ 23.40.100, **23.40.110** |
| **Arizona** | No statutory authority |
| **Arkansas**<br>*Ark. Code Ann.* | *Teachers* – § 6-17-202 |
| **California**<br>*Cal. Gov't Code* | *Local Government Employees* – **§ 3502.5**<br>*State Employees* – §§ 3515.5, **3515.7**<br>*Public School Employees* – §§ 3543-3543.2, **3546**<br>*Higher Education Employees* – §§ **3583.5, 3584** |
| **Colorado**<br>*Colo. Rev. Stat.* | *Public Mass Transportation System Employees* –<br>§§ 8-3-104(12), 8-3-107 |

*Citations in bold indicate authorization for agency or fair-share fees. Some States combine authority for collective-bargaining and for fees in a single statutory provision.

App. 1

**Connecticut**
*Conn. Gen. Stat.*

*Municipal Employees* – §§ 7-468 to 7-469
*State Employees* – §§ 5-271, **5-280**
*Teachers* – § **10-153a**
*Family Child Care Providers* – § **17b-705a**
*Personal-Care Attendants* – § **17b-706b**

**Delaware**
*Del. Code Ann.*
*[tit.], [§]*

*Public Employees* – 19, §§ 1303-1304, **1319**
*Police Officers & Firefighters* – 19, §§ 1603-1604
*Public School Employees* – 14, §§ 4003-4004, **4019**

**District of Columbia**
*D.C. Code*

*Public Employees* – §§ **1-617.07**, 1-617.10, 1-617.11

**Florida**
*Fla. Stat.*

*Public Employees* – § 447.307

**Georgia**
*Ga. Code Ann.*

*Firefighters* – § 25-5-5
*Collective-Bargaining Restriction on Teachers* – § 20-2-989.10

**Hawai'i**
*Haw. Rev. Stat.*

*Public Employees* – §§ **89-3**, **89-4**, 89-8

App. 2

| | |
|---|---|
| **Idaho**<br>*Idaho Code* | *Teachers* – § 33-1273<br>*Firefighters* – § 44-1803 |
| **Illinois**<br>*[ch.] Ill. Comp.<br>Stat. [§]* | *Public Employees* – 5, § **315/6**<br>*Educational Employees* – 115, §§ 5/3, 5/10, **5/11**<br>*Home Care & Home Health Workers* – 20, § **2405/3** |
| **Indiana**<br>*Ind. Code* | *Employees of Correctional Institutions* – § 11-10-5-5<br>*Employees of State Institutions* – § 12-24-3-5<br>*Employees of Soldiers' & Sailors' Children's Home* – § 16-33-4-23<br>*Employees of the Schools for the Blind and for the Deaf* –<br>§§ 20-21-4-4, 20-22-4-4<br>*Employees of a School Corp. or Charter School* – § 20-26-5-32.2<br>*Teachers* – §§ 20-29-2-9, 20-29-5-2<br>*Some Local Public Safety Employees* – § 36-8-22-7 |
| **Iowa**<br>*Iowa Code* | *Public Employees* – § 20.16 |
| **Kansas**<br>*Kan. Stat. Ann.* | *Teachers* – § 72-5415 |

App. 3

| **Kentucky**<br>*Ky. Rev. Stat. Ann.* | *City & Local Government Firefighters* – §§ 345.030, 345.040<br>*Local Government Police Officers* – §§ 67C.402, 67C.404<br>*Urban-County Police Officers, Firefighter Personnel, Firefighters &*<br>*Corrections Personnel* – §§ 67A.6902, 67A.6903<br>**Housing Auth. of Louisville v. Service Emps. Int'l Union,**<br>***Local 557***, 885 S.W.2d 692, 696-97 (Ky. 1994) (upholding fair-<br>share fees) |
|---|---|
| **Louisiana** | No statutory authority |
| **Maine**<br>*Me. Stat. [tit.] [§]* | *Municipal Employees* – 26, §§ **629**, **963**, 965, 967<br>*State Employees* – 26, §§ **979-B**, 979-D, 979-F<br>*University of Maine Employees* – 26, §§ 1023, 1025, 1026<br>*Judicial Employees* – 26, §§ **1283**, 1285, 1287 |
| **Maryland**<br>*Md. Code Ann.,*<br>*[subject]* | *State Employees* – State Pers. & Pens., §§ 3-301, 3-407, **3-502**<br>*Teachers* – Educ. §§ 6-404, **6-407**<br>*School Employees* – Educ. §§ **6-504**, 6-505, 6-509<br>*Family Child Care Providers* – Fam. Law § **5-595.3**<br>*Independent Child Care Providers* – Health-Gen. § **15-904** |

| State | Statutory Authority |
|---|---|
| **Massachusetts**<br>*Mass. Gen. Laws*<br>*[ch.], [§]* | *Public Employees* – 150E, §§ **2**, 4, 5, **12**<br>*Child Care Providers* – 15D, § 17<br>*Personal Care Attendants* – 118E, § 73 |
| **Michigan**<br>*Mich. Comp.*<br>*Laws* | *Public Police & Fire Dep't Employees* – §§ 423.234, **423.210**<br>*State Police Troopers & Sergeants* – § 423.274 |
| **Minnesota**<br>*Minn. Stat.* | *Public Employees* – § **179A.06** |
| **Mississippi** | No statutory authority |
| **Missouri**<br>*Mo. Rev. Stat.* | *Public Employees* – §§ 105.510, **105.520;** ***Schaffer v. Board of***<br>***Educ. of City of St. Louis***, 869 S.W.2d 163, 166 (Mo. Ct. App.<br>1993) (finding implicit authority for fair-share provisions in<br>§ 105.520)<br>*Personal Care Attendants* – § 208.862 |
| **Montana**<br>*Mont. Code Ann.* | *Public Employees* – §§ **39-31-204**, 39-31-205, 39-31-305, **39-31-401** |

App. 5

| State | |
|---|---|
| **Nebraska**<br>Neb. Rev. Stat. | *Public Employees* – §§ 48-816, 48-838<br>*State Employees* – § 81-1372 |
| **Nevada**<br>Nev. Rev. Stat. | *Local Government Employees* – § 288.160 |
| **New Hampshire**<br>N.H. Rev. Stat. Ann. | *Public Employees* – §§ **273-A:3**, 273-A:11; *Nashua Teachers Union v. Nashua Sch. Dist.*, 707 A.2d 448, 451-52 (N.H. 1998)<br>(§ 273-A:3(I) permits negotiation of agency fees) |
| **New Jersey**<br>N.J. Stat. Ann. | *Public Employees* – §§ 34:13A-5.3, **34A:13A-5.5, 34:13A-5.6** |
| **New Mexico**<br>N.M. Stat. Ann. | *Public Employees* – §§ **10-7E-9**, 10-7E-15<br>*Family Child Care Providers* – § 50-4-33 |
| **New York**<br>N.Y. [subject] Law | *Public Employees* – Civ. Serv. §§ 204, **208**<br>*Child Care Providers* – Lab. § 695-d |
| **North Carolina**<br>N.C. Gen. Stat. | Public-sector collective-bargaining restriction – § 95-98 |

App. 6

| **North Dakota**<br>*N.D. Cent. Code* | *Meet-and-Confer Authorization for Teachers* – § 15.1-16-13 |
| **Ohio**<br>*Ohio Rev. Code Ann.* | *Public Employees* – §§ 4117.04, 4117.05, **4117.09** |
| **Oklahoma**<br>*Okla. Stat. [tit.], [§]* | *Municipal Firefighters & Police Officers* – 11, § 51-103<br>*Rural Fire Protection District Firefighters* – 19, § 901.30-2<br>*School Employees* – 70, § 509.2 |
| **Oregon**<br>*Or. Rev. Stat.* | *Public Employees* – §§ 243.666, 243.672<br>*Home Care Workers* – §§ 410.612, 410.614<br>*Family Child Care Workers* – § 657A.430 |
| **Pennsylvania**<br>*Pa. Stat. [tit.], [§]* | *Public Employees* – 43, §§ **1102.3**, 1101.606<br>*Police Officers & Firefighters* – 43, § 217.1 |
| **Puerto Rico**<br>*P.R. Laws [tit.], [§]* | *Public Employees* – 3, §§ 1451b, 1451f, **1454a** |

App. 7

| | |
|---|---|
| **Rhode Island**<br>*R.I. Gen. Laws* | *State Employees* – §§ **36-11-2**, 36-11-7<br>*Employees, including Public Employees* – § 28-7-14<br>*Municipal Firefighters* – § 28-9.1-5<br>*Municipal Police Officers* – § 28-9.2-5<br>*Teachers* – § 28-9.3-3; ***Town of North Kingstown v. North***<br>***Kingstown Teachers Ass'n***, 110 R.I. 698, 706 (1972) (fair-share<br>fees permissible)<br>*Municipal Employees* – § 28-9.4-4<br>*State Police* – § 28-9.5-5<br>*Statewide 911 Employees* – § 28-9.6-5<br>*State Correctional Officers* – § 28-9.7-5<br>*Family Child Care Providers* – §§ 40-6.6-2, 40-6.6-4 |
| **South Carolina** | Public sector collective bargaining restriction |
| **South Dakota**<br>*S.D. Codified Laws* | *Public Employees* – § 3-18-3 |
| **Tennessee**<br>*Tenn. Code* | *Meet and Confer Authorization for Local Public-School Teachers* –<br>§ 49-5-608 |

App. 8

| | |
|---|---|
| **Texas**<br>*Tex Gov't Code Ann.* | Public-sector collective-bargaining restriction – § 617.002 |
| **Utah**<br>*Utah Code Ann.* | *Firefighters* – § 34-20A-4 |
| **Vermont**<br>*Vt. Stat. Ann.*<br>*[tit.], [§]* | *State Employees* – 3, §§ **903**, 941<br>*Judiciary Employees* – 3, §§ 1011, **1012**<br>*Teachers & Administrators* – 16, §§ **1982**, 1991<br>*Independent Direct Support Providers* – 21, § **1634**<br>*Municipal Employees* – 21, §§ **1722**, 1723, **1726**, 1734 |
| **Virginia**<br>*Va. Code Ann.* | Public sector collective bargaining restriction – § 40.1-57.2 |

App. 9

| | |
|---|---|
| **Washington**<br>*Wash. Rev. Code* | *State Employees* – §§ **41.80.50**, 41.80.080, **41.80.100**<br>*Local Government Employees* – §§ 41.56.100, **41.56.113**, **41.56.122**<br>*School Employees* – §§ 41.59.090, **41.59.100**<br>*Community College Employees* – §§ **28B.52.025**, 28B.52.030, **28B.52.045**<br>*Marine Employees* – §§ 47.64.011, 47.64.135, **47.64.160**<br>*Port Employees* – §§ 53.18.015, 53.18.050<br>*Long-Term Care Workers* – § 74.39A.270 |
| **West Virginia** | No statutory authority |
| **Wisconsin**<br>*Wis. Stat.* | *Public Safety Officers* – §§ **111.81**, 111.82, **111.85**, 111.825, 111.83 |
| **Wyoming**<br>*Wyo. Stat. Ann.* | *Firefighters* – § 27-10-103 |

App. 10

# EXHIBIT D

Case 2:18-cv-03439-NGG-RLM   Document 50-2   Filed 06/06/19   Page 70 of 76 PageID #: 299



**JUNE 27, 2018** Albany, NY

# Governor Cuomo Responds to Supreme Court's Janus Decision

## Governor Cuomo on Janus: "The Supreme Court just did what Republicans and big business have sought to do for years—attempt to undermine the strength of the labor movement. But not here in New York. Not now, not never."

The Supreme Court's Janus decision delivers a victory to extreme conservatives and billionaires intent on diminishing the power of organized labor. This case was a long-sought goal in their ongoing war to weaken the voice of working men and women across the country.

In deciding Janus, the Supreme Court opined that the First Amendment shields individuals from involuntary payments that may subsequently support political messaging that is counter to one's personal views - but that reasoning is a smoke screen disguising the reality. Non-members are already afforded protections from such instances, and can be reimbursed for any money spent on political activities. At the same time, unions represent every single employee while negotiating collective bargaining agreements, including hourly rates, health insurance and other benefits.

The Supreme Court just did what Republicans and big business have sought to do for years—attempt to undermine the strength of the labor movement. But not here in New York. Not now, not never.

Let me be very clear: the flame of the labor movement burns stronger than ever here in New York. And so long as I am governor of the State of New York, the labor movement will continue to deliver on the promise of the American Dream.

Case 2:18-cv-03439-NGG-RLM   Document 50-2   Filed 06/06/19   Page 71 of 76 PageID #: 300

New York is a union state. The labor movement was born here more than a century ago, when in the wake of the Triangle Shirtwaist Factory fire New York became the first state to enact laws protecting workers. And it has continued to thrive in New York: today we are proud to have the highest rate of union membership in the country - more than double the national rate.

I learned the value of unions from my father. He believed that labor was the number-one force for good in this state, because it gave voice to the voiceless and empowered working New Yorkers to demand safe conditions and take on corporate greed. He saw unions not as adversaries but as partners in his effort to build a fairer and more equal society.

Conservative Republicans today and those behind the Janus case want to demonize labor as an enemy to economic progress and a relic of the past. Nothing could be further from the truth. From 1940 to 1970, when unions were at their peak, inequality fell while the economy grew. As unions declined, the gap between rich and working class has grown wider even as the economy continues to grow. For millions of young people entering the workforce, the American Dream is receding as the rich get richer, and working conditions deteriorate.

In New York, we value labor because we know it represents the best of who we are. It's teachers preparing our children for their futures. It's nurses and health care workers who have dedicated their lives to saving others. It's state employees clearing our roads, keeping our parks open and serving our communities. It's local police, keeping our streets safe. It's builders constructing the 21st-century infrastructure that will carry our economy forward.

We also know that labor is the greatest change agent this nation has ever known. As the voice of working people, labor built the middle class and advanced the great progressive achievements that we take for granted today — victories like the Social Security Act, the Fair Labor Standards Act establishing the 40-hour work week, setting a minimum wage and prohibiting child labor, the Equal Pay Act banning gender wage discrimination, and the Occupational Safety and Health Act.

None of these breakthroughs was served up on a silver platter. They were the result of

Case 2:18-cv-03439-NGG-RLM   Document 50-2   Filed 06/06/19   Page 72 of 76 PageID #: 301

determined negotiations, representing the aspirations of millions of men and women to receive their fair share of the American Dream.

Today, organized labor continues to be the engine for social change. Unions in this state have served as a critical partner and roaring force in the crucial fights of our time. Without labor, we never would have been able to pass the nation's first $15 statewide minimum wage to lift up the most vulnerable among us; we never would have been able to pass the nation's strongest paid family leave policy so that New Yorkers don't have to choose between a paycheck and caring for their loved ones; and we would never have been able to undertake the most ambitious infrastructure program in the nation to rebuild our roads, bridges, and public transit.

Nor should we forget the key role the labor movement has played in other crusades for social justice, like the civil rights movement. In the words of Dr. Martin Luther King Jr., "The labor movement did not diminish the strength of the nation but enlarged it. By raising the living standards of millions, labor miraculously created a market for industry and lifted the whole nation to undreamed of levels of production. Those who attack labor forget these simple truths, but history remembers them."

While the federal government tries to take labor backward, we are moving forward with our historic pro-labor agenda. We have put working men and women first by enforcing the prevailing wage, promoting project labor agreements and combating exploitation of workers in any and every industry. Last year we passed legislation to allow union members to deduct their dues from state taxes. And in anticipation of the Supreme Court's ruling, we passed earlier this year the nation's first legislation to protect union membership in our public-sector workplaces.

We are also working with organized labor on additional legislation to ensure that right-wing groups cannot target workers using their personal information. In today's climate, public-sector workers like law enforcement officers and teachers should not have to worry that their personal information will be used against them. Preventing the harassment and intimidation of workers who are engaged in union activities or looking to unionize is vital to the labor movement. While the Janus decision attempts to undermine worker safety and

privacy, we will step in to prevent this from happening. Union busting will not be tolerated in New York State.

The Janus decision was the result of years of planning at right-wing conferences, funded by billionaires, to strip away protections that cost them money. But American history proves that the future belongs to those who are willing to work for it. We will continue to do everything in our power to protect and strengthen organized labor. Together, we can build a better American Dream than the impoverished one outlined by this decision. In the state of New York, the future of labor is bright.

*This op-ed was published by the New York Daily News and is available here.*

# Contact the Governor's Press Office

**Contact us by phone:**

Albany:  (518) 474 - 8418

New York City:  (212) 681 - 4640

**Contact us by email:**

Press.Office@exec.ny.gov

# EXHIBIT E



# State of New York

## Executive Chamber

No. 183

E X E C U T I V E   O R D E R

## PROTECTING THE PERSONAL PRIVACY OF PUBLIC SECTOR WORKERS

**WHEREAS,** the labor movement was born in New York State more than a century ago, when, in the wake of the Triangle Shirtwaist Factory fire New York became the first state to enact laws protecting workers; and

**WHEREAS,** the labor movement continues to thrive in New York, which today boasts the highest rate of union membership in the country — more than double the national rate;

**WHEREAS,** as the voice of working people, labor built the middle class and advanced the great progressive achievements that we take for granted today — victories such as the Social Security Act, the Fair Labor Standards Act establishing the 40-hour work week, setting a minimum wage and prohibiting child labor, the Equal Pay Act banning gender wage discrimination, and the Occupational Safety and Health Act; and

**WHEREAS,** across New York State and this country, workers' personal information such as their home addresses and cell phone numbers, are being used to attack, harass, and intimidate them; and

**WHEREAS,** although today's decision by the United States Supreme Court in *Janus v AFSCME* attempts to undermine worker safety and privacy, New York State will not subject public sector workers to the abuse of their personal information as part of a campaign to harass and intimate workers for any reason, including engaging in union activities or looking to unionize.

**NOW, THEREFORE, I, ANDREW M. CUOMO,** Governor of the State of New York, by virtue of the authority vested in me by the Constitution and laws of the State of New York, do hereby order as follows:

A.  Definitions

"State entity" shall mean (i) all agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions, for which the Governor appoints the Chair, the Chief Executive, or the majority of Board members, except for the Port Authority of New York and New Jersey.

B. Responsibilities of State Entities

No State entity, including any of its officers or employees, shall disclose: (a) the home address(es), personal telephone number(s), personal cell phone number(s), personal e-mail address(es) of a public employee, as the term "public employee" is defined in Article 14 of the Civil Service Law, except (i) to an employee organization that, in accordance with Article 14 of the Civil Service Law, is the certified or recognized bargaining representative of a unit of public employees; (ii) to a bona fide employee organization that, in accordance with Article 14 of the Civil Service Law, is legitimately seeking to be certified or recognized as bargaining representative of a unit of public employees solely for purposes of aiding such employee organization in obtaining certification or recognition; or (iii) to the extent compelled to do so by lawful service of process, subpoena, court order, or as otherwise required by law.  This order shall not apply to work-related, publicly available information such as title, salary, and dates of employment.



G I V E N   under my hand and the Privy Seal of the State in the City of Albany this twenty-seventh day of June in the year two thousand eighteen.

BY THE GOVERNOR

Secretary to the Governor