# EXHIBIT A

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York  ▼

**RECEIVED**

JUN 2 2 2018

**DISTRICT CLERK'S OFFICE**
**# 3868**

|  |  |  |
|---|---|---|
| Pellegrino et al | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 18-cv-3439 |
| New York State United Teachers et al | ) | |
| *Defendant* | ) | |

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  Northport-East Union Free School District

    *(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

    A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

    This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within   30   days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

    If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

    If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

    Please read the enclosed statement about the duty to avoid unnecessary expenses.

    I certify that this request is being sent to you on the date below.

Date:   06/20/2018

                                             /s/ Paul Niehaus
                            *Signature of the attorney or unrepresented party*

                                            Paul Niehaus
                                            *Printed name*
                                        Kirsch & Niehaus PLLC
                                    150 East 58th Street, 22nd Floor
                                        New York, NY 10155
                                            *Address*

                                  paul.niehaus@kirschniehaus.com
                                            *E-mail address*

                                        212-623-0223
                                            *Telephone number*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York ▾

| | |
|---|---|
| Pellegrino et al | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:18-cv-03439 |
| New York State United Teachers et al. | ) |
| *Defendant* | ) |

## WAIVER OF THE SERVICE OF SUMMONS

To:   Mr. Paul Niehaus, Kirsch & Niehaus PLLC
        *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____06/19/2018_____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

Northport-East Untion Free School District
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

---

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK
### CENTRAL ISLIP DIVISION

| | |
|---|---|
| **Scott Pellegrino**, on behalf of himself and all others similarly situated; and **Christine VanOstrand**, on behalf of herself and all others similarly situated, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| **New York State United Teachers**; **United Teachers of Northport**, as representative of the class of all chapters and affiliates of New York State United Teachers; **Northport-East Northport Union Free School District**, as representative of the class of all school districts in the state of New York; **Andrew Cuomo**, in his official capacity as governor of New York; **Barbara Underwood**, in her official capacity as Attorney General of New York; **John Wirenius**, in his official capacity as chair of the New York Public Employment Relations Board; **Robert Hite**, in his official capacity as member of the New York Public Employment Relations Board, | **Plaintiffs' Class-Action Complaint** |
| Defendants. | |

Scott Pellegrino and Christine VanOstrand are public-school teachers who bring this class action on behalf of themselves and all others similarly situated, seeking redress for the defendants' past and ongoing violations of their constitutionally protected rights. The defendants have violated the class members' constitutional rights

by forcing non-union members to pay compulsory "agency fees" to the New York State United Teachers (NYSUT) or its affiliates as a condition of their employment.

Mr. Pellegrino and Ms. VanOstrand sue on behalf two separate classes. The first class consists of "agency-fee payers." These are employees who refuse to join the NYSUT or its affiliates but are compelled to pay "fair-share fees" to the union as a condition of their employment. *See* N.Y. Civ. Serv. L. § 208(3)(b) (attached as Exhibit 1). Ms. VanOstrand is an "agency-fee payer" who refuses to join the NYSUT or its affiliates but is nonetheless compelled to remit money to the union. Ms. VanOstrand sues as class representative for all current and former agency-fee payers to the NYSUT or its affiliates.

The second class consists of union members who would have quit the NYSUT had they not been compelled to work in an unconstitutional agency shop. Mr. Pellegrino, for example, has chosen to remain a member of the union, even though he opposes the NYSUT's collective-bargaining activities and its political and ideological advocacy, because resigning his membership would save very little money and would not be worth the cost of losing his vote and whatever little influence he might have in collective-bargaining matters. Mr. Pellegrino seeks classwide relief on behalf of all NYSUT members who retained their membership only because they would have been forced to pay "agency fees" had they quit, and he seeks compensatory damages for each class member in an amount equal to the "agency fees" that they were forced to pay regardless of whether they retained or resigned their union membership.

## JURISDICTION AND VENUE

1.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2.  Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

3.    Because the claims related to Mr. Pellegrino arose in Suffolk County and Mr. Pellegrino resides in Suffolk County, assignment to the Central Islip Division is proper.

## PARTIES

4.    Plaintiff Scott Pellegrino resides in Suffolk County, New York.

5.    Plaintiff Christine VanOstrand resides in Tioga County, New York.

6.    Defendant New York State United Teachers (NYSUT) is a labor union whose headquarters are located at 800 Troy-Schenectady Road, Latham, New York 12110.

7.    Defendant United Teachers of Northport is a local union chapter affiliated with the NYSUT. It is sued as representative of the class of all chapters and affiliates of the NYSUT.

8.    Defendant Northport-East Northport Union Free School District is a school district in Suffolk County, New York. Its offices are located at 158 Laurel Avenue, Northport, New York 11768. It is sued as representative of the class of all school districts in the state of New York.

9.    Defendant Andrew Cuomo is the governor of New York. His office is in Albany, New York. Governor Cuomo is the representative of the State and he is sued in his official capacity.

10.   Defendant Barbara Underwood is the Attorney General of New York. Her offices are in Albany, New York, and New York, New York. She is charged with enforcing the state's laws, including Article 14 of the New York State Civil Service Law (also known as the Taylor Law), and she is sued in her official capacity.

11.   Defendant John Wirenius is chair of the New York Public Employment Relations Board, and defendant Robert Hite is a member of the New York Public Em-

ployment Relations Board. They are charged with enforcing the State's public-employee collective-bargaining laws, including the Taylor Law, and they are sued in their official capacities.

## STATEMENT OF THE CLAIM

12.   Mr. Pellegrino is a public-school teacher in the Northport-East Northport Union Free School District, and he is a member of the NYSUT.

13.   Mr. Pellegrino opposes the NYSUT's political advocacy and collective-bargaining activities. Nevertheless, he has chosen to remain in the union because he would have been forced to continue paying "agency fees" had he resigned, and the difference in money between the full membership dues and the "agency fees" would not have been worth the loss of his vote and whatever little influence he might be able to exert in collective-bargaining matters.

14.   The collective-bargaining agreement negotiated between the Northport-East Northport Union Free School District and the United Teachers of Northport requires the school district to deduct "agency fees" from the paychecks of nonunion members "in an amount equal to the regular and usual monthly dues." *See* Exhibit 2, at page 3.

15.   The collective-bargaining agreement also promises that the union will "indemnify and save the District harmless from any and all costs arising out of litigation in any form concerning the application of the provisions of this Article." *See* Exhibit 2, at page 4.

16.   The compelled subsidy that Mr. Pellegrino and his fellow school employees must pay to the NYSUT as a condition of their employment violates their constitutional rights—regardless of whether they have chosen to remain in the union (as Mr. Pellegrino has) or resign their membership (as the agency-fee payers have).

17.   Ms. VanOstrand is a public-school teacher in the Union-Endicott Central School District. Ms. VanOstrand refuses to join the NYSUT or its affiliates because she disapproves of their political advocacy and collective-bargaining activities.

18.   Even though Ms. VanOstrand is not a member of the NYSUT or its affiliates, she is compelled to pay "agency fees" to the NYSUT as a condition of her employment.

19.   Ms. VanOstrand does not wish to pay these "agency fees" because she disapproves of the NYSUT's activities and does not wish to subsidize them in any way. The compelled subsidy that Ms. VanOstrand and her fellow agency-fee payers must remit to the NYSUT as a condition of their employment violates their constitutional rights.

20.   Although the Taylor Law allows agency-fee payers to demand a refund of money that "represents the employee's pro rata share of expenditures by the [union] in aid of activities or causes of a political or ideological nature," N.Y. Civ. Serv. L. § 208(3)(b), this does not alleviate the defendants' constitutional violations. A public-employee union's collective-bargaining activities are no less political than its lobbying and electioneering activities, as all of these actions are directed at the government and seek to influence government policy. *See Harris v. Quinn*, 134 S. Ct. 2618, 2632–33 (2014). In addition, money is fungible, so when the representative plaintiffs and their fellow class members are forced to subsidize the NYSUT's collective-bargaining activities, they are freeing up resources for the NYSUT to spend on political and ideological activities. Finally, Mr. Pellegrino and Ms. VanOstrand do not wish to subsidize *any* of the NYSUT's activities, and their compelled support of the NYSUT's collective-bargaining activities is no less an affront than their compelled support of the NYSUT's political and ideological advocacy.

21.   The law of New York authorizes the NYSUT to extract money from non-union members as a condition of their employment. *See, e.g.,* N.Y. Civ. Serv. L.

§ 208(3)(b) (attached to the complaint as Exhibit 1). These state laws are unconstitutional to the extent that they allow public-employee unions to extract "agency fees" from nonmembers—or any type of money from any public employee—as a condition of employment and without first securing the employee's affirmative, written, and freely given consent.

22. The NYSUT is acting under color of state law by imposing and collecting these "agency fees" from Ms. VanOstrand and her fellow class members, and by threatening to impose "agency fees" on Mr. Pellegrino if he decides to quit the union. *See* N.Y. Civ. Serv. L. § 208(3)(b).

23. The NYSUT has committed the tort of conversion by appropriating money from agency-fee payers without first securing their affirmative, written, and freely given consent. The NYSUT cannot defend its tortious conduct by relying on N.Y. Civ. Serv. L. § 208(3)(b), because the statute is unconstitutional to the extent it purports to shield a public-employee union's compelled extraction of money from agency-fee payers. Unconstitutional statutes cannot confer immunity on tortious conduct.

24. At least two of the recent amendments to the Taylor Law violate the Constitution by attempting to dissuade and thwart Mr. Pellegrino and Ms. VanOstrand from exercising their constitutional right to withhold financial support from the NYSUT.

25. N.Y. Civ. Serv. L. § 208(4)(a) violates the Constitution by requiring public employers to turn over an employee's home address to the union whenever an employee is hired, reemployed, or promoted or transferred to a new bargaining unit— regardless of whether the employee consents and even if the employee opposes this disclosure of his personal information. This provision unconstitutionally chills the exercise of First Amendment freedoms by giving public-employee unions the home addresses of employees who may not wish to join or financially support the union, and

it imposes no restrictions on what the unions may do with this personal information that they obtain. Labor unions have a long history of bullying and intimidating anti-union employees, and the courts do not and cannot tolerate compelled-disclosure laws that chill the exercise of First Amendment freedoms. *See NAACP v. Alabama*, 357 U.S. 449 (1958).

26.   N.Y. Civ. Serv. L. § 208(1)(b)(1) violates the Constitution by limiting a public employee's ability to revoke his consent to the deduction of union dues from his paycheck. The statute requires an employee who wishes to revoke his union membership to do so "in writing in accordance with the terms of the signed authorization" that triggered the automatic deduction of his union dues. But this empowers unions to create "terms" in their authorization forms that limit an employee's ability to revoke his financial support of the union at a later date. Under 208(1)(b)(1), for example, a union might induce its members to sign an "authorization" form that allows them to resign their membership and revoke their dues payments only during a 10-day "open-enrollment" period that occurs once per year. But a public employee has a constitutional right to revoke his membership and financial support of a public-employee union at any time, and it cannot be limited by the terms that appear in an authorization form.

### CLASS ALLEGATIONS—AGENCY-FEE PAYERS

27.   Ms. VanOstrand brings this class action under Fed. R. Civ. P. 23(b)(1)(A), (b)(1)(B), and (b)(3). The class includes all individuals who: (1) are or were employed by the State of New York or any of its subunits, including any school district in the State; (2) are or were nonmembers of the NYSUT who were compelled by the NYUST or its affiliates to pay "agency fees" or "fair-share fees"—regardless of whether those fees were remitted to the union, its affiliates, or a third-party organi-

zation. The class includes everyone who has ever fallen within this definition, including former or retired teachers or teachers who have moved to other States, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

28. The number of persons in the class makes joinder of the individual class members impractical.

29. There are questions of fact and law common to all class members. Factually, all class members are public employees and union nonmembers who have been forced to pay "fair-share fees" to the NYSUT as a condition of their employment. Legally, the U.S. Constitution and New York tort law afford the same rights to every member of the class.

30. Ms. VanOstrand's claims are typical of other class members, as each class member has objected to NYSUT membership yet was subject to "agency fees" despite their refusal to join the union.

31. Ms. VanOstrand adequately represents the interests of their fellow class members, and she has no interests antagonistic to the class.

32. A class action can be maintained under Rule 23(b)(1)(A) because separate actions by class members could risk inconsistent adjudications on the underlying legal issues.

33. A class action can be maintained under Rule 23(b)(1)(B) because an adjudication determining the constitutionality of compulsory "agency fees" will, as a practical matter, be dispositive of the interests of all class members.

34. A class action can be maintained under Rule 23(b)(3) because the common questions of law and fact identified in the complaint predominate over any questions affecting only individual class members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among

other things, all class members are subjected to the same violation of their constitutional rights, but the amount of money involved in each individual's claim would make it burdensome for class members to maintain separate actions.

## CLASS ALLEGATIONS—UNION MEMBERS

35. Mr. Pellegrino seeks to represent a separate class of union members who would have quit the union but chose to remain because they would have been compelled to pay "agency fees" had they resigned. This class includes all individuals who: (1) are or previously were employed by the State of New York or any of its subunits, including any school district in the State; (2) are or were members of the NYSUT who would have quit the union had they not been forced to work in an unconstitutional agency shop. The class includes everyone who has ever fallen within this definition, including former or retired teachers or teachers who have moved to other States, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

36. The number of persons in the class makes joinder of the individual class members impractical.

37. There are questions of fact and law common to all class members. Factually, all class members are reluctant NYSUT nonmembers who remained in the union only because they would have been forced to pay "agency fees" had they resigned. Legally, the U.S. Constitution and New York tort law afford the same rights and remedies to every member of the class.

38. Mr. Pellegrino's claims are typical of other class members, as each class member opposes the NYSUT yet has chosen to remain in the union on account of the unconstitutional agency-shop arrangement.

39. Mr. Pellegrino adequately represents the interests of his fellow class members, and he has no interests antagonistic to the class.

40. A class action can be maintained under Rule 23(b)(1)(A) because separate actions by class members could risk inconsistent adjudications on the underlying legal issues.

41. A class action can be maintained under Rule 23(b)(1)(B) because an adjudication determining the constitutionality of compulsory "agency fees" and the appropriate remedy for reluctant union members such as Mr. Pellegrino will, as a practical matter, be dispositive of the interests of all class members.

42. A class action can be maintained under Rule 23(b)(3) because the common questions of law and fact identified in the complaint predominate over any questions affecting only individual class members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other things, all class members are subjected to the same violation of their constitutional rights, but the amount of money involved in each individual's claim would make it burdensome for class members to maintain separate actions.

## CAUSES OF ACTION

43.   Mr. Pellegrino and Ms. VanOstrand are suing the NYSUT and its local affiliates, the school districts, Governor Cuomo, Attorney General Underwood, and the members of the Public Employment Relations Board under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, each of which supplies a cause of action for the individual and class-wide relief that they are requesting.

44.   Mr. Pellegrino and Ms. VanOstrand are also suing the NYSUT under the state-law tort of conversion, and they invoke the supplemental jurisdiction of this court over that state-law claim. *See* 28 U.S.C. § 1367.

## DEMAND FOR RELIEF

45.   Mr. Pellegrino and Ms. VanOstrand respectfully request that the court:

a.      certify a class of all nonunion members who have been forced to pay "agency fees" to the NYSUT or its affiliates as a condition of their employment;

b.      certify a separate class of the NYSUT members who would have resigned their membership had they not been subject to "agency fees" after quitting;

c.      declare that Mr. Pellegrino, Ms. VanOstrand, and their fellow class members have a constitutional right to decline to join or financially support a public-employee union, and that they cannot be forced to pay money to a public-employee union as a condition of their employment;

d.      declare that state tort law protects the right of Mr. Pellegrino, Ms. VanOstrand, and their fellow class members not to have their wages garnished or redirected by the NYSUT without their affirmative, written, and freely given consent, and that any federal or state law or collective-bargaining agreement that purports to override these protections of state tort law by allowing the NYSUT to help itself to the wages and paychecks of school employees—or that compels school employees to consent the garnishment of their wages by the NYSUT as a condition of their employment—is unconstitutional and without legal effect;

e.      declare N.Y. Civ. Serv. L. § 208(3)(a)–(b) unconstitutional because it allows public-employee unions to extract "agency fees" from nonmembers as a condition of their employment, and permanently enjoin Governor Cuomo, Attorney General Underwood, the members of the Public Employment Relations Board, the school districts, and all of their officers, agents, servants, employees, attorneys, and any other

person or entity in active concert or participation with them, from enforcing N.Y. Civ. Serv. L. § 208(3)(a)–(b), or any other provision of state law that authorizes or enforces public-employee union shops;

f.   declare that all collective-bargaining agreements that compel the representative plaintiffs and their fellow class members to pay "agency fees" to the NYSUT or its affiliates as a condition of their employment violate the constitutional rights of Mr. Pellegrino, Ms. VanOstrand, and their fellow class members;

g.   order the NYSUT and its affiliates to repay all "agency fees" that they unconstitutionally extracted from Ms. VanOstrand and her fellow agency-fee class members;

h.   order the NYSUT and its affiliates to pay compensatory damages to every union member in the class represented by Mr. Pellegrino in an amount equal to the "agency fees" that they were forced to pay regardless of whether they retained or resigned their union membership;

i.   permanently enjoin the NYSUT and its affiliates, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with it, from taking or redirecting any type of money from Mr. Pellegrino, Ms. VanOstrand, their fellow class members, or any other public employee as a condition of their employment and without first obtaining the employee's affirmative, written, and freely given consent;

j.   permanently enjoin the Northport-East Northport Union Free School District, along with every school district in the State, from deducting "agency fees" from the paychecks of non-union members;

k.    permanently enjoin the Northport-East Northport Union Free School District, along with every school district in the State, from entering into any collective-bargaining agreement that allows a public-employee union to collect or redirect any type of money from a non-union member;

l.    permanently enjoin the Northport-East Northport Union Free School District, along with every school district in the State, from entering into any collective-bargaining agreement that allows a public-employee union to collect or redirect any type of money from any school employee without first securing the employee's affirmative, written, and freely given consent;

m.    permanently enjoin all of the defendants, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from enforcing any provision of federal or New York law, or any provision of a collective-bargaining agreement, that requires any payment of money as a consequence for exercising one's constitutional right not to join or financially support a public-employee union;

n.    declare that N.Y. Civ. Serv. L. § 208(4)(a) violates the Constitution by requiring public employers to turn over their employees' home addresses to a union without the employee's consent, and permanently enjoin Governor Cuomo, Attorney General Underwood, the members of the Public Employment Relations Board, and all of their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from enforcing N.Y. Civ. Serv. L. § 208(4)(a);

o. permanently enjoin the Northport-East Northport Union Free School District, along with every school district in the State, from disclosing the home addresses or other personal information of its employees to the NYSUT or any other public-employee union without first securing the employee's affirmative, written, and freely given consent, and permanently enjoin the Northport-East Northport Union Free School District, along with every school district in the State, from requiring an employee to consent to the disclosure of their home address to the NYSUT or any other public-employee union as a condition of their employment;

p. permanently enjoin the NYSUT and its affiliates and chapters, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from seeking or obtaining the home address or other personal information of any employee who has chosen not to join or financially support the union, or any employee who has declined to give his employer permission to disclose his personal information to the NYSUT;

q. declare that N.Y. Civ. Serv. L. § 208(1)(b)(1) violates the Constitution by limiting a public employee's ability to revoke his consent to the deduction of union dues from his paycheck, and permanently enjoin all of the defendants, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from enforcing anything in section 208(1)(b)(1) or in a signed authorization form that purports to limit a public employee's ability to revoke his union membership or financial support of the union at any time during the calendar year;

r.       order the NYSUT, its affiliates and chapters, the Northport-East Northport Union Free School District, and every school district in the State to immediately honor and enforce a public employee's decision to withdraw his membership or financial support of a public-employee union, regardless of the time of year that the decision is made;

s.       award costs and attorneys' fees under 42 U.S.C. § 1988;

t.       grant all other relief that the Court may deem just, proper, or equitable.

                              Respectfully submitted.

                              /s/ Paul Niehaus
JONATHAN F. MITCHELL*          PAUL NIEHAUS
Mitchell Law PLLC              Kirsch & Niehaus
106 East Sixth Street          150 East 58th Street
Suite 900                      22nd Floor
Austin, Texas 78701            New York, New York 10155
(512) 686-3940                 (212) 631-0223
jonathan@mitchell.law          paul.niehaus@kirschniehaus.com

* *pro hac vice* application
  forthcoming
                              *Counsel for Plaintiffs and*
Dated: June 12, 2018          *the Proposed Class*

# EXHIBIT B

New York Civil Service Law § 208
Rights accompanying certification or recognition

1. A public employer shall extend to an employee organization certified or recognized pursuant to this article the following rights:

(a) to represent the employees in negotiations notwithstanding the existence of an agreement with an employee organization that is no longer certified or recognized, and in settlement of grievances; and

(b) to membership dues deduction, upon presentation of dues deduction authorization cards signed by individual employees.

2. An employee organization certified or recognized pursuant to this article shall be entitled to unchallenged representation status until seven months prior to the expiration of a written agreement between the public employer and said employee organization determining terms and conditions of employment. For the purposes of this subdivision, (a) any such agreement for a term covering other than the fiscal year of the public employer shall be deemed to expire with the fiscal year ending immediately prior to the termination date of such agreement, (b) any such agreement having a term in excess of three years shall be treated as an agreement for a term of three years, provided, however, any such agreement between the state and an employee organization representing employees in the executive or judicial branches which commences in the calendar year two thousand eleven having a term in excess of three years shall be treated as an agreement for a term certain specified in such agreement but in no event for a term greater than four years, and (c) extensions of any such agreement shall not extend the period of unchallenged representation status.

3. (a) Notwithstanding provisions of and restrictions of sections two hundred two and two hundred nine-a of this article, and section two hundred one of the state finance law, every employee organization that has been recognized or certified as the exclusive representative of employees of the state within a negotiating unit of classified civil service employees, employees within a negotiating unit of civilian state employees of the division of military and naval affairs or employees in a collective negotiating unit established pursuant to this article for the professional services in the state university, for the members of the state police or for the members of the capitol buildings police force of the office of general services shall be entitled to have deducted from the wage or salary of the employees in such negotiating unit who are not members of said employee organization the amount equivalent to the dues levied by such employee organization, and the state comptroller shall make such deductions and transmit the sum so deducted to such employee organization. Provided, however, that the foregoing provisions of this subdivision shall only be applicable in the case of an employee organization which has established and maintained a procedure providing for the refund to any employee demanding the return any part of an agency shop fee deduction which represents the employee's pro rata share of expenditures by the

organization in aid of activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment. Nothing herein shall be deemed to require an employee to become a member of such employee organization.

(b) Notwithstanding provisions of and restrictions of sections two hundred two and two hundred nine-a of this article and section ninety-three-b of the general municipal law, every employee organization that has been recognized or certified as the exclusive representative of employees within a negotiating unit of other than state employees shall be entitled to have deducted from the wage or salary of employees of such negotiating unit who are not members of said employee organization the amount equivalent to the dues levied by such employee organization and the fiscal or disbursing officer of the local government or authority involved shall make such deductions and transmit the sum so deducted to such employee organization. Provided, however, that the foregoing provisions of this subdivision shall only be applicable in the case of an employee organization which has established and maintained a procedure providing for the refund to any employee demanding the return of any part of an agency shop fee deduction which represents the employee's pro rata share of expenditures by the organization in aid of activities or causes of a political or ideological nature only incidentally related to terms and conditions of employment. Nothing herein shall be deemed to require an employee to become a member of such employee organization.

# EXHIBIT C

AGREEMENT

between

NORTHPORT-EAST NORTHPORT
UNION FREE SCHOOL DISTRICT

and

THE UNITED TEACHERS
of NORTHPORT

July 1, 2014 - June 30, 2018

## TABLE OF CONTENTS

ARTICLE 1
    RECOGNITION ................................................................. 1

ARTICLE 2
    NEGOTIATION PROCEDURES ....................................... 2

ARTICLE 3
    PAYROLL DEDUCTIONS ................................................. 2

ARTICLE 4
    AGENCY FEE AND DUES DEDUCTION........................... 3

ARTICLE 5
    PAY DATES ...................................................................... 4

ARTICLE 6
    RIGHTS OF TEACHERS ................................................... 4

ARTICLE 7
    ACADEMIC FREEDOM ..................................................... 4

ARTICLE 8
    GRIEVANCE POLICY ....................................................... 5

ARTICLE 9
    JOINT COMMITTEES ....................................................... 9

ARTICLE 10
    MEETINGS........................................................................ 10

ARTICLE 11
    UNION RIGHTS ................................................................ 11

ARTICLE 12
    TEACHER WORK DAY - WORK YEAR ............................. 13

ARTICLE 13
    MANAGEMENT RIGHTS ................................................... 13

ARTICLE 14
    SCHOOL CALENDAR........................................................ 13

ARTICLE 15
    FACULTY ROOMS ................................................................................... 14

ARTICLE 16
    TEACHER PROFESSIONAL GROWTH ................................................ 14

ARTICLE 17
    MANDATORY IN-SERVICE ...................................................................... 19

ARTICLE 18
    TEACHER SELECTION ........................................................................... 20

ARTICLE 19
    PROFESSIONAL EVALUATION PROGRAM ........................................ 20

ARTICLE 20
    SEPARATION OF PERSONNEL ............................................................ 21

ARTICLE 21
    JOB DESCRIPTION ................................................................................ 22

ARTICLE 22
    ADMINISTRATIVE POSITIONS ............................................................. 22

ARTICLE 23
    VOLUNTARY TRANSFERS .................................................................... 23

ARTICLE 24
    INVOLUNTARY TRANSFERS ................................................................ 24

ARTICLE 25
    TRANSFERS AND STATUS ................................................................... 25

ARTICLE 26
    TEACHER FILES .................................................................................... 25

ARTICLE 27
    CLASS COVERAGE ............................................................................... 26

ARTICLE 28
    CLASS INTERRUPTIONS ...................................................................... 26

ARTICLE 29
    NON-TEACHING DUTIES............................................................ 27

ARTICLE 30
    REGULAR SUBSTITUTE TEACHERS AND PART-TIME TEACHERS........... 28

ARTICLE 31
    CONDITIONS OF PROFESSIONAL PRACTICE ............................... 29

ARTICLE 32
    RETIREMENT BENEFIT .......................................................... 35

ARTICLE 33
    SALARY ............................................................................ 36

ARTICLE 34
    APPLICATION OF TEACHERS' SALARY SCHEDULE ...................... 39

ARTICLE 35
    INSURANCE ....................................................................... 40

ARTICLE 36
    EXTRA COMPENSATION FOR EXTRA SERVICES ........................ 43

ARTICLE 37
    COMPENSATION FOR PROFESSIONAL ACTIVITIES .................... 52

ARTICLE 38
    COMPENSATION FOR HOME INSTRUCTION................................ 53

ARTICLE 39
    TAX SHELTERED ANNUITY ................................................... 53

ARTICLE 40
    SUMMER SCHOOL .............................................................. 53

ARTICLE 41
    TEACHER ATTENDANCE REVIEW........................................... 56

ARTICLE 42
    LEAVES OF ABSENCE ......................................................... 57

ARTICLE 43
    STAFF SIGN-OUTS .............................................................. 59

iii

ARTICLE 44
    PROFESSIONAL DEVELOPMENT FUND.......................................... 60

ARTICLE 45
    PROFESSIONAL REGISTERED NURSES ...................................... 62

ARTICLE 46
    OTHER LEAVES OF ABSENCE ...................................................... 63

ARTICLE 47
    PERSONAL INJURY BENEFIT ........................................................ 63

ARTICLE 48
    PROTECTION................................................................................... 63

ARTICLE 49
    MISCELLANEOUS PROVISIONS..................................................... 64

ARTICLE 50
    DURATION OF AGREEMENT ......................................................... 64

ARTICLE 51
    TEACHING ASSISTANTS ............................................................... 65

## WITNESSETH

WHEREAS, the Board of Education and the Union recognize and declare that providing a quality education for the children of the Northport-East Northport Union Free School District is their mutual aim and that the character of such education depends largely upon the quality, dedication, and morale of the teaching staff, and

WHEREAS, the members of the teaching profession are particularly qualified and professionally obliged to assist in formulating policies and programs designed to improve educational standards, and

WHEREAS, the Board has a statutory obligation pursuant to Article 14 of the Civil Service Law (Chapter 352 of the Laws of 1967, Public Employees Fair Employment Act) to negotiate with the Union as the representative of its teaching personnel with respect to hours, wages and terms and conditions of employment, and

WHEREAS, the parties have reached certain understandings which they desire to confirm in this Agreement,

RESOLVED, in consideration of the following mutual covenants, it is hereby agreed as follows:

## PREAMBLE

This Agreement entered into this      of            , 2016, by and between the Northport-East Northport Union Free School District, hereafter called the District and the United Teachers of Northport, hereafter called the Union.

## ARTICLE 1
## RECOGNITION

A.    (1)    The District, having duly recognized the United Teachers of Northport (New York State United Teachers, AFT, AFL-CIO, and NEA) heretofore, hereby agrees that the UTN shall be accorded sole, exclusive, and unchallenged representation status for the teachers of the Northport-East Northport Union Free School District as the term teacher is defined below, for the duration of this Agreement.

(2)    The term teacher means all certified personnel including Professional Registered Nurse below the level of Chairperson.

B.    The Board and administration agree not to negotiate or officially consult with any other teacher organization for the duration of this recognition.

C.    Such representation may be challenged under conditions set forth in the procedures of the Public Employment Relations Board.

1

D.    The United Teachers of Northport and the Board of Education subscribe to the principle that differences shall be resolved by collective negotiations and the utilization of grievance procedures, as provided by this Agreement and Law. Therefore, the United Teachers of Northport agree that there shall be no strikes against the School District during the term of this Agreement, which terminates on June 30, 2018.

ARTICLE 2
NEGOTIATION PROCEDURES

A.    It is understood and agreed to by both parties that this contract represents their full and entire agreement. All and any matters in dispute or controversy of employment raised in negotiations and/or which legally could have been raised in negotiations shall be deemed to be completely settled by this agreement for its duration (except as explicitly provided for in this agreement). This contract shall be amended only upon the voluntary, mutual written agreement of the parties.

B.    It is contemplated that terms and conditions of employment provided in this agreement shall remain in effect until altered by mutual agreement in writing between the parties. Nevertheless, because of the special nature of the public educational process, it is recognized that matters may from time to time arise of vital mutual concern of the parties which have not been fully negotiated. It is in the public interest that the opportunity for mutual discussion of such matters be provided. The parties accordingly agree to cooperate in arranging meetings, selecting representatives for discussion, furnishing necessary information and otherwise constructively considering and subject to A above, resolving any such matters.

C.    Neither party in any negotiations shall have any control over the selection of the negotiating representatives of the other party and each party may select its representative from within or outside the school district. While no final agreement shall be executed without ratification by the Union and the District, the parties mutually pledge that their representatives will be clothed with all necessary power and authority to make proposals, consider proposals, and reach compromises in the course of negotiations.

D.    The initial proposals will be exchanged by February 1 of the year in which the contract expires and shall be considered privileged communications as mutually agreed to by both parties.

ARTICLE 3
PAYROLL DEDUCTIONS

A.    The District agrees to deduct from the salaries of its teachers dues for the United Teachers of Northport as said teachers individually and voluntarily authorize the District to deduct and to transmit the monies promptly to said Union. Dues deduction authorizations will be in writing on a form agreed to by the Union and the District.

B.     The United Teachers of Northport will certify to the District in writing the current rate of membership dues of the Union named in Section A above. The Union will give the District fifteen (15) days written notice prior to the effective date of any change. Current dues authorization cards will remain valid unless specifically withdrawn in writing by the individual prior to September 15 of the then current school year.

C.     Deductions referred to in Section A above will be made beginning on or about October 15. The District will not be required to honor for any month's deduction any authorizations that are delivered to it later than two (2) weeks prior to the distribution of the payroll from which the deductions are to be made.

D.     The District will transfer to the United Teachers of Northport, three (3) days after each bi-weekly deductions, all monies due to it.

E.     Payroll deductions will be made for the following provided that at least seventy-five (75) staff members so request:

       1.     NYSTRS Retirement Loans
       2.     Teachers Federal Credit Union (including direct deposit via electronic transfer) and such other financial institutions as the parties may mutually agree on.
       3.     NYSUT Benefit Trust
       4.     NYSUT sponsored insurance programs.

## ARTICLE 4
## AGENCY FEE AND DUES DEDUCTION

A.     Pursuant to the passage of legislation enabling the implementation of an Agency Shop Fee, the District does hereby agree that no later than fifteen (15) days after the effective date of employment, each employee who is not a member of the United Teachers of Northport will pay to the collective bargaining agent each month a service charge toward the administration of this agreement and the representation of such employee; provided, however, that each employee will have available to him/her membership in the United Teachers of Northport on the same terms and conditions as are available to every other member of the Union. The service charge shall be an amount equal to the collective bargaining agent's regular and usual initiation fee, if any, and monthly dues for each month thereafter in an amount equal to the regular and usual monthly dues. The District shall deduct such fee in the same manner the membership dues are deducted. The amount collected through the agency fee shall be used to represent the individual as a member of the bargaining unit and shall not be used toward expenditures by the organization in and of activities or causes of political or ideological nature only incidentally related to terms and conditions of employment.

B.     Any teacher from whom an agency fee has been deducted pursuant to this provision who has any objection thereto shall be limited to processing his/her objection in

3

accordance with organizational appeal procedures contained in a separate organizational document governing such appeals.

C.     The agency shop fee shall be suspended in the event membership in the organization (probationary teachers, tenured teachers and full time regular substitutes) drops below ninety (90%) percent of the total number of bargaining unit members (probationary teachers, tenured teachers, and full time regular substitutes).

D.     The UTN will supply, upon the request of the District, proof of total UTN membership in probationary teachers, tenured teachers, and full time regular substitutes.

E.     The UTN will indemnify and save the District harmless from any and all costs arising out of litigation in any form concerning the application of the provisions of this Article.

ARTICLE 5
PAY DATES

Pay dates for teachers including extra pay and summer school shall be determined in May of the previous school year after agreement with the United Teachers of Northport.

ARTICLE 6
RIGHTS OF TEACHERS

A.     The private and personal life of any teacher is not within the appropriate concern or attention of the District except when it impairs the teacher's effectiveness in the classroom or position. Notwithstanding their employment, teachers shall be entitled to full rights of citizenship and no legal religious, legal political, or organizational activities of any teacher or the lack thereof shall be grounds for any discipline or discrimination with respect to the professional employment of such teacher.

B.     Any significant complaint of substance regarding a teacher made to the administration by any parent, student, or other person will be promptly called to the teacher's attention and, upon request by the teacher, the name(s) of the complainant.

ARTICLE 7
ACADEMIC FREEDOM

A.     The nature of American democracy demands that citizens be able to listen to all sides of controversial issues, sort out the facts, and arrive at independent conclusions. Students in school, therefore, have a right to be exposed to a balanced view of differing perspectives of issues which are within their intellectual grasp and are under current debate in our society.

4

B.     This right of students imposes certain obligations upon the District, the teachers, the administration, and the community.

C.     The District will attempt through its policies to employ capable teachers, supply them with the necessary teaching materials, and maintain an atmosphere of academic freedom in the Northport schools.

D.     The teachers as individuals and through their councils, committees and departments, will be responsible for determining when and how to deal with controversial issues according to the maturity and needs of students and the policies of the District.

E.     The community has a right to expect that controversial issues will be presented in a fair and unbiased manner and to communicate through proper channels to the Board of Education if convinced that they are not.

F.     The administration will be available to consult with teachers regarding the appropriateness of controversial issues. The teacher(s) and the principal shall make a prior joint determination with regard to any non-school personnel invited to present a viewpoint to students. In the event agreement is not reached the teacher(s) or principal may refer the matter to the TAC for review.

G.     Although the foregoing does not apply to Professional Registered Nurses employed by the District, the District acknowledges that the nurses it employs are professionals and that they must exercise their professional judgment in accordance with the Code of Ethics promulgated by the American Nurses Association.

ARTICLE 8
GRIEVANCE POLICY

A.     Definitions

1. "Grievance" - a claimed violation, misinterpretation, or inequitable application of the provisions of this agreement, or of any other law, regulation or policy which relates to or involves a teacher.

2. "Teacher" - an employee within the bargaining unit or any group of such employees. The Union shall be considered as a group of employees when rights guaranteed to the Union, as opposed to individual teachers' rights, are alleged to have been abridged.

3. "Party in Interest" - The person or persons making the claim and any person who might be required to take action or against whom action might be taken in order to resolve the claim.

5

4. "Days" - shall mean school days.

B.     Basic Principles

1.     It is the intent of these procedures to provide for the orderly and prompt settlement of differences in a fair and equitable manner.

2.     No reprisals of any kind shall be taken by either party or by any member of the administration against any party in interest, Union representative, any member of the Grievance Committee (a committee comprises solely of union members) or any participant in grievance procedure by reason of such participation.

3.     Failure at any step to communicate a decision within the specified time limit shall permit the aggrieved to proceed to the next step. Failure at any step of this procedure to appeal a grievance to the next step within the specified time limit shall be deemed to be acceptance of the decision rendered at that step.

4.     Any party in interest shall have the right to be represented at any stage of the procedure by a person of his/her own choice. When a teacher is not represented by the Union, the Union may be present to state its views at all stages of the grievance procedure.

5.     Decisions rendered at Levels I, II, III and IV of the procedure shall be in writing setting forth the decision and the reasons thereof and shall be transmitted promptly to all parties in interest and to the chairperson of the Grievance Committee. Appeals by the grievant to higher levels shall state the specific objections to the decision(s) rendered.

6.     All records of hearings shall be privileged information and shall be filed at the Central Office through the Executive Director for Human Resources separate from the personnel files of the participants.

7.     Time limitations may be extended by written agreement of both parties involved.

8.     In the event a grievance is filed on or after June 1, attempt will be made to reduce the time limits set forth so that the grievance procedure may be exhausted prior to the end of the school term. With the consent of the aggrieved, the grievance shall be processed during the summer months according to the time limits provided in Section C.

9.     Grievances which do not involve the interpretation, meaning, or application of any of the provisions of this agreement may be processed through Level III but shall not be arbitrable.

6

10.     The sole remedy available to any teacher for any alleged breach of this agreement or any alleged violation of his/her rights hereunder shall be pursuant to the grievance and arbitration procedure, provided, however, that nothing contained herein shall deprive any teacher of any legal rights which he/she presently has.

11.     A grievance may start at Level II or III if the aggrieved (or the Grievance Committee, if the aggrieved is represented by the Union) and the Superintendent of Schools determine that the personnel indicated in the omitted levels are not "parties of interest". No grievance may start at Level IV unless mutually agreed upon.

12.     A grievance shall be deemed waived if not submitted in writing within the same school year (September-June) in which the alleged event constituting the basis for the grievance occurred, except that if such alleged event occurred after June 1, the grievance shall not be deemed waived if submitted in writing within the same calendar year.

C.     Procedures

1.     Level I

The aggrieved teacher, either directly or through the Union's Grievance Committee representative, shall present the grievance to his/her principal who shall orally and informally discuss the grievance with the teacher. Should the grievance not be resolved through the informal procedure above, the teacher shall present the grievance and the relief desired in writing to the principal. The principal shall render his/her determination to the aggrieved teacher within ten (10) days after the formal grievance has been presented to him/her.

2.     Level II

a.     If the aggrieved teacher is not satisfied with the decision at Level I, he/she may, either directly or through the Union Grievance Committee representative, present his/her grievance in writing to the Superintendent within seven (7) days after the decision at Level I. The grievance shall be considered waived if not submitted to the Superintendent within seven (7) days after the decision in Level I.

b.     The Superintendent shall within five (5) days of receipt of the written grievance meet with the aggrieved teacher in an effort to resolve it.

c.     The Superintendent shall within ten (10) days of receipt of the written grievance render a decision.

d.     If the grievance is not satisfactorily resolved at this stage, the aggrieved teacher may proceed to Level III.

7

3.    Level III

a.    If the aggrieved teacher is not satisfied with the decision at Level II, he/she may, either directly or through the Union Grievance Committee representative, present his/her grievance in writing to the Clerk of the Board of Education within seven (7) days after the decision at Level II. The grievance shall be considered waived if not submitted to the Clerk of the Board within seven (7) days after the decision at Level II.

b.    A Committee of Board of Education members shall within ten (10) days receipt of the written grievance meet with the aggrieved teacher in an effort to resolve it.

c.    The committee of Board members (if the Board does not meet as a committee of the whole at Step b. above) shall transmit its findings and recommendations to the full Board of Education within seven (7) days of receipt by the Clerk of the written grievance. The full Board of Education shall thereafter render its decision within twenty (20) days of receipt of the aforesaid findings and recommendations.

4.  Level IV

a.    If the Union is not satisfied with the disposition of the grievance at Level III, or if no decision has been rendered within the time limit specified above, the Union may submit a written Notice of Intention to arbitrate pursuant to the Civil Practice Law and Rules of the State of New York. The Union and the Board agree to use the following permanent arbitrators, in rotating order:

1.    Robert Simmelkjaer
2.    Bonnie Siber Weinstock
3.    Martin Scheinman
4.    Robert Douglas
5.    Arthur Riegel
6.    Rosemary Townley

Both parties will abide by the Rules and Regulations for Voluntary Arbitration of the AAA insofar as they do not conflict with the terms of this agreement.

b.    The arbitrator shall make a decision in writing within thirty (30) calendar days from the close of hearings. The arbitrator shall be without power or authority to make any decision which requires the commission of an act prohibited by law or regulations of the Commissioner of Education or which violates the terms of this agreement. Arbitration of grievance involving the interpretation, meaning or application of any of the provisions of this agreement shall be final and binding.

8

    c.     The cost for the services of the arbitrator shall be borne by the party whose position is not sustained. Each party, however, shall bear the expenses of its representatives, witnesses and counsel.

ARTICLE 9
JOINT COMMITTEES

The Board of Education desires to receive teacher advice and to provide for such involvement of teachers in the planning of basic educational policy, programs and curriculum. The following committees and committee purposes are established to assist in the implementation of the foregoing at three levels, to wit: the individual school, the Central administration, and the Board itself.

A.    Building Committee

The principal of each school shall meet at least once a month with the Union Building Committee (BC) at its request to discuss school operation, master scheduling, school policy making and questions relating to the implementation of the Agreement. These meetings shall be held at a time of the day mutually agreed upon, and if held during the regular school day, shall not result in loss of pay to the teachers. The Building Committee shall consist of not more than five (5) teachers in each school except at the senior high school which shall have twelve (12), selected or appointed in such a manner to be determined by the Union. The BC members selected or appointed shall have a common planning time (lunch hour or preparation period), if feasible.

The Building Committee shall present the principal with an agenda for the meeting at least twenty-four (24) hours in advance.

B.    Teacher-Administrative Council

The Superintendent and/or his/her designated representative(s) and the representatives of the Union shall meet regularly to:

1.    Promote maximum understanding of the functional, professional and personnel problems of teachers and administrators;

2.    Provide for mutual determination of the means of implementing the policies contained in this Agreement;

3.    Clarify existing policies contained in the Agreement;

4.    Clarify Administrative Rules and Regulations;

5.    Provide for teacher advice in planning anticipated change in

9

educational policy, programs and curriculum;

      6.    Provide for Professional Registered Nurse advice in formulating and implementing basic health and safety policies and procedures.

    C.    Board-Teacher Relations

      1.    In order to inform each other of the educational needs and problems which are encountered in the operation of the schools, the Board and the Union will engage in a dialogue within the framework of a Board-Teacher Relations Committee. Meetings will be scheduled:

        a.    To discuss mutual goals;

        b.    To advise and counsel each other in order to attain harmonious effective high standards of quality education.

      2.    Meetings may be scheduled by:

        a.    The Board of Education

        b.    The Union

        c.    The Superintendent of Schools whenever a meeting may be mutually advantageous both to the Board and the Union.

      3.    Such meetings normally will be held within two (2) weeks of the Board of Education meeting at which the request was adopted or received as the case may be, provided that an agenda of positions accompanies the request and provided further that no negotiations shall take place at any such meeting.

    D.    Intent

      It is the intent of the parties that nothing herein shall be deemed to limit or otherwise impair the Board of Education's authority granted it under the laws of the State of New York.

ARTICLE 10<br>MEETINGS

    A.    Teachers may be required to attend meetings on each Monday during the school year immediately preceding or following the school day. Meetings, which precede the school day, shall be limited to sixty (60) minutes unless this time is extended by a majority vote of the teachers present. District-wide or multi-building meetings conducted

10

after the school day shall conclude no later than seventy (70) minutes after the earliest end time among the schools involved in said meeting. Meetings may be held on the Tuesday after Columbus Day, Presidents' Day, and Memorial Day. Teachers may be excused by the party calling the meeting from meeting on these three (3) days for attendance at courses. No teacher will be negatively evaluated for failing to attend two (2) conflicting meetings and no teacher will be required to attend more than one (1) meeting on any Monday. Said meetings may be used for purposes to be determined by the administration. The UTN shall be permitted to use seven (7) Mondays, upon one (1) week's notice, to hold meetings. The teachers involved will be given notice and a copy of the agenda of any meeting they are required to attend no later than the Friday morning preceding such meeting.

B. All other before or after school meetings will be arranged by joint determination of the appropriate administrator and the appropriate UTN representative. For building meetings, the appropriate Union representative shall be the Building Chairperson, and for District-wide meetings, the appropriate UTN representative shall be the Union President.

ARTICLE 11
UNION RIGHTS

A. Time Off for Union Activities

1. The President of the Union shall be released from all teaching and non-instructional duties. The President shall be free to utilize his/her time on Union business or other professional activities related to his/her employment in the District. Use of this time for purposes other than the above shall be grounds for a grievance by the Superintendent of Schools. Such grievance shall be submitted at Level III. The President shall accrue seniority in his/her tenure area and he/she shall be entitled to all other rights and benefits extended to teachers employed by the Board of Education, as though he/she were assigned a regular teaching load. The President shall have the option of returning to the school and department or grade level he/she left at the time his/her term began. It is understood that effective July 1, 1993, the foregoing release time will be partly funded by a restructuring of the Professional Development Fund as set forth in Article 44 hereof. Effective July 1, 2006, the UTN will contribute an additional $17,500 per year toward the cost of the release time provided to the UTN President.

2. When representatives of the Union are mutually scheduled by the District and Union to participate during working hours in negotiations, they shall suffer no loss of pay. However, the District is not obligated to pay the salaries of more than six (6) Union representatives.

3. Except as set forth in subsection 1, no teacher shall engage in teacher Union activities during any professionally assigned periods. However, the officially

designated representative(s) of the Union shall at the written request of the President (filed with the Superintendent) be relieved of their instructional responsibilities and provided substitute teachers, when necessary, for a cumulative total of twenty-five (25) days per year for the purpose of contract administration and related Union activities.

4.  When it is necessary for the Executive Vice President of the Union, the Chairperson of the Grievance Committee, or the Chairperson of the Negotiations Committee to engage in activities directly related to the Union's duties as representatives of the teachers which cannot be performed other than during school hours, upon the approval of the Superintendent, they shall be given such time without loss of pay.

5.  The President or an officially designated representative of the Union shall be allowed to visit schools in order to investigate working conditions, teacher complaints, problems or for other purposes related to Union affairs. Upon arrival of the above mentioned persons they shall notify the building principal, or if absent, a designee.

B.  Other Rights

1.  There shall be two (2) seats reserved for the Union at all Board meetings.

2.  The Union shall be given an opportunity at building faculty meetings to present brief reports and announcements.

3.  The Union shall be given a place on the agenda of the orientation program for new teachers.

4.  The Union shall have the right to post notices of its activities and matters of Union concern on teacher bulletin boards. The Union may use teacher mailboxes for communications to teachers. Announcements of meetings may be listed in school activity bulletins and the public address system may be used for announcing the date, time and place of meetings. The Union shall assume full responsibility for the contents of all its publications.

5.  The Union will have the right to use the school buildings without cost at reasonable times for meetings. Request for use of buildings will be made to the principal of the building in advance, subject to Board policy.

6.  Before the District adopts a change in policy which affects wages, hours or any other condition of employment as defined by the Taylor Law which is not covered by the terms of this agreement, and which has not been proposed by the Union, the District will notify the Union in writing that it is considering such a change. The Union will have the right to negotiate such items with the Board within three (3) calendar weeks after receipt of said notice.

12

ARTICLE 12
TEACHER WORK DAY - WORK YEAR

A.      Teacher Work Day: The parties continue to recognize the desirability and need for teachers to be available before and after student hours, at the professional discretion of the teacher. All staff may be scheduled to arrive for work five (5) minutes before the commencement of the workday and remain at work five (5) minutes after the conclusion of the workday as set forth in Article 31.

In the event that the assessed valuation of the Northport Power Plan is reduced during the 2016-2017 tax year (as defined by the Town of Huntington as December 1 through November 30), or during the 2017-2018 tax year resulting in a total tax revenue reduction in either year exceeding $2,215,000, the foregoing modification of the Teacher Work Day shall be suspended starting the next Fall or Spring semester after the aforesaid reduction occurs.  Therefore, the language of Article 12, Subsection A, will revert back to the language found in the labor contract between the parties for the period of July 1, 2010 through June 30, 2014, which states that "[a]ll staff may be scheduled to arrive for work five (5) minutes before or five (5) minutes after the workday as set forth in Article 31."

B.      Teacher Work Year:  Teachers shall be available for professional duties from September 1 to June 30 at the request of the Superintendent of Schools except for legal holidays and normal school recesses.

C.      The provisions of this Article are not applicable to Professional Registered Nurses, except as set forth in paragraph B.

ARTICLE 13
MANAGEMENT RIGHTS

The District is charged by law to have in all respects the superintendence, management and control of the District. Nothing herein contained is intended, or shall it have the effect of abridging or violating the rights or obligations accorded to or imposed upon the District by the Education Law of the State of New York.

ARTICLE I4
SCHOOL CALENDAR

A.      The school calendar for the 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years shall consist of one hundred and eighty-four (184) instructional school days and one (1) Superintendent's Conference Day, insofar as it is feasible.   The Conference Day will precede the first day of instruction. The school year and instruction of pupils may commence on or after September 1 of each year of this contract.

B. Weather or other emergencies may cause the cancellation of some days, but in no case will the school year fall below the New York State minimum requirements unless by permission of the Commissioner of Education.

C. During the last week of school in June:

1. Secondary schools will follow the normal Regents and final exam schedules

2. The elementary school students' day will be scheduled for one-half (½) days for those days that exceed one hundred eighty (l80) days. The last day of the school year shall be counted within the said 180 days. In the event that conditions prevent this, the last Thursday shall be a one-half (½) day and Friday the normal and customary school closing day.

3. The foregoing shall be subject to compliance with Commissioner's Regulations.

## ARTICLE 15
## FACULTY ROOMS

The District will make every reasonable effort to provide for each school:

A. Private dining room for the faculty;

B. Adequate work space for the use of teachers in planning and carrying on out-of-class instructional responsibilities;

C. Special facilities for teachers to relax during lunch and professional preparation periods free from interruptions;

D. Clean, separate rest room facilities;

E. Rooms designated in A and C may be the same room provided there is ample space.

## ARTICLE 16
## TEACHER PROFESSIONAL GROWTH

Approval of Courses for Salary Credit.

A. Graduate Courses

All graduate courses must be from institutions of higher learning accredited by one of the regional associations within the United States and/or must be acceptable to

14

the New York State Education Department, Division of Certification, for purposes of New York State certification.

Teachers will receive salary credit for completed graduate level courses if one of the following criteria is met:

1.    The courses taken are required for certification in the teacher's assignment.

2.    The courses taken are in the teacher's area of assignment and will improve professional competence.

3.    The courses taken are offered by schools of education in the professional aspects of teaching (such as teaching methodology courses, philosophy of education courses, etc.) and will improve professional competence. For each column movement, no more than three (3) such credits shall be permitted.

4.    All graduate courses, with the exception of number 1 above, require prior approval of the Superintendent of Schools. Notification of completion of all graduate courses must be received by the District on an official graduate transcript or if unavailable other alternative official proof of course completion.

5.    Effective July 1, 1989 a two or three credit graduate level course in each block of fifteen (15) credits required for column movement must have been obtained after January 1, 1980.

After July 1, 1990, a three (3) credit graduate level course in each of fifteen (15) credits required for column movement must have been obtained after January 1, 1985.

6.    Correspondence Courses may be accepted for column movement credit following prior discussion with and approval of the Superintendent of Schools.

7.    Non-duplicative Regents college exam credit may be accepted for, column movement credit, following prior discussion and approval of the Superintendent of Schools, on the basis of one (1) column transfer credit for three (3) Regents college exam credits.

B.    In-Service.

Salary credit will be granted for in-service courses which meet the following criteria:

1.    In-service credit may not be used until a Master's Degree applicable toward certification requirements has been awarded.  In-service credit earned while

15

employed at the Northport-East Northport Union Free School District as a teacher prior to receipt of a Master's Degree, may be used subsequent to conferral of a Master's Degree, provided that requirements of subsection (5) have been met.

2.   All in-service courses required by the District shall automatically receive salary credit.

3.   In the event the District offers in-service courses providing either credit or salary, the decision as to which the teacher desires must be made prior to the commencement of the in-service course and cannot be altered once a decision has been made.

4.   Credit will be granted for SCOPE in-service courses in the teachers' area of assignment and which will improve professional competence, and which are not repetitious of courses previously taken.

5.   All other in-service courses require the approval of the Superintendent of Schools.  Courses must meet the equivalent of fifteen (15) one (1) hour sessions for one (1) in-service credit.  Proof of completion of all in-service courses must be received by the District on an official transcript or if unavailable other alternative official proof of course completion.

C.     Miscellaneous

1.     No more than six (6) in-service or graduate credits in video courses may be taken per lifetime.

2.     No more than a total of six (6) on-line or correspondence credits (graduate or in-service) may be taken for each column movement.

3.     Continuing Education Units will only be accepted for in-service credit and require prior approval.

4.     All courses, with the exception of (A)(1), (B)(2), and (B)(4) above, require prior approval of the Superintendent, and may not be similar to any courses previously taken.

5.     Proof of completion of all graduate and in-service courses must be received by the District on an official graduate transcript or if unavailable other alternative official proof of course completion.

16

D.     Undergraduate Courses

While it is understood that college courses taken beyond the Masters level should generally be at the graduate level, some undergraduate courses may be substituted for in-service course requirements with prior discussion with and approval by the Superintendent of Schools.  The following guidelines will apply:

1.     Undergraduate courses which are used for the purpose of obtaining additional certification and which are not part of the "Additional Certification Program" may be used toward column movement, subject to the following:

a.     Similar courses are not available at the graduate level, and

b.     The teacher has been awarded the certification, and

c.     The teacher has been employed by the District in the certification area for which the courses have been used for certification.

2.     Special circumstances exist -- e.g., similar courses are not available in the area on the graduate level; the course will enable the teacher to meet programmatic requirements of the District.

E.     Newly hired probationary teachers who have not yet earned a Master's Degree have a responsibility to submit a graduate plan to the Superintendent.  This graduate plan shall serve as a framework for completion of the Master's Degree as required by Education Law.

F.     1.     Out of every block of fifteen (15) credits required for a column movement, seven (7) elective in-service credits may be applied. Thus, the following chart shall apply:

| Classification | Total In-service Credits |
|----------------|--------------------------|
| BA & 15 | -- |
| BA & 30 | -- |
| MA | -- |
| MA & 15 | 7 |
| MA & 30 | 14 |
| MA & 45 | 21 |
| MA & 60 | 28 |
| MA & 75 | 35 |

17

2.      Except as set forth in Article 17, in-service courses required by the District shall automatically receive salary credit and therefore the limitation of seven (7) in-service credits set forth above may be exceeded.

3.      Effective July 1, 1989, one of the aforesaid seven (7) in-service credits in each block of fifteen (15) credits required for column advancement must have been obtained on or after July 1, 1986. Effective July 1, 1990, two of the aforesaid seven (7) in-service credits must have been obtained after July 1, 1987.

4.      Effective July 1, 1990, any in-service courses taken before July 1, 1980 may not be applied to column advancement

5.      In-service course credit previously used and applied toward column advancement may not be reconsidered or used for column advancement. (Reshuffling of in-service and graduate credits will not be permitted.)

6.      Effective July 1, 2006, teachers may only move one column per school year.

G.      It is understood that teachers shall elect courses to improve professional competence. Courses which do not meet the criteria outlined in this article require approval of the Superintendent of Schools. The Superintendent shall either approve the course or refer the matter to the PDC for written recommendation. In the event that an affirmative PDC recommendation is denied by the Superintendent, the question may be processed on its merits at Level III of the grievance procedure. Nothing herein shall deprive the teacher of the right to bring an individual grievance.

H.      The Union recognizes its responsibility to foster the growth of the professional through its involvement with teacher training programs. No student or intern shall be assigned without the consent of the teacher. At the discretion of the cooperating teacher, no student teacher or intern shall be assigned without a prior interview. The cooperating teacher shall have access to student credentials whenever they are made available to the District. The consent of any teacher to such assignment shall not unreasonably be withheld.

I.      Effective July 1, 2015, unit members may file an application for salary change only once during the school year, on or before September 15. Unit members shall not be entitled to apply for salary adjustments at any other time during the school year. Once a unit member has filed an application for salary change, and submits all requisite proof of course completion, adjustment to the unit member's salary will take place following a review by the District and approval by the Board of Education. Unit members shall receive payments which reflect an adjustment to their salary within (30) days after approval by the Board of Education. In addition, any retrospective monies owed to unit members shall be

18

paid in a separate lump sum amount within sixty (60) days of the aforesaid Board Action, retroactive to September 1. Salary transfer requests containing courses completed by June 30 of the school year, if approved by the Board of Education, will affect salary adjustments to teachers effective July 1 of the following school year.  Salary transfers containing courses completed after June 30th of the school year, i.e. between July 1st and the beginning of school will affect salary adjustments effective the first day of the regular school year.

J.     Teachers whose initial employment in the District commences on or after September 1, 1989 and who have a Master's with a program requiring more than thirty-six (36) credits shall have the excess credits beyond thirty-six (36) applied to a future salary transfer.

K.     Courses enrolled in prior to October 16, 1989 and which are applied toward future salary transfers are subject to the provisions of the previous agreement.  Any courses enrolled in on or after October 16, 1989 are subject to the new Agreement.

L.     The provisions of this article shall not be applicable to Professional Registered Nurses.

ARTICLE 17
MANDATORY IN-SERVICE

If the administration identifies that a teacher has demonstrated the need to improve teaching skills and/or knowledge of subject matter taught, a meeting will be held with the teacher at which meeting the teacher shall be entitled to Union representation. The parties shall discuss the administration's concerns as well as the availability of suitable in-service and/or college courses. Should the teacher fail to voluntarily enroll in such a course, the Superintendent may direct that the teacher enroll in an appropriate in-service or college course. In the event that such enrollment is mandatory, the cost of the course shall be assumed by the District and the teacher will be entitled to mileage reimbursement.

Further, if the course is offered outside the teacher's work day, the District shall pay the teacher at the rate of 1/1350th of the teacher's salary for each hour of attendance at the course. Following the administration's suggestion that the teacher voluntarily take an in-service course, but prior to the mandated enrollments, the affected teacher may meet with the Superintendent along with a Union representative to discuss the situation. Only one mandated course assignment may be made per semester. In the event of mandated assignment, no salary credit shall be granted. Nothing contained herein shall be deemed a prerequisite to the institution of Section 3020-a charges regarding a tenured teacher nor as a prerequisite to the dismissal of a probationary teacher.

19

ARTICLE 18
TEACHER SELECTION

A.    Teachers will participate in the interviewing of new staff except in extraordinary situations. Staff members will submit written recommendations as part of the selection process. Insofar as possible, teachers from the department or school where the vacancy exists will serve on the selection committee.

B.    In no event is an uncertified applicant to be hired if a certified applicant is on hand with equal qualification, unless approved by the Commissioner of Education.

C.    Additionally, the administration will provide to the Union any information available relating to the professional qualification of an applicant for a teaching position, so long as the applicant consents thereto, excluding confidential placement folders.

D.    The foregoing shall not be applicable to teachers employed pursuant to Section 3014b of the Education Law of the State of New York.

E.    Professional Registered Nurses are permitted to participate in the selection of appropriately related personnel

ARTICLE 19
PROFESSIONAL EVALUATION PROGRAM

A.    Introduction

1.    A basic purpose of evaluation is primarily to improve instruction by supporting the concept that students deserve a continuing program of quality education that maximizes learning opportunities. This necessitates continual, but reasonable evaluation for all members of the professional staff. A basic purpose of evaluation is to provide that only able and competent personnel are employed in the District to effectuate an outstanding program of education. The continual development of a program of evaluation is the direct responsibility of the entire professional staff and jointly developed by them. The administration of the evaluation procedure within the limits set by this agreement is the task of the Superintendent. Evaluation forms shall be developed jointly by the teachers and the administration.

2.    Goals of Evaluation: The goals of evaluation are to:

a.    determine the extent to which the professional's services meet previously established and mutually acceptable criteria, mutually understood by the individual and the evaluator;

b.    provide the stimulus for the professional staff member to make a conscious organized effort to improve professional competence;

20

    c. provide a continuous dialogue between those involved in the evaluation process for their mutual benefit;

    d. attempt to assure that each student will continue to benefit from services of professionals who maintain the highest possible standards of excellence.

  B. Procedure

    1. To ensure that the performance of all teachers and pupil personnel professionals not subject to Education Law §3012-c and §3012-d will be evaluated annually, as set forth in Section 100.2(o) of the Commissioner's Regulations, the UTN and the administration developed and agreed to a Procedure for Annual Professional Review which was approved by the Board of Education. Any revisions to such procedure which may be required by the Commissioner's Office shall be subject to negotiation by the parties.

    2. The foregoing process shall not be applicable to Professional Registered Nurses.  Professional Registered Nurses will be evaluated as follows:

    a. The principal or his/her designee shall provide an annual written evaluation of each nurse.

    b. The nurse is to be given notice of formal observation visits by the principal or other supervisor by the close of the preceding school day. This requirement may be waived upon mutual agreement of the nurse concerned and the supervisor.

    c. The individual nurse shall have an evaluation conference and an opportunity to submit written comments on the evaluation which shall become a part of the evaluation.

    3. Notwithstanding any of the provisions of this article, it is expressly understood that the substantive content of a teacher's observation shall not be arbitrable.

ARTICLE 20
SEPARATION OF PERSONNEL

  A. Annual written administrative evaluations will be the instrument through which teachers are informed that their services will not be continued, except in cases of misconduct and/or layoff. Where applicable, the notifications in these evaluations are subject to modification based upon the District's receipt of the teacher's final composite APPR score.

  B. Probationary teachers' services may be terminated at any time during the probationary period.  However, the District will comply with all relevant statutory provisions prior to such termination.

C.     Probationary teachers not recommended for continued employment will be given a written statement of the reasons thereof by the Superintendent or his designee, as required by law.

D.     The foregoing (Section A, B and C) shall not be applicable to Professional Registered Nurses

1.     Probationary period - Each person employed as a Professional Registered Nurse shall be placed on a probationary period of twenty-six (26) weeks. If at the end of this period the employee's service is considered to be satisfactory, the employee shall be a permanent employee of the District.

2.     Security - There shall be no discharge of permanent Professional Registered Nurses except for just cause. The Union reserves the right to dispute any discharge. If the parties fail to agree, the matter shall be subject to the grievance procedure as provided for in this agreement.

ARTICLE 21
JOB DESCRIPTION

A.     Published descriptions are to be developed for each class of position indicating necessary qualifications, duties, organizational responsibilities, accompanying responsibilities, and compensation, if any, above the salary schedule. Lines of responsibility and authority are to be clearly defined.

B.     A file on all current job descriptions for all positions and extra pay assignments shall be provided for the use of the Union.  This file shall be kept up to date and the Union shall be informed of each change proposed in a job description in sufficient time to request a discussion or further information before the proposed description is finalized.

C.     A preliminary job description shall be prepared and presented to the Union before any person is approached concerning a new position or extra pay assignment

ARTICLE 22
ADMINISTRATIVE POSITIONS

A.     When a vacancy occurs for an administrative position procedures shall be developed by the Executive Officer of the District and the President of the Union to assure the involvement of the teaching staff concerned and the Union.

B.     Administrative positions are defined as all positions requiring certification which are not included in the definition of "teacher." (See Article 1.)

22

C.    The above-described involvement of the Union and teaching staff in the selection of persons to fill administrative vacancies shall be advisory.

D.    Each staff member shall receive written notice of administrative vacancies.

### ARTICLE 23
### VOLUNTARY TRANSFERS

A.    Transfer Requests

1.    Teachers who desire a change in grade and/or subject assignment, or who desire a transfer to another building, shall file a written request with the Superintendent prior to February 15th. Such statement shall include the grade and/or subject to which the teacher desires to be assigned and the school or schools to which a transfer is desirable, in order of preference. This list will be used for one (1) year and will be the sole indication to the Office of Human Resources of the staff who are interested in transferring to another position for the following school year. Upon application, the Executive Director for Human Resources may accept a late filed voluntary transfer request, following consultation with the Union President.

2.    No later than two (2) working days after the Board of Education sets its budget vote for each school year, the Executive Director for Human Resources shall post in all school buildings a list of anticipated elementary vacancies and new teaching assignments which will occur for the following school year.

3.    No later than the beginning of the third week in May of each school year, the Executive Director for Human Resources shall post in all school buildings a list of anticipated secondary vacancies and new teaching assignments along with a supplemental list of elementary vacancies which will occur during the following school year.

4.    No new teacher shall be employed in the school system for a position where a request for transfer is pending.

B.    Vacancies Occurring During the School Year

Voluntary transfer requests previously filed pursuant to paragraph A 1 above will be considered for position(s) that become vacant during the school year. Such vacancies shall not be posted. However, the Executive Director for Human Resources shall give the Union President written notice of said vacancies as they occur. A staff member who has not previously filed a transfer request under paragraph A 1 above who seeks to transfer to a position which becomes vacant during the school year shall file such a request with the Executive Director for Human Resources. Such request may be accepted or rejected at the discretion of the Executive Director for Human Resources after consultation with the Union President.

C. In the determination of requests for voluntary reassignment and/or transfer, the convenience and wishes of the individual teacher will be considered as long as they do not conflict with the instruction and program requirements and best interest of the School District.

## ARTICLE 24
## INVOLUNTARY TRANSFERS

A. An involuntary transfer is one not requested by the teacher.

B. An involuntary transfer which does not come within the definition of C below to which the teacher objects will be made only after the Principal has explored alternatives with the individual teacher and the building committee.

C. An involuntary transfer which involves a change from one building to another, and/or from one tenure area to another, and/or from one grade level to another (more than three grade levels up or down), shall be made in accordance with the following procedures:

1. When the need for an involuntary transfer or reassignment arises, volunteers from among those meeting the qualifications of the position will be sought. Such solicitation shall be accomplished by the building principal or department chairperson of the building or department affected by the involuntary transfer. The administrator shall meet with staff and solicit volunteers. There shall be no posting of the vacancy. Thereafter, involuntary transfers will be made to fill the remaining vacancies, if any. Subsequent vacancies occurring as the result of the transfer may be filled by the administration without seeking further volunteers.

2. Notice of involuntary transfer or reassignment for the ensuing school year shall be given to teachers as soon as practicable and under normal circumstances no later than June 10th.

3. A teacher being involuntarily transferred may request and will be granted a meeting with the Superintendent of Schools or his/her designee within ten (10) working days of notice of involuntary transfer at which time the teacher will be notified of the reason thereof. The teacher may be accompanied by a Union representative.

4. In the determination of transfers hereunder, the convenience and wishes of the individual teacher will be honored to the extent that they do not conflict with the instructional and program requirements and best interest of the School District.

24

## ARTICLE 25
## TRANSFERS AND STATUS

A. Any probationary teacher who requests and is granted a voluntary transfer to a position to which he/she is appointed to a probationary period in a different tenure area shall serve a minimum of two (2) probationary years in the position.

B. Tenure teachers transferred to a new tenure area will normally be granted tenure after a one year period provided, however, that this new probationary period may be extended to two years upon the written requests of the building principal, chair or director. Such request shall state the reason for the extension and is non-grievable.

C. The provisions of this article shall not be applicable to Professional Registered Nurses.

## ARTICLE 26
## TEACHER FILES

The official district teacher file shall be maintained in the Office of Human Resources under the following circumstances:

A. No material shall be filed unless the teacher has had an opportunity to examine the material. The signature of the teacher, or in lieu thereof, the signature of the Union President or his designee, must be affixed on the actual copy. It is understood that such signature merely signifies that the material has been examined. Such signature does not necessarily indicate agreement with its content.

B. The teacher shall have the right to answer any material kept and such answer shall be reviewed by the Superintendent of Schools and attached to the file copy. Said answer shall be submitted to the Superintendent within thirty (30) calendar days. The response time shall be suspended during the period between the closing and opening of school. If no response is obtained within this time limit, said document will automatically be filed in the teacher's personnel file.

C. Upon personal request, the Superintendent of Schools shall give individual teachers access to their personnel file, within two (2) school days.

D. Upon receipt of a written request, the teacher shall be furnished a reproduction of any material in his/her personnel file.

## ARTICLE 27
## CLASS COVERAGE

A.    The District agrees that teachers will not be required to take the class of an absent teacher unless in an emergency. (Emergency means an unforeseen combination of circumstances which calls for immediate action.)  A teacher may volunteer to take the class of an absent teacher.  In both cases a teacher will be paid 1/1000ths of the median salary as determined as of October 1 of each year of this contract.

B.    Emergencies (as defined above) may be declared only by the building principal or a designee (person authorized by the Superintendent of Schools).  The BC chairperson shall be notified as soon as feasible whenever such emergency class coverage is deemed necessary.

C.    A substitute teacher list shall be given to the teachers' Union on an annual basis in September. They shall be informed of changes to such list periodically.

D.    No member of the teacher aide staff may be assigned to supervise an instructional class except under the direct supervision of a member of the professional staff or except if so requested by the teacher and approved by the principal or in the event of an emergency as defined above.  Teacher aides shall not be used on a regular basis in lieu of substitute teachers.

E.    The provisions of this article shall not be applicable to Professional Registered Nurses.

F.    In unusual circumstances when emergency coverage extends beyond twenty-five (25) consecutive work days, starting on day 26 the rate of pay for class coverage will be an additional 20% of the covering teacher's current daily rate of pay, per period, for the duration of coverage and retroactive to the first day of continuous coverage. In situations where coverage extends through the last day of school and the teacher is needed to take care of end of year responsibilities, e.g. the scoring of final exams, the additional 20% of salary will be paid through the end of the school calendar year.  The additional 20% for overages will not apply on days absent for any reason.

## ARTICLE 28
## CLASS INTERRUPTIONS

A.    Interruptions of classes in session shall be kept to a minimum.

B.    The provisions of this article shall not be applicable to Professional Registered Nurses.

## ARTICLE 29
## NON-TEACHING DUTIES

A.　The principal may only assign teachers the following duties when a combination of unforeseen circumstances which require immediate action (or other such situations) arise, after review with the BC chairperson, except as noted in F and G below:

>　Direct supervision of lunchrooms and cafeteria;
>　Direct supervision of loading and unloading buses;
>　Direct supervision of halls during class periods;
>　Direct supervision of school playgrounds.

B.　Teachers need not be utilized in direct supervision of study halls, or in taking children from the cafeteria or playground.

C.　Within the limits of personnel budgeted for each school it shall be considered desirable to eliminate assigning teachers clerical duties such as:

>　Routine clerical entries on student records;
>　Inventory of books and supplies in storage areas;
>　Collecting monies;
>　Typing and duplicating instructional materials.

D.　Effective July 1, 2006, notwithstanding the foregoing provisions of Sections A and B above, the administration may solicit volunteers from among the teaching staff to perform the duty of direct supervision of a school playground or cafeteria. Teachers accepting this assignment shall be paid an annual stipend of $2,500 per period. The foregoing assignment shall be in addition to each teacher's responsibility under Sections A, B, F and I.

E.　The assignment and effectiveness of personnel employed to relieve teachers of duties described above shall be reviewed by the BC. A report of the conclusions reached shall be forwarded to the principal by April 1st for submission to the Superintendent. Teachers shall cooperate in the evaluation of personnel assigned to implement this article.

F.　Effective July 1, 2006, during either the duty period or the 9th period, teachers may be assigned by the administration at the high school to commons or hall duty for up to ninety (90) days each year and at the middle schools to hall duty for up to seventy (70) days each year. (Said assignment shall be equitably rotated among staff). The administration shall be permitted to call upon teachers who are assigned to commons duty at the high school or hall duty at the middle school, to assist in supervision of students during cafeteria periods, when necessary.

1.　Each week, three (3) middle school teachers will be assigned to bus supervision duty for ten (10) minutes following the dismissal of students. The foregoing

27

duty shall be performed throughout the school year by all staff members.

G.      Effective July 1, 2002, all elementary school teachers may be assigned to afternoon bus duty, which shall be equitably rotated.

H.      No teachers shall be assigned janitorial duties.

I.      Notwithstanding the foregoing, it is agreed that every teacher shares a responsibility to help maintain discipline throughout the school.

J.      The provisions of this article shall not be applicable to Professional Registered Nurses.

ARTICLE 30
REGULAR SUBSTITUTE TEACHERS AND
PART-TIME TEACHERS

A.      Regular substitutes are persons employed to replace probationary and tenured teachers on official leave of absence.  A regular substitute list shall be maintained according to date of employment. Regular substitute status shall be counted toward the probationary period.  Regular substitutes shall be given first consideration for openings in the District only in the area in which they were employed as a regular substitute and for which they are qualified, provided that their annual evaluation(s) have been satisfactory. The foregoing preference shall continue for the two (2) year period following termination of the regular substitute assignment.  The rights created hereunder for regular substitute teachers shall be subordinate to the rights of excessed teachers on the preferred eligible list pursuant to Section 2510 of the Education Law.

B.      Regular substitutes shall be granted preferred status on the per-diem assignment list, subject to the following procedures and conditions:

1.      They shall be granted preferred status on the list for a period of two (2) years following expiration of their appointment as a regular substitute teacher.

2.      Prior to the commencement of the school year, regular substitute teachers who wish to be called for per-diem assignments shall be given the opportunity to file a statement with the District setting forth those periods of the school year during which they will and will not be available for per-diem assignments.  If a teacher refuses more than seven (7) such assignments, he/she shall be dropped from the list of teachers available for such assignments, after notification of the Union President.

C.      A regular substitute appointed to replace a teacher on an extended leave shall be placed on the proper schedule and step on the teachers' salary schedule.  Regular substitutes shall participate in all applicable employee benefits.

28

D.    Prior to the employment of part-time teachers, the position shall be discussed with the appropriate teaching and administrative personnel concerned and the BC chairperson. If the BC chairperson is unavailable for consultation, the President of the Union must be contacted, and will appoint some teacher to serve in the place of the BC chairperson.

E.    Excessed probationary and tenured teachers who are on the preferred eligible list established by Section 2510 of the Education Law shall be entitled to appointment to regular substitute vacancies of a semester or more.

F.    The provisions of this article shall not be applicable to Professional Registered Nurses.

G.    Notwithstanding the effective date of this Agreement, the new provisions of this Article shall be effective 6/30/86 and will be applicable to all regular substitute teachers who are currently on the regular substitute list.

## ARTICLE 31
## CONDITIONS OF PROFESSIONAL PRACTICE

A.    1.    All middle school and high school teachers (6-12) shall be entitled to an uninterrupted, duty-free lunch period of not less than 40 minutes or the length of time students are scheduled for lunch, whichever is greater.

2.    All elementary school teachers (K-5) shall be entitled to an uninterrupted, duty-free lunch period of 45 minutes.

3.    All middle school and high school teachers (6-12) shall be assigned no more than 25 teaching classes per week. (A normal class period is the approximate equivalent of 45 minutes.) All middle school and high school teachers (6-12) shall have one normal class period each day for preparation. Notwithstanding the provisions of A.3 above, in order to provide more laboratory experience for students, science teachers who teach laboratories in excess of twenty-five (25) periods per week (not to exceed twenty-eight [28]), shall be paid 1/25th of his/her salary for the duration of the assignment, per period. Science teachers may be mandatorily assigned to the foregoing.

4.    All elementary school teachers (K-5) shall receive a duty-free uninterrupted preparation period of forty-five (45) minutes within the pupil day.

5.    The total length of all elementary teachers' (K-5) professional day shall be  six (6) hours and twenty (20) minutes except as modified by A.7 and A.8 below.

29

6.    The total length of the middle school and high school teachers' (6-12) professional day shall not exceed that which is presently in force except as modified by A.7 and A.8 below.

7.    a.    Additional Professional Development Time -- In addition to A.5 and A.6 above, teachers hired before July 1, 2002 shall work an additional fifteen (15) hours annually before or after school.

b.    In addition to A.5 and A.6 above, teachers hired on or after July 1, 2002 shall work an additional twenty (20) hours before or after school.

c.    Use of said hours shall be scheduled before and after school by the administration following consultation with the UTN President or his/her designee. The hours shall be utilized in assignments made by the administration in the following areas, including but not limited to: staff development, horizontal and vertical curriculum articulation, meetings with administration, District in-service programs, interdisciplinary planning, department, building and other than regularly scheduled faculty meetings. Assignment and allocation of hours among teachers shall be at the discretion of the Superintendent of Schools or his/her designee following consultation with the UTN President or his/her designee.  Assignments shall not be unreasonably made. Individual proposals from teachers shall be considered by the administration.  Disputes shall be submitted to an expedited arbitration using the list set forth in Article 8(C)(4)(a). It shall be the responsibility of each teacher to maintain a record of compliance with the requirements of this section, which record shall be in a form prescribed by the District.  The record shall be made available by the teacher from time to time for administrative review.

8.    It is mutually agreed that it is educationally beneficial to provide continuous uninterrupted instructional time. The District will use its best effort to achieve the goal of a ninety (90) minute uninterrupted block of instructional time in grades K-5, provided that the same does not result in increased cost to the District.

9.    The balance of time within the school day shall be utilized for professional duties, responsibilities, and growth.

At the secondary level, the balance of time within the school day shall be utilized for professional duties, responsibilities and growth.  Such activities, which may be assigned by the administration, shall include homeroom, study hall supervision, academic resource room and time out room assistance, teacher aide supervision, parent/teacher conferences, professional development, inter disciplinary planning, supervision of makeup tests, assistance to independent study students and students involved in special academic projects, supervision of the school store at the high school, student consultations, facilitation of student work in labs and lab facilities, special education resource room student articulation, meetings with administrators or other needed responsibilities as determined by the administration following consultation with the building

committee. In addition to the foregoing, activities shall include: curriculum work, including textbook review, articulation of curriculum projects, preparation of proposed curriculum projects, and review of limited curriculum changes and modifications. These activities shall be ancillary to the work compensable under Article 37 of this Agreement.

For purposes of this article, "academic resource room assistance" shall mean a rotational assignment of staff members at each of the District's secondary schools from each department to a room designated by the administration. The teaching staff and/or administration shall foster student referral to the resource room which may include release from regular class assignment.

B.    Academic Intervention Services

Effective 9/1/02, Academic Intervention Services at the middle school and high school levels shall include additional help and tutoring opportunities for students beyond the extra help time provided in the contract, or as otherwise currently provided by unit members. Beginning in the second year of this contract, Academic Intervention Services means administrative assignment to particular personnel for the purpose of providing additional help and tutoring opportunities, for up to ten (10) students for up to forty five (45) periods each year to be scheduled on either an A/B - every other day over ninety (90) days (for a 45 day total), or continuously for forty five (45) days. (Teachers assigned to AIS shall not be assigned building duties during the year of performance of AIS services). The assignment includes appropriate student progress reports to parents and administration; no credit will be granted. The determination of the assignment of students to Academic Intervention Services for the purposes of additional help and tutoring, and the cessation of such services, will be in accordance with applicable Commissioner Regulations. In the event the Commissioner of Education no longer requires the provision of Academic Intervention Services (additional help and tutoring), and other than a change in the title of such services, the parties will meet to develop an alternative remediation program. Should the parties fail to agree after a reasonable period of time, the issue may be submitted by either party to binding interest arbitration pursuant to the Rules for Voluntary Labor Arbitration of the American Arbitration Association. (The foregoing shall not be applicable to a change in the title of such services, effectuated by the Commissioner, when substantially the same remediation services are continued to be required to be provided notwithstanding the change in title of such services.)

No reduction in staff shall result from implementation of the AIS program. The Superintendent, or his/her designee, shall periodically consult with the UTN President regarding implementation of the AIS program.

C.    Flexible Scheduling

1.    Flexible Scheduling shall be applicable to the High School, Middle School and Elementary Schools. Except as hereinafter set forth, implementation of flexible

31

scheduling shall be studied by a joint district/teacher committee during the 1995-96 school year.  The recommendations of the Committee shall be presented to the Superintendent on or before March 1, 1996.

> 2.  Flexible scheduling shall be implemented in the 1996-1997 school year at the High School and Middle School to the extent of one period before or one period after the school day.  (However, flexible scheduling shall be implemented at the High School library on February 1, 1996.)

> 3.  The District shall rely on volunteers to implement flexible scheduling; however, the Superintendent of Schools shall have the ultimate right to assign library staff to flexible scheduling at the High School library.

> 4.  Flexible scheduling shall not be used to reduce staff nor shall it increase the teacher work day.  Further, flexible scheduling shall not affect the current practice relating to early morning high school gym.  Those teacher volunteers for the "0" period shall not be required to attend after school faculty meetings only if a faculty meeting is called on a flexible schedule day.  Affected teachers shall obtain from a colleague information disseminated at the faculty meeting.

> 5.  Effective July 1, 2002, the District shall be permitted, at the high school, to establish a "0" period to a 10th period to which teachers may be assigned.  However, assignments shall be continuous, to wit: 0 to 8th, 1st to 9th, or 2nd to 10th period.

> 6.  Effective July 1, 2002, the District shall be permitted, at the middle schools, to establish a "0" period to a 9th period to which teachers may be assigned.  However, assignments shall be continuous to wit: 0 to 7th, 1st to 8th, or 2nd to 9th.

> 7.  With respect to sections 5 and 6 hereinabove, the District shall first seek volunteers.  If there are insufficient volunteers, then the District may assign staff to these flex schedules.

D.  No appointment with parents shall be scheduled without prior notice to and cooperation of the teacher.

E.  Principals and/or department chairpersons shall develop teaching schedules with the teachers concerned.  Consideration shall be given to the number and types of preparations.

F.  Unreasonable, extended, continuous periods of teaching and/or supervision of children will be avoided.

G.     Teachers who are assigned to more than one school on a daily basis shall be compensated at the prevailing IRS rate upon ratification of this contract.  Their schedules shall be adjusted to allow reasonable time for such inter-school travel.  Time for travel shall not be taken from preparation or lunchtime.

H.     All teaching assignments for the next school year shall be announced, whenever possible, no later than thirty (30) days before the end of the school year.

I.     If the tentative schedule of any teacher must be changed after the current school year has ended, the appropriate administrator shall discuss such change with the teacher involved.  If the teacher is unavailable, the notification of change will be made in writing.

J.     <u>Class Size</u>

1.     The Board and the Union agree that large class sizes and pupil/teacher ratios may be inimical to effective education and unduly onerous to individual teachers. The parties further agree that insofar as funds and facilities are available, the highest priority will go to reducing regular class sizes and teacher/pupil ratios where these numbers exceed educationally-sound approaches to the learning experiences of students. The Board agrees to make every effort to maintain the class size standard in effect during the school year 2006-2007 for the term of this agreement. In the event of a financial emergency resulting in a substantial and significant reduction in assessed valuation and/or the state aid, which emergency was unforeseen, said class size standards shall be applied on an average District-wide basis.

2.     Grades K-5

a.     Special Education students who are recommended for a traditional self-contained Skills Center or Learning Center and participate in mainstream opportunities for two (2) or more hours in a regular classroom setting will be weighted as a 1.5 student when calculating class size.

b.     Special Education students who are recommended for a traditional self-contained Skills Center or Learning Center and participate in mainstream opportunities for two (2) or less hours in a regular classroom setting will be weighted as a 1.0 when calculating class size.

c.     Special Education students, from Resource Room placement, who spend more than two (2) hours in regular classroom activities will be weighted as a 1.5 student when calculating class size.

d.     Special Education students, from Skill Centers and/or Learning Centers, who participate in inclusion models will be weighted as a 1.0 student when calculating class size.

33

3.      Grades 6-12

1.      Special Education students, who participate in inclusion programs, will be weighted as a 1.5 student when calculating class size.

b.      Special Education students, who are placed in regular subject classes as a mainstream student, will be weighted as a 1.5 student when calculating class size.

The District agrees to assign students evenly to regular classes.

K.      During the term of this Agreement, the District shall not lay off teachers (including guidance counselors, social workers, psychologists and other such employees) making up the bargaining unit to such an extent that the total bargaining unit staff to total student ratio exceeds 1:17.6.

L.      A procedure shall be developed by the Pupil Personnel Department for the transfer of students to other than their home school. Such procedures shall provide for the involvement of the teachers affected.

M.      In the event that the District ceases to provide a full-day Kindergarten program and reverts back to the use of a half-day Kindergarten program, the District shall provide special area kindergarten assistance (art, music and physical education) to all kindergarten teachers, in a combined total of no less than sixty (60) minutes per full week per class, (a.m. and p.m.).

N.      The District shall provide each school library with a full-time teacher aide or clerk typist.

O.      For the school year 1987-88 and each school year thereafter, the District shall provide for elementary school (K-5) teacher/parent report card conferences as follows:

1.      Fall

One half-day and two (2) early release days of 150 minutes.

2.      Spring

One half day and two (2) early release days of 150 minutes.

3.      Parents unable to confer with staff before, during, or after the regularly scheduled conference time may request a conference, at an alternate time, with the teacher. The administration and teacher shall confer to determine how the request can be accommodated.

34

4.     Substitute teachers will be used to provide release time for conferences that cannot be scheduled during the above-referenced times.  The need for release time and the scheduling of said time shall be discussed between the Building Committee and Building Principal.

5.     The parties shall, by mutual agreement, establish a conference schedule.

6.     Effective September 1, 2001, at the elementary school level, in addition to the traditional Annual Open House, all unit members will attend one fall and one spring evening parent/teacher conference to be scheduled by the administration following consultation with the UTN.  Conferences shall not exceed two (2) hours in duration.  A building administrator shall be present at the evening parent/teacher conferences.

P.     1.     Sections A, B, E, F, I, J, K, M, N, and O hereof shall not be applicable to Professional Registered Nurses.  The remaining provisions shall be applicable.

2.     The District and Union continue to recognize the need for the presence of Professional Registered Nurses, as set forth below, during school hours. It is, therefore, agreed that:

a.     The length of workday currently in effect shall remain in effect for the term of this contract, i.e., the professional day for Professional Registered Nurses shall commence with the scheduled arrival of the first bus in the students' instructional day and end with the departure of the last bus at the end of the students' instructional day.

b.     Each Professional Registered Nurse shall normally receive an uninterrupted, duty-free lunch period equal to that provided for teaching personnel assigned to the same building. While it is recognized that the professional responsibility of unit members may require the interruption of lunch upon occasion, the District affirms that it shall make every reasonable effort to comply with the spirit of this provision.  To that end, the Superintendent of Schools shall send a letter to District staff.

ARTICLE 32
RETIREMENT BENEFIT

A.     Effective July 1, 2015, unit members who voluntarily retire from active service with the Northport-East Northport Union Free School District with an effective date of June 30th and notify the District in writing by January 1st of the school year in which said retirement is effective will be paid a retirement benefit based upon the number of accumulated unused sick leave days according to the schedule outlined below. Where an employee voluntarily retires from active service effective on a date occurring in a month

35

other than June, he/she shall be paid said benefit provided he/she notifies the District no later than one hundred forty (140) days prior to the retirement date. The January 1 deadline or the one hundred forty (140) day prior notice requirement may be waived at the sole discretion of the Superintendent of Schools or his/her designee for extenuating circumstances. This benefit will also be paid if the employee dies while in the active service of the District. In no event shall an employee discharged for cause be entitled to this benefit.

Said benefit will be paid according to the following schedule:

| Leave Days Accumulated | Rate |
| --- | --- |
| 0-50 | 0 |
| 51 | $ 3,360 + $65.91 per day over 51 to 67 |
| 68 | $ 4,626 + $65.91 per day over 68 to 84 |
| 85 | $ 5,966 + $70.22 per day over 85 to 101 |
| 102 | $ 7,412 + $72.66 per day over 102 to 118 |
| 119 | $ 8,945 + $75.19 per day over 119 to 135 |
| 136 | $10,600 + $77.99 per day over 136 to 152 |
| 153 | $12,374 + $80.91 per day over 153 to 169 |
| 170 | $14,287 + $84.07 per day over 170 to 186 |
| 187 | $16,361 + $87.53 per day over 187 to 203 |
| 204 | $18,611 + $91.26 per day over 204 to 220 |
| 221 | $21,056 + $95.30 per day over 221 to 237 |
| 238 | $23,728 + $99.71 per day over 238 |

B.      Professional Registered Nurses will be eligible for said benefit at 95%.


ARTICLE 33
SALARY

A.      Upon expiration of the contract, no increment will be granted until the parties agree upon a subsequent labor contract. Following two successive unsatisfactory evaluations, increment may be withheld upon direction of the Superintendent.

**2014-2015:** The salary schedule for the school year July 1, 2014 through June 30, 2015 shall be created by increasing the 2013-2014 schedule by an amount equal to the value of increment, confirmed by both parties to be 2.85% for the 2014-2015 school year. Step increment shall not be granted. The UTN acknowledges that any monies retrospectively owed to unit members for the 2014-2015 school year as a result of the foregoing have been paid, retroactive to July 1st, in a separate lump sum amount.

**2015-2016**: The salary schedule for the school year July 1, 2015 through June 30, 2016 shall be created by increasing the 2014-2015 schedule by an amount equal to the value of increment, confirmed by both parties to be 2.85% for the 2015-2016 school year. Step increment shall not be granted.

**2016-2017:**  The salary schedule for the school year July 1, 2016 through June 30, 2017 shall be created by increasing the 2015-2016 schedule by 1.2%. One-half (½) of the applicable step increment will be awarded to eligible unit members effective July 1, 2016.

**2017-2018:**  The salary schedule for the school year July 1, 2017 through June 30, 2018 shall be created by increasing the 2016-2017 schedule by 1.25%. Effective July 1, 2017, eligible unit members will be awarded one-half (½) of their applicable step increment not granted during the 2016-2017 school year.

The parties have agreed upon the salary schedules attached as Appendix "A", "B", "C", and "D."  Appendix "A" shall be effective July 1, 2014, Appendix "B" shall be effective July 1, 2015, Appendix "C" shall be effective July 1, 2016, and Appendix "D" shall be effective July 1, 2017.

In the event that the assessed valuation of the Northport Power Plant is reduced during the 2016-2017 tax year (defined by the Town of Huntington as December 1 through November 30), or during the 2017-2018 tax year, resulting in a total tax revenue reduction in either year exceeding $2,215,000, any agreed upon wage increase and step incremental payment scheduled for the 2016-17 or 2017-18 school years shall not be granted. In such event, the UTN shall have the right to elect reopener negotiations concerning wages.  In order to effectuate the foregoing, any agreed upon wage increase and step increment for the 2016-17 or 2017-18 school years shall be paid on the day next following the aforesaid fixing of the tax levy, retroactive to the previous September 1st.  Any dispute arising under this paragraph shall be resolved by expedited arbitration before Jay Siegel, Esq. The party seeking arbitration shall serve a demand for arbitration on the other party within ten (10) days of the date the party demanding arbitration knew or should have known of the facts or occurrence giving rise to the dispute.  In all other respects, the rules of the American Arbitration Association shall govern the conduct of the arbitration.

B.    Longevity

1.    Effective July 1, 1993, a teacher shall be entitled to the payment of longevity salary increase according to the following schedule:

Completed Years of Service

20-24 $500.00 Total Award
25-29 $1,000.00 Total Award
30 or more $1,500.00 Total Award

A teacher is entitled to receive a longevity payment upon completion of 20, 25 and 30 or more years of service to the District as of the June 30 of the preceding school year. A teacher entitled to receive said lump sum longevity payment shall be paid the applicable sum on the payroll prior to the first payroll of the 1995-96 school year and in each succeeding school year. The first longevity payment under the 1995-99 agreement applies to all unit members who have completed 20 or more years of service prior to July 1, 1996 and who are actively employed on July 1, 1996. Said longevity roster has been constructed as set forth in a certain side letter dated December 8, 1992.

2.      In addition to the above longevity payment, an additional award of $60 per year of Northport service shall be granted to any unit member with twenty (20) or more years of service to the District, and to any unit member on Step 20 of the schedule with at least fifteen (15) years of District service.  This longevity payment shall be paid on or about August 1st following each year of eligibility, the first year beginning July 1, 2001.  (However, persons retiring shall be paid said sum on the June 30th of the retirement year.)

3.      Individuals who resign for the purpose of retirement will be paid the sum of "1" and "2" above on June 30 of the school year in which they retire.

4.      Effective July 1, 2006, Appendix "F" shall apply to those teachers identified in Attachment "3" of the Memorandum of Agreement between the District and the Union dated December 12, 2006.

5.      Notwithstanding the foregoing paragraphs, all longevity payments shall remain at the amounts in effect on June 30, 2010 for the 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years. Longevity shall be frozen for the term of this Agreement.

C.      The District shall apply for EIT funds during each year of this contract. Any EIT funds received by the District for the 2014-2015, 2015-2016, 2016-2017, and 2018-2019 school years shall be retained by the District to defray the cost of the above settlement, and shall be paid into the District's General Fund.

D.      The parties further agree that until a new salary structure is negotiated on or after July 1, 2018, the salaries for unit members shall be that in effect on June 30, 2018 for all unit members.

E.      Professional Registered Nurses will be paid pursuant to the salary schedules, which are based upon a rate of ninety-six percent (96%) of the appropriate steps of the BA column effective July 1, 2014, a rate of ninety-seven percent (97%) of the appropriate steps of the BA column effective July 1, 2015, and a rate of ninety-eight percent (98%) of the appropriate steps of the BA column effective July 1, 2016, annexed hereto as Appendix "E."

38

F.     Special Salary Provisions

     1.    Special Project and Research:  Those teachers selected by the Superintendent to perform a special assignment and/or research project shall be paid a salary increase during the period of such service, ranging from $1,000 to $3,000 per annum. The manner of performance of such duties and the nature of the project or special assignment shall be determined by the Superintendent and/or his/her designee. The Superintendent shall establish the amount of salary increase to be paid, within the above range.

     2.    Salary Increase for Professional Achievement:  In the case of professional achievement occurring after July 1, 1986, i.e., scholarly publication, election to officer status in professional association, the teacher shall be granted a $500 award upon the recommendation of the Superintendent and there shall be five (5) such awards annually.  An advisory committee to the Superintendent shall be appointed consisting of two (2) administrators appointed by the Superintendent and two (2) teachers appointed by the Union President.  The committee shall consider nominations for the awards (made by the teaching staff or administrator on or before April 1) for outstanding contributions to the teaching profession or the field of education.

     3.    The decision of the Superintendent regarding items "1" and "2" above shall be non-grievable and non-arbitrable.

G.     Teachers returning from an unpaid leave of absence will receive the same increment placement credit on the salary schedules as teachers who were not on an unpaid leave, provided the returning teacher has been paid for ninety (90) or more school days during the 12 month period immediately preceding their leave return date.

ARTICLE 34
APPLICATION OF TEACHERS'
SALARY SCHEDULE

A.     The differential for BA and sixty (60) hours will be $300 above the BA & 30 hour schedule.

B.     In addition to their regular salaries as indicated on the salary schedule, guidance counselors and psychologists shall receive 1/200th of their regular scheduled salary for each full day's work in excess of the number of days classroom teachers are required to work.  In no case shall this be less than $500.00.

C.     All personnel in this unit will be paid according to the salary schedule.

D.     Military Service - not to exceed two (2) years of credit.

     1.    One (1) year of credit on the teachers' salary schedule for each full year of military service.

39

2.      One (1) year of credit on the teachers' salary schedule for each partial year of military service of six (6) months or more.

3.      Peace Corps service or Vista service on same basis.

E.      The provisions of this article shall not be applicable to Professional Registered Nurses.

F.      Teachers shall receive a $1,000 one-time award upon acquisition of National Board Certification.

ARTICLE 35
INSURANCE

A.      Each teacher will receive Group Life Insurance coverage equal to the amount of the teacher's annual salary + $10,000.

B.      1.      As soon as possible after the effective date of this agreement, the Board will establish an Internal Revenue Code salary reduction plan for dental and health insurance, excess major medical, disability, and child and/or elder care, subject to the requirements of the Internal Revenue Code.

2.      Either the Board or the Union may demand negotiations for change of health insurance carrier or to provide for self-funding of health/dental care benefits provided that the resulting dental and/or health insurance plan or self-funded program remains the same as that provided under the current plan.   If said negotiations reach impasse, nonbinding fact-finding shall follow.

C.      The New York State Health Insurance Plan ("NYSHIP") is provided to all full-time teachers of the District with partial contribution by the District.   Effective June 30, 2014 and thereafter, the partial contribution by the District shall be as follows:

Premium

|  | District | Teacher |
|---|---|---|
| Individual Plan | 79% | 21% |
| Family Plan | 79% | 21% |

The District will offer a Health Maintenance Organization Insurance Program (HMO) for the 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years. Effective June 30, 2014, the District's portion of the premium payment for this option will not exceed seventy-nine (79%) percent.

D.      Dental Insurance: The District will appropriate each year the sum required to pay fifty-five (55%) percent of the premium costs of a dental insurance policy for the 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years. The lifetime orthodontic benefit shall be $1,500 and the maximum annual benefit shall be $1,500.

40

E.      Excess Major Medical:  The District agrees to appropriate $33,000.00 for the EMM insurance premium for 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years.

F.      Disability Insurance:  The District will appropriate $35,000.00 for the disability insurance premiums for the 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years.

The parties agree that during the term of the Agreement, July 1, 2014 to June 30, 2018, that if a new disability policy can be obtained providing for a higher benefit payment, at no additional cost to the District, the same shall be implemented.

G.      Notwithstanding the foregoing, a staff member covered as of August 29, 1989 under the Empire Health Insurance Plan may submit a waiver of coverage, in a form to be designed by the District in consultation with the Union, on or before November 1st of the school year.  The teacher shall be paid, on a yearly basis, the sum of forty (40%) percent of the then premium cost, otherwise payable by the District, in the event he/she chooses to waive coverage.  Final payment shall be on or about January 1.  In the event a teacher who has chosen this option because of an unforeseen personal event must re-enroll, the teacher shall return, on a pro-rata basis, that portion of the forty (40%) percent previously paid that year, determined as of the date of re-enrollment.  Re-enrollment shall be subject to the New York State Government Employee's Health Insurance Program Manual of Procedures for Participating Subdivisions. Teachers whose employment commences on or after September 1, 1989 will be offered the option of:

1.      Forty (40%) percent of individual premium rebate of premium;

2.      Individual coverage;

3.      Family coverage.

The above listed plan is applicable to part-time teachers on a pro-rata basis.

H.      All probationary and tenured teachers excessed as a result of abolition of positions will be provided health, major medical and dental insurance coverage, at the rates prescribed herein, for one (1) year following date of excess unless the teacher acquires a new job or unless spouse has similar coverage.

I.      Effective January 1, 2007, unit members who are married to other unit members, or to other employees of the District, will not be eligible for dual family coverage; the spouse having the birthday falling earlier in the calendar year shall be enrolled in family coverage unless the couple elects otherwise on or before the effective date of the change in coverage.  The other spouse shall have the option to be enrolled in individual coverage.

41

J.      Family health insurance will be offered to domestic partners in accordance with the applicable rules of NYSHIP.  The above listed restrictions on family health insurance coverage will be applicable to domestic partner coverage.

K.      Proration of Part-Time Benefits

1.      Teachers who voluntarily request part-time status (i.e., a leave of absence to part-time status) will be offered health, major medical, dental, life, and disability insurance coverage.  The District contribution toward premium cost shall be based upon a proration of full premium reflecting the percentage amount of the teacher's appointment. (For example, a point one, [0.1], teacher will be granted a ten [10%] percent District contribution towards premium costs).  The teacher will reimburse the District for premium costs for that portion of the premium costs payable by the teacher when billed by the District.

2.      Part-time teachers will be offered health, major medical, dental, life and disability insurance coverage at a District contribution toward premium cost based upon a proration of full premium.  The District contribution toward premium cost shall be based upon a prorationing of full premium reflecting the percentage amount of the teacher's appointment.  (For example, a point one, [0.1], teacher will be granted a ten (10%) percent District contribution towards premium costs).  The teacher will reimburse the District for premium costs for that portion of the premium costs payable by the teacher when billed by the District.

3.      Notwithstanding the above, teachers employed for less than fifty (50%) percent are not eligible for the long-term disability policy.

L.      Workers' Compensation - Whenever employees are absent on paid sick leave as a result of work-related accident occurring during duty hours and the District is awarded salary reimbursement as a result of a Workers' Compensation Board hearing, the permanent employees involved will be credited with that amount of such sick leave that they have taken on account of such accident for the first forty-five (45) days equivalent to the monetary amount received by the District divided by the per-diem substitute rate of pay, and thereafter divided by the per-diem substitute rate applicable to per-diem substitutes after forty-five (45) days of service.

Notwithstanding the foregoing, any award for partial/total disability shall be paid to the injured employee.

If the application of this formula results in the reinstatement of less than fifty (50%) percent, then the number of days reinstated will be raised to an amount equal to fifty (50%) percent of the sick days utilized.

ARTICLE 36
EXTRA COMPENSATION
FOR EXTRA SERVICES

A.  Interscholastics

1.  Wage Scale for the 2014-15, 2015-16, 2016-17, and 2017-18
school years are as follows:

| | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 |
|---|---|---|---|---|
| **FOOTBALL** | | | | |
| Varsity Head | 9,178 | 9,224 | 9,224 | 9,270 |
| Varsity Assistant | 6,321 | 6,353 | 6,353 | 6,385 |
| JV Head | 6,232 | 6,263 | 6,263 | 6,294 |
| JV Assistant | 5,077 | 5,103 | 5,103 | 5,128 |
| MS Head | 4,912 | 4,937 | 4,937 | 4,962 |
| MS Assistant | 4,473 | 4,496 | 4,496 | 4,518 |
| | | | | |
| **BASKETBALL** | | | | |
| Varsity Head | 8,512 | 8,555 | 8,555 | 8,598 |
| Varsity Assistant | 5,873 | 5,903 | 5,903 | 5,932 |
| JV Head | 6,099 | 6,130 | 6,130 | 6,160 |
| MS Head | 4,912 | 4,937 | 4,937 | 4,962 |
| MS Assistant | 4,421 | 4,443 | 4,443 | 4,465 |
| | | | | |
| **WRESTLING** | | | | |
| Varsity Head | 7,945 | 7,984 | 7,984 | 8,024 |
| Varsity Assistant | 5,481 | 5,509 | 5,509 | 5,536 |
| JV Head | 6,032 | 6,062 | 6,062 | 6,092 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |
| MS Assistant | 4,085 | 4,106 | 4,106 | 4,126 |
| | | | | |
| **BASEBALL** | | | | |
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,077 | 5,103 | 5,103 | 5,128 |
| JV Head | 5,767 | 5,796 | 5,796 | 5,825 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |
| MS Assistant | 4,085 | 4,106 | 4,106 | 4,126 |
| | | | | |
| **FIELD HOCKEY** | | | | |
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,022 | 5,047 | 5,047 | 5,072 |
| JV Head | 5,767 | 5,796 | 5,796 | 5,825 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |
| MS Assistant | 4,085 | 4,106 | 4,106 | 4,126 |

**SOFTBALL**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,077 | 5,103 | 5,103 | 5,128 |
| JV Head | 5,767 | 5,796 | 5,796 | 5,825 |
| JV Assistant | 3,979 | 3,999 | 3,999 | 4,019 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |
| MS Assistant | 4,085 | 4,106 | 4,106 | 4,126 |

**VOLLEYBALL**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,022 | 5,047 | 5,047 | 5,072 |
| JV Head | 5,767 | 5,796 | 5,796 | 5,825 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |
| MS Assistant | 4,085 | 4,106 | 4,106 | 4,126 |

**TRACK**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,767 | 5,796 | 5,796 | 5,825 |
| MS Head | 4,912 | 4,937 | 4,937 | 4,962 |
| MS Assistant | 4,473 | 4,496 | 4,496 | 4,518 |

**LACROSSE**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,077 | 5,103 | 5,103 | 5,128 |
| JV Head | 5,767 | 5,796 | 5,796 | 5,825 |
| JV Assistant | 3,979 | 3,999 | 3,999 | 4,019 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |
| MS Assistant | 4,085 | 4,106 | 4,106 | 4,126 |

**SOCCER**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| Varsity Assistant | 5,077 | 5,103 | 5,103 | 5,128 |
| JV Head | 5,767 | 5,796 | 5,796 | 5,825 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |

**CROSS COUNTRY**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 7,279 | 7,316 | 7,316 | 7,352 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |

**TENNIS**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 6,032 | 6,062 | 6,062 | 6,092 |
| JV Head | 5,077 | 5,103 | 5,103 | 5,128 |
| MS Head | 4,540 | 4,562 | 4,562 | 4,585 |

**GOLF**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 5,900 | 5,930 | 5,930 | 5,960 |
| JV Head | 5,077 | 5,103 | 5,103 | 5,128 |

**BOWLING**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 4,600 | 4,623 | 4,623 | 4,646 |

**CHEERLEADING**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 5,238 | 5,264 | 5,264 | 5,291 |
| JV Head | 4,025 | 4,045 | 4,045 | 4,065 |
| MS Head | 2,503 | 2,516 | 2,516 | 2,529 |

**SWIMMING**

| | | | | |
|---|---|---|---|---|
| Varsity Head | 2,503 | 2,516 | 2,516 | 2,529 |

**ATHLETIC COORDINATOR**

| | | | | |
|---|---|---|---|---|
| High School | 8,512 | 8,555 | 8,555 | 8,598 |
| Middle School | 5,888 | 5,918 | 5,918 | 5,948 |

2.     Post-Season Playoff Games

In the event that a varsity team is eligible to participate in post-season playoff games, participating coaches and assistant coaches shall be compensated in accordance with the requirements set forth below:

a.     Eligibility

(1).     The Head Coach of said varsity team shall be compensated in accordance with the schedule set forth in 2.b below:

(2).     The Athletic Director shall have the sole discretion to determine the number of assistant coach(es) required for each varsity team for the entire post-season. The entire post-season shall be defined as post-season playoff game(s) and official practice sessions (as defined in 2.b.(2) below). Once the number of assistant coaches is determined, the same number of assistant coaches shall be eligible for compensation throughout the entire post-season.

(3).     Subject to the limitations set forth in 2.a.(2) above, up to a maximum of two (2) varsity assistant coaches shall be eligible for compensation for participating in a particular playoff game and/ or official practice session, in accordance with the schedule set forth in 2.b. below.

(4).     Subject to the limitations set forth in 2.a.(2) above, up to a maximum of four (4) varsity football assistant coaches shall be eligible for compensation for participating in a particular playoff game and/or official practice session, in accordance with the schedule set forth in 2.b. below.

(5).     Only District employees who have received compensation from the District during the school year in which the post-season playoff game(s) takes place, shall be eligible for payment under this provision.

(6).     Once the number of assistant coaches for the post-season has been determined by the Athletic Director, the Athletic Director and the varsity head coach shall jointly select the individuals to fill said positions.

45

b.    Payment Schedule

(1).    Varsity head and assistant coaches meeting the eligibility criteria set forth above shall receive the following rate of pay for each approved official post-season game and each approved official practice session in which the head and/or assistant coaches participate.

(2).    Official practice session shall be defined as instances where students, while under the supervision of the varsity head coach, are actively engaged in the particular sport in preparation for the New York State Public High School Athletic Association OR a Section XI sanctioned post-season game.

(3).    Rate of pay per official game/official practice session for the 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years shall be as follows:

| Head Coach | $133 |
|---|---|
| Assistant Coach | $100 |

B.  Extra-Curricular

| | | |
|---|---|---|
| AM-PM Musical* | | D |
| Aerospace Club Advisor | HS | D |
| Alumni Association | HS | D |
| Amnesty Club | HS | D |
| Arts and Crafts | MS | D |
| Art Club Advisor | HS/MS | E |
| Art Club Advisor | Elem. | C |
| Art/Literary Magazine Advisor | Elem. | C |
| Art/Literary Magazine Advisor | MS/HS | E |
| Art/Literary Magazine Coordinator | Elem/MS | E |
| Baking Club | MS/HS | D |
| Banner Team | HS | E |
| Bicycle Club Advisor | MS/HS | E |
| Business Honor Society | HS | C |
| Chamber Orchestra Advisor | | E |
| Chess Club | MS/HS | D |
| Community Services Club Advisor | MS/HS | E |
| Community Services Club Asst. Adv. | MS/HS | D |
| Computer Club Advisor | HS/MS | F |
| Conflict Management Program | HS/MS | F |
| Cultural Arts Enhancement | MS | E |

46

| | | |
|---|---|---|
| Current Affairs Club | MS/HS | E |
| Curriculum Club Advisor | Elem/MS/HS | D |
| Curriculum Fair Advisor | Elem/MS/HS | D |
| DECA Club Advisor | HS | J |
| Debate Club | HS | E |
| Diplomats Workshop Advisor | HS | F |
| Fishing Club Advisor | MS | C |
| Freshman Class Advisor | HS | E |
| Future Bus. Leaders of | | |
|     America Advisor | HS | E |
| Future Teachers of America | HS | D |
| Grand Friends Advisor | | E |
| Ham Radio Advisor | | C |
| HS Drama Director | HS | I |
| HS Drama Technical Director | HS | F |
| HS Music Production Choreog. | HS | F |
| HS Music Production Costume Dir. | HS | F |
| HS Music Production Director | HS | J |
| HS Music Production Producer | HS | F |
| HS Music Production Light Dir. | HS | C |
| HS Music Production Orchestra | HS | F |
| HS Music Production Tech. | HS | F |
| HS Music Production Vocal | HS | F |
| Honor Society | HS | G |
| Honor Society | MS | E |
| Identity Club | HS | D |
| Interact | HS | E |
| Internet Coordinator | HS | D |
| Intramurals | Elem./MS | C |
| Intramurals Lunchtime | Elem./MS | C |
| Intramurals Special Education | Elem./MS/HS | C |
| Jazz Workshop | MS | E |
| Junior Class Advisor | HS | E |
| Junior National Honor Society | HS | E |
| Key Club | HS | C |
| Kickers Advisor | HS | E |
| LISEC | HS | E |
| Language Clubs | MS/HS | D |
| Law Club | HS | G |
| Leaders Club | MS | D |
| Marching Band Director | HS | I |
| Marching Band Assistant Director | HS | E |
| Mathletes | MS/HS | D |
| Math Olympiads (6th Grade) | MS | D |

47

| | | |
|---|---|---|
| Math Seminars | MS | D |
| Music/Drama Advisor | Elem. | E |
| Music/Drama Advisor | MS | F |
| Music/Drama Assistant Advisor | Elem. | D |
| Music/Drama Assistant Advisor | MS | E |
| Music/Drama Director | Elem. | G |
| Music/Drama Director | MS | H |
| Natural Helpers Advisor | HS | G |
| New York City | HS | H |
| Newspaper Advisor | MS | F |
| Newspaper Advisor | HS | F |
| Newspaper Club II | HS | D |
| Peer Counseling | MS | G |
| Peer Tutoring | MS | E |
| Pep Club | MS/HS | F |
| Photo Club | Elem. | C |
| Photo Club Advisor | MS/HS | E |
| Physical Education Leaders Club | HS | E |
| Print Club | MS/HS | E |
| Radio Club | MS/HS | D |
| SFA Advisor | HS | G |
| School Magazine | Elem. | D |
| School Store Advisor | MS | E |
| School Store Advisor | HS | K |
| Science Club | Elem. | D |
| Science Club | MS | D |
| Science Fair | MS | C |
| Scorer or Timer, All Sports (rate/game) | MS/HS | A |
| Sophomore Class Advisor | HS | E |
| Special Act. Coordinator | Elem./MS/HS | C |
| Special Activity Coordinators/ Chaperone | | |
| per Activity | Elem.**/MS/HS | B |
| per Game | MS/HS | A |
| Senior Class Advisor | HS | I |
| Senior Class Assistant Advisor | HS | F |
| Stage Band | HS | E |
| Students Activities Coordinator | HS | E |
| Student Activities Treasurer | MS | G |
| Student Activities Treasurer | HS | L |
| Student Council Advisor | Elem. | D |
| Student Council Advisor | MS | F |
| Students for 60,000 | HS | J |

48

| | | |
|---|---|---|
| Students for 60,000 Assistant Advisor | HS | D |
| Tigerettes | HS | E |
| Variety Show | MS | E |
| Variety Show | HS | E |
| Video Club | MS/HS | D |
| Wilderness Club | MS/HS | G |
| Yearbook Advisor | MS | F |
| Yearbook Advisor | HS | J |
| Yearbook Business Advisor | HS | E |
| Yorker Club | MS | E |

\*This compensation shall only apply if rehearsals are not scheduled as part of the teacher's normal teaching load.

\*\*Concerts, plays, productions, dances. Elementary music teachers may apply for this activity.

Teachers of music who accompany students for the sole purpose of chaperoning at County and State festivals and County and State music activities held out of District AND which take place when school is not normally in session will be compensated at wage scale "B" for such chaperoning.

The letter references set forth alongside of each extra compensation position, as listed above, are intended to coincide with the following wage scale for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018 school years.

1. <u>Wage Scale-Extra Curricular</u>

| | **2014-2015** | **2015-2016** | **2016-2017** | **2017-2018** |
|---|---|---|---|---|
| A | $ 91.46 | $ 91.91 | $ 91.91 | $ 92.37 |
| B | $ 159.80 | $ 160.59 | $ 160.59 | $ 161.40 |
| C | $ 1,386.90 | $ 1,393.83 | $ 1,393.83 | $ 1,400.80 |
| D | $ 1,706.49 | $ 1,715.02 | $ 1,715.02 | $ 1,723.60 |
| E | $ 2,336.63 | $ 2,348.31 | $ 2,348.31 | $ 2,360.05 |
| F | $ 3,096.41 | $ 3,111.89 | $ 3,111.89 | $ 3,127.45 |
| G | $ 3,836.09 | $ 3,855.27 | $ 3,855.27 | $ 3,874.54 |
| H | $ 4,479.29 | $ 4,501.68 | $ 4,501.68 | $ 4,524.19 |
| I | $ 5,122.49 | $ 5,148.10 | $ 5,148.10 | $ 5,173.84 |
| J | $ 5,960.66 | $ 5,990.46 | $ 5,990.46 | $ 6,020.41 |
| K | $ 7,031.99 | $ 7,067.14 | $ 7,067.14 | $ 7,102.48 |
| L | $ 7,673.18 | $ 7,711.54 | $ 7,711.54 | $ 7,750.10 |

49

a.     Pay for seasonal activities listed above will be made upon satisfactory completion of the activity as recommended by the supervisor (i.e., Principal, Director, etc.).

b.     Any teacher who qualifies for supplementary pay for extra services rendered during any part of any school year must submit to the Building Principal involved by April 30 a complete report covering all aspects of the extra services performed. The report shall include such information as:

(1).     Numbers of students involved

(2).     Number of hours spent in supervisory and advisory capacities before and after regular school hours, evenings, Saturdays and holidays, etc.

(3).     Special events and significant programs held during the school year

(4).     Expenses, if any, incurred by teacher in performance of assigned duties

(5)     Other pertinent factors which will help to further clarify the nature of the particular services.

c.     The Building Principal or Director involved, upon receipt of report submitted, will evaluate the quality of such services rendered, and will recommend to the Superintendent for Board consideration that:

(1)     Supplementary salary payment be made to designated teacher in one lump sum upon completion of the activity.

(2).     Supplementary salary payments be withheld because such services were not rendered in accordance with duties, responsibilities and functions specified in description of extra pay assignment in question.

(3).     Supplementary salary be modified in accordance with certain services not rendered.

2.     Procedures for applying for extra-pay assignments:

a.     Notice of vacancies for extra-pay assignment shall be listed in all schools at least ten (10) school days and when practical twenty (20) school days prior to the closing date for applications.  Copies of such notices shall be sent to all BC chairpersons.

50

b.      The posting shall include a description of the duties for the assignment, the qualifications required, the location for the assignment and compensation.

c.      Application for such assignment shall be made to the appropriate Building Principal or Director, unless otherwise specified.

d.      Extra-pay assignment shall be considered vacated at the termination of the assignment and must be reapplied for if desired.  All such assignments will be open to application by all qualified personnel.

e.      Guidelines and regulations for any extra-pay assignment or position will be determined after consultation with the Union.

3.      New positions may be created by the Board of Education in its sole discretion after compliance with Article 21 of this Agreement.

4.      Any of the foregoing positions may be filled at the sole discretion of the Board of Education.

5.      The Union shall have the right to submit proposals for extra-pay positions to the Board of Education for their consideration.

6.      The Board of Education recognizes that extra-pay and sports activities are an important component of the overall educational program.  However, in the event of the abolition of an extra-pay position(s), the President of the Union may request negotiations with the District concerning the impact of the decision to abolish said position(s) as presently required by the Taylor Law of the State of New York.

7.      Professional Registered Nurses, who are qualified, may apply for any extra-pay position in the District.

8.      Effective July 1, 2002, a mentor stipend in the amount of $1,200 shall be implemented. Prior to the foregoing date, the parties shall establish a committee to develop recommended guidelines for the position, including duties and necessary training. The committee will submit its recommendation to the Superintendent of Schools for his review and/or implementation.

9.      A joint committee shall be established to review and provide recommendations regarding co-curricular and extra-curricular stipend amounts.

## ARTICLE 37
## COMPENSATION FOR
## PROFESSIONAL ACTIVITIES

A.    Staff members recommended by the Superintendent of Schools and approved by the Board of Education for employment or training during July, August and other periods of time not included in the professional staff calendar shall be compensated as follows:

1.    For those teachers whose assignment involves active participation in a program, i.e., as a writer of curriculum or a scorer of State assessment testing, the hourly rate of pay shall be $49.35 for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018.

2.    For those teachers whose assignment involves instructing a workshop, the rate of pay shall be $57.57 for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018.

3.    For those teachers who attend a conference or workshop wherein the major effort takes place within the conference or workshop setting, the rate of pay shall be $36.18 for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018.

4.    For those teachers who participate in an assignment conducted immediately after school wherein they do not leave the District, the minimum time limit per session for both the assignment and compensation will be one (1) hour. For those teachers who participate in an assignment wherein they must come to the District from their homes or elsewhere, the minimum time limit per session for both the assignment and compensation will be two (2) hours. Reimbursement for registration and per-diem living expenses, where the activity is located other than the district, will be allowable when required of the participant. This compensation shall apply to activities:

a.    Required by the District as part of an approved program;

b.    Determined as necessary for the improvement of skills and knowledge pertaining to specific courses;

c.    Recommended as a service which upgrades the quality of the educational program.

B.    Restrictions:

1.    Fellowships procured by a staff member and approved by the Superintendent of Schools shall carry no compensation other than reimbursement for travel and registration required of the participant.

52

2.      Teachers receiving compensation under this policy shall not receive in-service or course credit applicable for salary transfer purposes.

3.      For summer school employment, see Article 40.

ARTICLE 38
COMPENSATION FOR HOME INSTRUCTION

A.      Permanent staff working on assignment as home instructor shall be paid at the rate of $74.00 for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018.

B.      Mileage from the teacher's home school to the home of the pupil, and return, shall be paid at the prevailing IRS rate upon ratification of this contract.

C.      No teacher shall be required to accept the assignment as home instructor; failure to accept such an assignment shall not be considered negatively in the teacher's evaluation.

ARTICLE 39
TAX SHELTERED ANNUITY

A.      A tax sheltered annuity plan is basically an agreement between the Board of Education and the individual teacher to withhold or reduce an agreed upon portion of a teacher's salary and to apply those funds to the purchase of an annuity plan or program.

B.      Any member who wishes to initiate, change or terminate participation in this plan may do so by notifying the School District business office in writing at least thirty (30) days in advance of the initiation, termination, or change.

C.      The contributions to the annuity plan will be automatically deducted in equal parts from each paycheck and forwarded to the companies after they have submitted their monthly statements verifying contract members to the business office.

ARTICLE 40
SUMMER SCHOOL

A.      No teaching position shall be filled by a teacher not employed by the District if there is an equally qualified (certified) applicant for such a position who is employed by said School District. Only properly certified applicants shall be considered for a summer school position. In determining whether an applicant is the best qualified applicant for the position, the Superintendent or his/her designee shall utilize the criteria set forth in paragraph (C) of this Article.

B.    All openings for Summer School positions shall be sent to all teachers employed by the District as soon as possible.

C.    When applicants for Summer School positions exceed the positions available, the best qualified applicant shall be selected. In making such selection, the Superintendent or his/her designee shall consider the following criteria:

1.    recent teaching experience of subject/course matter during the regular school year;

2.    recent teaching experience of subject/course matter during summer school;

3.    teaching performance during the regular school year;

4.    teaching performance during summer school; and

5.    years of service in prior summer school positions.

The criteria set forth in Section C, above, of this Article shall not be applied to applicants holding the following positions:

- Attendance teacher
- Commons manager
- UTN President
- Teacher coordinator, e.g. Law Program

Should two (2) or more applicants be equally qualified, District seniority may be considered as additional criteria, beginning the summer of 1981.

D.    Summer School teachers will be granted one (1) personal leave day and one (1) sick leave day.  The foregoing sick and personal days may be accumulated as a part of the teacher's accumulated sick leave bank if the same are unused during Summer School, following application to the personnel office. Teachers employed by the District may use additional days from accumulated sick leave from the regular school year if more than one day's sick leave is required.

E.    It is understood that teachers may be observed during the summer session. Such observations are to be conducted in accordance with the procedures set forth in Article 19 of this Agreement.  It is understood that the dates set forth in Article 19 are not applicable to summer school evaluations. All evaluations (self and administrative) for the Summer Session, must be completed and given to the administrator/teacher by the August 31st following the conclusion of the summer school session.

F.    Identification of elementary pupils who will attend Summer School must be accomplished by June 15, whenever feasible.

54

G.     Classes of different subject matter should not be combined for the purpose of instruction without the consent of the teacher.

H.     Summer School pay shall be at the following rates for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018:

1.     Elementary  Summer School Program

Teacher - 4 hours per day;
20 days                                    $4,055.37

2.     Pre-School Summer School Program

Teachers - 4 hours per day;
30 days                                    $6,083.08

Other staff - 4 hours
per day                                    $202.78

3.     Extended School Year Program

 Teacher - 6 hours per day;
 30 days                                   $9,124.33

Teacher staff - 4 hours
per day                                    $202.78

4.     Summer Music Program

Teacher - 4 hours per day;
25 days                                    $5,069.22

In District substitute rate shall be as follows for the school 2014-2015, 2015-2016, 2016-2017, and 2017-2018:

 per 2 hour course:           $101.41

I.     Teachers employed for Summer Enrichment Music Clinic will be compensated at the rate of 1/200th of their annual salary, per day for trip days.

J.     Personnel employed for Summer School Enrichment Programs, which are contingent upon budget passage, shall be employed subject to Section "C" above.

55

K.      The President of the Union may consult with the Superintendent of Schools, or his/her designee, concerning the application of the relevant provisions of this Agreement to the Summer School Program prior to offering Summer School positions.

L.      Sections A, B, C, D, G, I and J shall be applicable to Professional Registered Nurses. The remaining sections shall not be applicable.

ARTICLE 41
TEACHER ATTENDANCE REVIEW

Should a teacher's building administrator or supervisor be concerned with a teacher's attendance record, the following steps shall be taken:

A.      The direct supervisor will meet with the staff member and informally discuss the nature of the concern with the teacher.

B.      After a reasonable period of time, to be determined by the supervisor, if the absentee problem has continued, a formal letter will be sent to the teacher stating the nature of the concern. In addition, the supervisor shall arrange a meeting among the affected teacher, the supervisor and the Superintendent or his/her designee. The teacher may bring a Union representative to this meeting.

C.      The meeting will be held at a mutually convenient time and will be intended to produce a satisfactory resolution of the problem. Failure by the teacher to abate the attendance problem shall result in the placement of a letter in the teacher's personnel file by the Superintendent of Schools or his/her designee setting forth the nature of the attendance problem and indicating the failure of the teacher to correct the situation. The letter shall also summarize prior meetings with the teacher held with administration regarding the administration's concern with the teacher's attendance. Further, the teacher may be required to substantiate future use of sick days by a physician's note for up to the balance of the then current school year and the next following school year and/or be required to substantiate all requests for personal leave by submission of a written statement setting forth the reason(s) underlying the personal leave request for up to the balance of the then current school year and the next following school year.

D.      Nothing herein shall prohibit the District from taking action in accordance with law including but not limited to the provisions of Section 913 and 3020-a of the Education Law.

# ARTICLE 42
## LEAVES OF ABSENCE

A.     Sick Leave

1.     Absence of a teacher from duty during the period September 1-June 30 of any school year resulting from personal accident or personal illness, or death in the immediate family shall be considered "Sick Leave of Absence."

2.     Effective September 1, and on each anniversary date thereafter, each teacher shall be credited with fifteen (15) days "Sick Leave of Absence" with full pay. To the extent not used, sick leave shall be cumulative from year to year during term of employment.

3.     Charges against accumulated sick leave credits shall be applied only on such day or days during the period September 1-June 30 of any school year as the teacher is regularly scheduled to be on duty.

4.     Teachers quarantined in their places of residence, because of illness of some member of the household with a contagious disease or by contact with student in school, shall be granted leave of absence without salary deduction for the duration of the quarantine or such other period as the school doctor shall certify as requisite or prudent.

5.     Teachers unable to attend to their school duties for any of the above-stated reasons, or otherwise, shall notify the person designated as promptly as possible stating the probable duration of their absence, so that arrangements may be made to obtain a substitute.

6.     Teachers shall receive written notification annually of the amount of accumulated "Sick Leave of Absence."

B.     Personal Days

1.     Teachers may use up to five (5) days of accumulated sick leave of absence for personal reasons.

2.     Family illness is to be reported as "sick" instead of personal.

3.     The parties agree that, because of the importance to children of a teacher being in the classroom, teachers are expected, when possible, to schedule personal business on days when school is not in session.  Personal days are only to be used when this is not possible.

4.     Personal days (up to five per school year) that are not contiguous with a vacation period or weekend do not require prior approval.  Teachers are not required to give a reason for these days unless abuse is suspected.

5. Personal days (up to five per school year) that are contiguous with a vacation period or weekend require the prior approval of the building principal and/or immediate supervisor. Requests that would extend a weekend or holiday by more than two additional days also require the approval of the Assistant Superintendent for Human Resources.

Requests for Personal Leave of Absence forms must be completed and submitted to the Office of Human Resources for all requests that are contiguous with a vacation period or weekend.

6. Any personal day requests that would result in an excess of five being taken in any one school year must receive the prior approval of the Superintendent of Schools or his/her designee. (It is understood that certain situations may make prior approval impossible. In those instances, paperwork must be submitted immediately upon return to work. It is also understood that the District retains the right to disapprove the day, in which case, the individual's annual pay will be reduced by 1/200 for each day.)

7. Personal days in excess of five will only be granted for very serious needs. Days that are denied may not be taken "without pay".

8. The Assistant Superintendent for Human Resources will initiate an attendance review when abuse of personal days is suspected, including suspected abuse of the five allowable days per school year.

C. With prior approval of the Superintendent of Schools, teachers may be absent for the following professional reasons:

1. Delegate to a Union affiliated organization.

2. To attend a professional workshop, seminar, conference or training lab (non-deductible).

3. Visitation for purpose of observing teaching methods and techniques (non-deductible).

D. Days used for jury duty are nondeductible. Payment for District service is conditioned upon employee furnishing the District with a statement of jury service (obtainable from the Court Commissioner of Juries) and upon the employee's reimbursement to the District of salary monies received on account of said service.

E. 1. Following the grant of a Family and Medical Leave Act ('FMLA') leave, provided that the teacher gives thirty (30) days notice prior to the termination of said leave,

58

an employee may request an unpaid child care leave of absence for the balance of the then current school year. (In the event that no FMLA leave precedes the start of an unpaid child care leave thirty (30) days notice prior to the anticipated start date of a proposed unpaid child care leave shall be given). If an unpaid child care leave is occasioned by the birth of a child during April, May or June, notice must be given as soon as possible, but not later than thirty (30) days after the birth of the child. Such leave may be extended for the following school year at the expiration of which the employee must resume his/her employment or forfeit his/her rights to employment. To extend a child care leave of absence into the following school year, the employee must notify the District by May 1st of the first year of the child care leave.

       2.     Any employee shall be entitled to utilize cumulative paid sick leave for absences directly resulting from disability incident to pregnancy or birth, provided that the employee submits medical verification of the disability satisfactory to the District.

       3.     Requests for part-time leaves shall be subject to the discretion of the District, pursuant to the Board practice in effect on June 30, 1986.

    F.     A joint committee shall be established to ascertain, inter alia, the cost/benefit of child care/family leaves as well as a child care facility.

    G.     Bereavement Leave

    Effective January 23, 2013, unit members shall be entitled to one day of bereavement leave annually for the death of an immediate family member, which shall not be chargeable to sick leave or any other existing category of leave. ("Immediate family" shall be defined as parent(s), spouse, child, sibling, grandchild, grandparent(s), father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandmother-in-law, grandfather-in-law, step-mother, step-father, and step-children.) If said day of bereavement leave is not utilized during the school year, the day may not be carried over to a subsequent school year.

ARTICLE 43
STAFF SIGN-OUTS

    A.     During lunch, each staff member shall be free to leave the building to attend to personal business. At times other than lunch, teachers will adhere to procedures established by the building principal. The staff member shall notify building principal or a designee of departure.

    B.     The provisions of this article shall not be applicable to Professional Registered Nurses.

## ARTICLE 44
## PROFESSIONAL DEVELOPMENT FUND

A . A Professional Development Fund is established in the following amount for the stated purposes and years indicated:

For Teacher In-Service Training, the rate of pay shall be $61,693 for school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018.

It is understood that effective July 1, 1993, said Professional Development Fund will be reduced by $25,000 to defray the cost of releasing the President of the Union from his/her teaching and non-instructional duties as set forth in this paragraph.

B.    Professional Development Committee

1.    The Professional Development Committee shall be composed of three (3) administrators appointed by the Superintendent and three (3) teachers appointed by the Union. Positive action of this committee must be approved by four (4) of the above designated committee members.

2.    Meetings shall be called by the Superintendent of Schools at the request of either the administration or the Union.

3.    This committee shall review all applications submitted under the provisions of this article (see paragraphs C & D below) prior to Board action. Administrative proposals may be submitted to the Professional Development Committee.

4.    Prior to delivery of final committee recommendations to the Board, the same shall be submitted to the Superintendent of Schools for his/her review and comment.

5.    The Board of Education reserves the right to reject individual proposals of the PDC, but may not reject the total expenditures listed in paragraph A above, if there are adequate acceptable proposals.

C.    Teacher In-Service Training

1.    In cases of direct and significant benefit to the District, special grant leaves may be awarded.  Such leaves shall not exceed one (1) year in duration.  In the event such special grant leave is awarded, an amount equal to the cost of the substitute teacher employed to replace the teacher on special grant leave shall be deducted from the total appropriation for Teacher In-Service Training listed in paragraph A above, not to exceed $15,000.00 per replacement.

2.    When it appears that a particular need for the employment of a teacher in another certification area arises, such requests may be granted. The procedure for such requests shall be as follows:

a.    All applicants will be granted a personal counseling session with the Superintendent or his/her designee to determine their qualifications and course needs for participation in this program and in relation to projected staff vacancies.

b.    A determination of eligibility and a prescription for participation shall be prepared by the administration.

c.    Thereafter, the teacher may submit an application for participation in this program to the Professional Development Committee for review and recommendation to the Board of Education.

d.    Any teacher found not qualified by the administration may submit an application to the Committee within ten (10) school days of the date he/she is notified by the administration.

e.    Successful applicants will agree in writing to complete all necessary course work.

f.    In the event that a teacher willfully fails to complete the prescribed course work, all sums expended by the District shall be reimbursed by said teacher. However, when the teacher is notified that the projected vacancy is not available and that he/she will not be employed, the foregoing shall not apply.

g.    Teachers whose participation in this program is approved by the Board of Education shall be reimbursed for all costs involved including tuition, fees and textbooks. Payment shall be made as soon after enrollment as possible. In any event, the District will supply the teacher with a certificate for submission to the educational institution involved, setting forth that the District will pay for all approved tuition and fees charged by the institution.

h.    Salary credit shall be granted to the individual for course work accomplished hereunder, only when an advanced degree or professional diploma is granted.

3.    The Professional Development Committee shall review all proposals for Teacher In-Service Training, Additional Certification and special grant leave requests, if any, according to the following standards:

        a.     Benefit to the District, and in the case of a special grant leave whether the application will result in direct and significant benefit to the District;

        b.     Benefit to the individual;

        c.     Benefit to the teaching profession;

        d.     In the case of a special grant leave request, the Committee will consider the recommendation of the individual's immediate supervisor.

## ARTICLE 45
## PROFESSIONAL REGISTERED NURSES

The following provisions shall be applicable to Professional Registered Nurses:

A.     Orientation and Training

     1.     An orientation program will be provided for all new nurses.

     2.     A joint committee (with equal representatives of Professional Registered Nurses and administrators) will be established to develop District-sponsored in-service programs.

     3.     The District agrees to reimburse each nurse who enrolls in course(s) designed to upgrade professional competence provided prior approval has been granted by the Superintendent of Schools.

B.     Duties - The duties of Professional Registered Nurses, currently in effect as set forth in the job description dated 9/17/76 on file in the Office of Human Resources, shall remain in effect during the term of this contract.

C.     Term Appointees - Full time term appointees appointed to replace a Professional Registered Nurse on extended leave, shall be placed on the appropriate salary step. Such appointees shall participate in all applicable employee benefits.

D.     Extra Pay - Extra pay shall be at the rate of 1/200th per full day (1/400th per four (4) hour day; 1/800th per two (2) hour day). Extra pay for athletic contest of one-half (1/2) day or less in duration shall be at the rate of 1/400th.

E.     Notwithstanding the above, the position of Lead Nurse will be compensated at a rate of $4,933 for the school years 2014-2015, 2015-2016, 2016-2017, and 2017-2018.

F.     A nurse may request per diem clerical assistance in circumstances when administrative and clerical tasks prevent the nurse from attending to the medical needs of the students.  Such requests must be submitted to the building principal and be approved by the Assistant Superintendent for Human Resources.

## ARTICLE 46
## OTHER LEAVES OF ABSENCE

A.     The Superintendent may recommend other leaves of absence for reasons not stated herein upon such conditions as the Board may deem appropriate.

B.     Such leaves shall not normally exceed two (2) years.

## ARTICLE 47
## PERSONAL INJURY BENEFIT

A.     Whenever a teacher is absent from school as a result of personal injury caused by an assault occurring in the discharge of his/her duties and not as the result of negligence, he/she will be paid full salary for the period of such absence and no part of such absence will be charged to annual sick leave. Such pay shall continue for a period of one (1) calendar year, after which sick leave and extended sick leave shall apply.

B.     The District will reimburse teachers for any clothing or other personal property damaged or destroyed as the result of an assault occurring in the discharge of duties and not as the result of negligence.

## ARTICLE 48
## PROTECTION

A.     Teachers will immediately report in writing to the school principal all cases of assault suffered by them in connection with their employment.

B.     The written report will be forwarded to the Board by the Superintendent. The Superintendent will comply with any reasonable request from the teacher for information relating to the incident and will act in appropriate ways as liaison between the teacher, the police and the courts.

## ARTICLE 49
## MISCELLANEOUS PROVISIONS

A.      This Agreement may be altered, changed, added to, deleted from or modified only through the voluntary and mutual consent of the parties in a written and signed amendment to this Agreement.

B.      This Agreement shall supersede any rules, regulations or practices of the Board and/or Administration which shall be contrary to or inconsistent with its terms. The provisions of this agreement shall be incorporated into and be considered part of the established policies of the Board.

C.      Any arrangement, agreement or contract hereafter executed shall be expressly made subject to and consistent with the terms of this or subsequent agreements to be executed by the parties. If an arrangement, agreement or contract contains any language inconsistent with this Agreement, this Agreement during its duration shall be controlling.

D.      The invalidity of any provision hereof, shall not affect, impair or invalidate the remainder, but shall be confined to such provision directly involved in the controversy in which such invalidity was determined.

E.      Copies of this Agreement shall be printed at the expense of the Board and available to all teachers now employed or hereafter employed by the Board within two (2) weeks after its execution or employment if that occurs later.

F.      It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefor, shall not become effective until the appropriate legislative body has given approval.

## ARTICLE 50
## DURATION OF AGREEMENT

This contract shall be effective as of July 1, 2014 and shall continue in effect through June 30, 2018.

## ARTICLE 51
## TEACHING ASSISTANTS

A.    The salary schedule for Teaching Assistants is attached hereto as Appendix G.  Placement on the salary schedule shall be in accordance with full years of service as a Teaching Assistant.  Level 4 will only be applicable for those Teaching Assistants holding a New York State Teaching Certificate.

B.    Teaching Assistants shall be entitled to longevity payments for years of service in the District as follows:

|  |  |  |
|---|---|---|
| - after 15 years of service | - | $225 |
| - after 20 years of service | - | $225 |
| - after 25 years of service | - | $300 |
| - after 30 years of service | - | $300 |

C.    The following enumerated Articles and Paragraphs of this contract shall be applicable to Teaching Assistants.   Any and all provisions not identified in this subparagraph shall not be applicable to Teaching Assistants.  The applicable Articles are as follows:

Applicable Articles: 1, 2, 3, 4, 5, 6 (Paragraphs A and B), 7 (except Paragraph F), 8, 9, 10, 11, 12 (Paragraph B), 13, 14, 15, 17, 20, 23 (Paragraphs A.1 and C), 26 (Paragraphs C and D), 29 (Paragraphs H and I), 31 (Paragraph G), 36 (Except Paragraph A.8 [mentor stipend]), 38, 39, 40, 41, 42 (Paragraphs A, B, C.1, D, E), 43, 44 (Paragraphs A and B), 46, 48, 49 and 50.

D.    INSURANCES

1.    Health Insurance

The District shall pay eighty-six (86%) percent of the cost of the health and welfare plan for full-time employees.  The District's contribution shall be eighty-five (85%) percent effective July 1, 2011, eighty-four (84%) percent effective July 1, 2012, and eighty-three (83%) percent effective June 30, 2014.

Teaching Assistants who have had health insurance coverage for two (2) years and who opt-out of such coverage by January 1, 2009, shall receive an annual payment of $2,000 provided they continue to opt-out.  No other Teaching Assistants shall be eligible for the opt-out payment.

65

2.     <u>Disability Insurance</u>

Teaching Assistants shall be eligible for the disability benefit provided to Teachers, subject to the requirement that Teaching Assistant contribute fifty (50%) percent of the increase in the cost of providing such benefit to the Teaching Assistants.

3.     <u>Life Insurance</u>

Upon completion of one year of active service in the District, Teaching Assistants will receive a group life insurance benefit in the amount of fifteen thousand ($15,000) dollars.

4.     <u>IRC Salary Reduction Plan</u>

The District will establish an IRC salary reduction plan for health insurance, EMM, child and/or elder care, subject to the requirements of the Internal Revenue Service.

5.     <u>Dental Insurance</u>

Teaching Assistants shall be eligible to participate in the Dental Plan by contributing one hundred (100%) percent of the premium toward such plan.

6.     <u>Excess Major Medical</u>

Teaching Assistants will be eligible to participate in the excess major medical benefit reflected in Article 35, Paragraph E of the contract.

E.     <u>PERSONNEL FILES</u>

No material that is negative, evaluative or disciplinary in nature shall be filed in Teaching Assistants' personnel files unless the employee has had the opportunity to see the material and sign off attesting to such review. The signature shall not imply or infer that the employee agrees with the content therein. Unit members shall have the right to answer any material by submitting such written response within thirty (30) days.

F.     <u>JOB DESCRIPTION</u>

The job description of Teaching Assistants shall be consistent with N.Y.C.R.R. §80-5.6.

G.     <u>WORK DAY</u>

The length of the work day shall be 7.5 hours. There shall be one-half hour lunch break and two fifteen minute breaks. One of these fifteen minute breaks shall be combined with the thirty (30) minute lunch break. This forty-five (45) minute uninterrupted

66

lunch break shall be in place as of July 1, 2009. At the High School the Teaching Assistants' remaining break will be subsumed within a duty/break period, which shall be equally divided between a duty assignment and break time (effective July 1, 2009).

Whenever feasible, breaks shall be scheduled to avoid extended, continuous supervision of students. Teaching assistants may be permitted to take advantage of opportunities within the work day to better plan for their professional responsibilities subject to the building administrator's review and agreement.

H.    VACANCIES

Teaching Assistants shall be permitted to be considered for vacant positions that exist or may arise during the school year by submitting a letter of interest at any time to the Office of Human Resources. Such requests will be considered in the best interests of the District and at the sole discretion of the Assistant Superintendent for Human Resources.

I.    RETIREMENT BENEFITS

Teaching Assistants who voluntarily retire will be paid a retirement benefit based upon the number of accumulated unused leave days according to the following schedule, provided, ninety (90) calendar days advance notice is given. The three months notice may be waived for extenuating circumstances. This benefit will also be paid if the employee dies while in the active service of the District. In no event shall an employee whose services have been terminated be entitled to this benefit. In order to participate in this benefit, an employee must meet the NYSTRS criteria for retirement.

Teaching Assistants shall receive their then current daily rate of pay for accumulated sick leave based on a formula of one (1) day for every five (5) days accumulated. Sick days accumulated after June 30, 2006, or after the date upon which the employee is appointed as a Teaching Assistant, whichever is earlier, shall be paid at the rate of one (1) day for every four (4) days accumulated (subject to reduction as days are utilized).

J..    Professional Development Fund

Teaching Assistants shall be permitted to access the professional development funds reflected in Article 44 of the contract for approved local workshops. Such workshops shall not exceed two (2) days.

K.    Workers' Compensation

Whenever employees are absent on paid sick leave as a result of a work-related accident occurring during duty hours and the District is awarded reimbursement as a result of the Worker's Compensation Board hearing, the permanent employee involved will be credited with the amount of sick leave that he/she has taken on account of such accident equivalent to the monetary amount received by the District divided by the employee's daily rate of pay.

Dated: 2/4/2016

_____
Mr. Robert Banzer
Superintendent of Schools

Dated: 2/4/2016

_____
Ms. Antoinette L. Blanck
President, United Teachers of
Northport

68

**APPENDIX A**

**2014-2015 Schedule (2013-2014 Schedule + 2.85%)**

| Step | BA | BA15 | BA30 | MA | MA15 | MA30 | MA45 | MA60 | MA75 | DR |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 50,971 | 52,215 | 54,326 | 57,899 | 59,717 | 62,361 | 63,703 | 65,102 | 67,713 | 70,327 |
| 2 | 52,378 | 53,917 | 56,198 | 59,800 | 61,826 | 64,473 | 65,984 | 67,495 | 70,078 | 72,664 |
| 3 | 53,784 | 55,618 | 58,069 | 61,700 | 63,937 | 66,583 | 68,264 | 69,885 | 72,440 | 74,998 |
| 4 | 55,897 | 57,870 | 60,602 | 64,513 | 66,752 | 69,396 | 71,218 | 73,067 | 75,510 | 77,954 |
| 5 | 58,005 | 60,122 | 63,134 | 67,329 | 69,566 | 72,211 | 74,171 | 76,244 | 78,577 | 80,907 |
| 6 | 60,117 | 62,373 | 65,667 | 70,142 | 72,380 | 75,025 | 77,127 | 79,425 | 81,646 | 83,864 |
| 7 | 62,227 | 64,628 | 68,201 | 72,958 | 75,193 | 77,840 | 80,082 | 82,603 | 84,712 | 86,818 |
| 8 | 64,338 | 66,876 | 70,733 | 75,770 | 78,007 | 80,654 | 83,039 | 85,788 | 87,932 | 90,131 |
| 9 | 66,449 | 69,128 | 73,266 | 78,584 | 80,823 | 83,468 | 85,993 | 88,967 | 91,191 | 93,472 |
| 10 | 68,559 | 71,379 | 75,799 | 81,398 | 83,636 | 86,281 | 88,948 | 92,147 | 94,451 | 96,813 |
| 11 | 70,670 | 73,630 | 78,332 | 84,210 | 86,452 | 89,097 | 91,902 | 95,325 | 97,709 | 100,151 |
| 12 | 72,779 | 75,883 | 80,865 | 87,027 | 89,265 | 91,910 | 94,856 | 98,507 | 100,968 | 103,492 |
| 13 | 74,889 | 78,133 | 83,394 | 89,842 | 92,079 | 94,724 | 97,812 | 101,686 | 104,226 | 106,834 |
| 14 | 77,001 | 80,383 | 85,929 | 92,657 | 94,892 | 97,538 | 100,767 | 104,865 | 107,486 | 110,174 |
| 15 | 79,111 | 82,634 | 88,460 | 95,469 | 97,706 | 100,353 | 103,721 | 108,047 | 110,747 | 113,516 |
| 16 | 81,225 | 84,886 | 90,996 | 98,284 | 100,521 | 103,167 | 106,677 | 111,226 | 114,004 | 116,856 |
| 17 | 83,333 | 87,138 | 93,526 | 101,098 | 103,334 | 105,978 | 109,631 | 114,404 | 117,264 | 120,197 |
| 18 | 85,446 | 89,391 | 96,060 | 103,911 | 106,149 | 108,795 | 112,587 | 117,585 | 120,525 | 123,537 |
| 19 | 87,556 | 91,639 | 98,592 | 106,726 | 108,963 | 111,608 | 115,540 | 120,766 | 123,785 | 126,879 |
| 20 | 89,667 | 93,893 | 101,126 | 109,540 | 111,777 | 114,423 | 118,493 | 123,946 | 127,044 | 130,218 |

**APPENDIX B**

**2015-2016 Schedule (2014-2015 Schedule + 2.85%)**

| Step | BA | BA15 | BA30 | MA | MA15 | MA30 | MA45 | MA60 | MA75 | DR |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 52,424 | 53,703 | 55,875 | 59,550 | 61,419 | 64,138 | 65,519 | 66,957 | 69,643 | 72,331 |
| 2 | 53,871 | 55,454 | 57,800 | 61,504 | 63,588 | 66,310 | 67,865 | 69,419 | 72,075 | 74,734 |
| 3 | 55,317 | 57,203 | 59,724 | 63,458 | 65,759 | 68,481 | 70,209 | 71,876 | 74,505 | 77,136 |
| 4 | 57,490 | 59,519 | 62,329 | 66,351 | 68,654 | 71,374 | 73,248 | 75,149 | 77,662 | 80,176 |
| 5 | 59,658 | 61,835 | 64,934 | 69,248 | 71,548 | 74,269 | 76,285 | 78,417 | 80,817 | 83,213 |
| 6 | 61,830 | 64,151 | 67,538 | 72,141 | 74,442 | 77,163 | 79,325 | 81,688 | 83,973 | 86,254 |
| 7 | 64,001 | 66,470 | 70,145 | 75,037 | 77,336 | 80,058 | 82,364 | 84,957 | 87,127 | 89,292 |
| 8 | 66,171 | 68,782 | 72,749 | 77,929 | 80,230 | 82,953 | 85,406 | 88,233 | 90,438 | 92,699 |
| 9 | 68,343 | 71,098 | 75,354 | 80,823 | 83,126 | 85,847 | 88,444 | 91,503 | 93,790 | 96,136 |
| 10 | 70,513 | 73,413 | 77,960 | 83,717 | 86,019 | 88,740 | 91,483 | 94,774 | 97,143 | 99,572 |
| 11 | 72,684 | 75,729 | 80,564 | 86,610 | 88,915 | 91,636 | 94,521 | 98,042 | 100,493 | 103,006 |
| 12 | 74,853 | 78,045 | 83,169 | 89,507 | 91,809 | 94,529 | 97,560 | 101,314 | 103,845 | 106,441 |
| 13 | 77,024 | 80,360 | 85,771 | 92,402 | 94,703 | 97,423 | 100,600 | 104,584 | 107,197 | 109,879 |
| 14 | 79,195 | 82,674 | 88,378 | 95,297 | 97,597 | 100,318 | 103,639 | 107,853 | 110,550 | 113,314 |
| 15 | 81,366 | 84,989 | 90,981 | 98,190 | 100,491 | 103,213 | 106,677 | 111,126 | 113,903 | 116,751 |
| 16 | 83,540 | 87,305 | 93,589 | 101,086 | 103,386 | 106,107 | 109,717 | 114,396 | 117,253 | 120,187 |
| 17 | 85,708 | 89,621 | 96,191 | 103,980 | 106,279 | 108,998 | 112,755 | 117,665 | 120,606 | 123,622 |
| 18 | 87,881 | 91,939 | 98,798 | 106,873 | 109,175 | 111,895 | 115,796 | 120,937 | 123,960 | 127,058 |
| 19 | 90,052 | 94,251 | 101,402 | 109,768 | 112,069 | 114,788 | 118,833 | 124,208 | 127,313 | 130,495 |
| 20 | 92,222 | 96,569 | 104,008 | 112,662 | 114,963 | 117,684 | 121,871 | 127,478 | 130,665 | 133,930 |

## APPENDIX C

**2016-2017 Salary Schedule (2015-2016 Schedule + 1.20%)**
**[Unit members shall receive half the value of full increment]**

| Step | BA | BA15 | BA30 | MA | MA15 | MA30 | MA45 | MA60 | MA75 | DR |
|------|------|------|------|------|------|------|------|------|------|------|
| 1 | 53,053 | 54,347 | 56,545 | 60,264 | 62,156 | 64,908 | 66,305 | 67,761 | 70,479 | 73,199 |
| 1a | 53,785 | 55,233 | 57,519 | 61,253 | 63,254 | 66,007 | 67,492 | 69,006 | 71,709 | 74,415 |
| 2 | 54,518 | 56,119 | 58,494 | 62,242 | 64,351 | 67,106 | 68,679 | 70,252 | 72,940 | 75,631 |
| 2a | 55,249 | 57,004 | 59,467 | 63,231 | 65,450 | 68,204 | 69,866 | 71,495 | 74,169 | 76,846 |
| 3 | 55,981 | 57,890 | 60,441 | 64,220 | 66,548 | 69,302 | 71,052 | 72,739 | 75,399 | 78,061 |
| 3a | 57,080 | 59,061 | 61,759 | 65,684 | 68,013 | 70,766 | 72,589 | 74,395 | 76,997 | 79,600 |
| 4 | 58,180 | 60,233 | 63,077 | 67,147 | 69,478 | 72,230 | 74,127 | 76,051 | 78,594 | 81,138 |
| 4a | 59,277 | 61,405 | 64,395 | 68,613 | 70,942 | 73,695 | 75,664 | 77,704 | 80,191 | 82,675 |
| 5 | 60,374 | 62,577 | 65,713 | 70,079 | 72,407 | 75,160 | 77,201 | 79,358 | 81,787 | 84,211 |
| 5a | 61,473 | 63,749 | 67,031 | 71,542 | 73,871 | 76,625 | 78,739 | 81,013 | 83,384 | 85,750 |
| 6 | 62,572 | 64,921 | 68,349 | 73,006 | 75,336 | 78,089 | 80,277 | 82,669 | 84,981 | 87,289 |
| 6a | 63,670 | 66,094 | 69,667 | 74,472 | 76,800 | 79,554 | 81,815 | 84,323 | 86,577 | 88,826 |
| 7 | 64,769 | 67,267 | 70,986 | 75,937 | 78,264 | 81,019 | 83,353 | 85,977 | 88,172 | 90,364 |
| 7a | 65,867 | 68,437 | 72,304 | 77,401 | 79,728 | 82,484 | 84,892 | 87,634 | 89,848 | 92,088 |
| 8 | 66,966 | 69,608 | 73,622 | 78,864 | 81,193 | 83,948 | 86,431 | 89,292 | 91,523 | 93,812 |
| 8a | 68,064 | 70,779 | 74,940 | 80,329 | 82,658 | 85,412 | 87,968 | 90,946 | 93,219 | 95,551 |
| 9 | 69,163 | 71,951 | 76,259 | 81,793 | 84,124 | 86,877 | 89,505 | 92,601 | 94,915 | 97,290 |
| 9a | 70,261 | 73,123 | 77,577 | 83,258 | 85,587 | 88,341 | 91,043 | 94,256 | 96,612 | 99,028 |
| 10 | 71,359 | 74,294 | 78,895 | 84,722 | 87,051 | 89,805 | 92,581 | 95,911 | 98,309 | 100,767 |
| 10a | 72,458 | 75,466 | 80,213 | 86,186 | 88,517 | 91,270 | 94,118 | 97,565 | 100,004 | 102,504 |
| 11 | 73,557 | 76,638 | 81,531 | 87,650 | 89,982 | 92,736 | 95,655 | 99,219 | 101,699 | 104,242 |
| 11a | 74,654 | 77,810 | 82,849 | 89,115 | 91,446 | 94,200 | 97,193 | 100,874 | 103,395 | 105,980 |
| 12 | 75,751 | 78,982 | 84,167 | 90,581 | 92,910 | 95,664 | 98,731 | 102,530 | 105,092 | 107,719 |
| 12a | 76,849 | 80,153 | 85,484 | 92,046 | 94,375 | 97,128 | 100,269 | 104,184 | 106,787 | 109,458 |
| 13 | 77,948 | 81,324 | 86,800 | 93,511 | 95,839 | 98,593 | 101,807 | 105,839 | 108,483 | 111,198 |
| 13a | 79,047 | 82,495 | 88,119 | 94,976 | 97,304 | 100,057 | 103,345 | 107,493 | 110,180 | 112,936 |
| 14 | 80,146 | 83,666 | 89,439 | 96,441 | 98,768 | 101,521 | 104,883 | 109,148 | 111,876 | 114,674 |
| 14a | 81,244 | 84,838 | 90,756 | 97,905 | 100,233 | 102,986 | 106,420 | 110,804 | 113,573 | 116,413 |
| 15 | 82,342 | 86,009 | 92,073 | 99,369 | 101,697 | 104,451 | 107,957 | 112,460 | 115,270 | 118,152 |
| 15a | 83,442 | 87,181 | 93,393 | 100,834 | 103,162 | 105,916 | 109,496 | 114,114 | 116,965 | 119,890 |
| 16 | 84,542 | 88,353 | 94,712 | 102,299 | 104,627 | 107,380 | 111,034 | 115,769 | 118,660 | 121,629 |
| 16a | 85,639 | 89,525 | 96,029 | 103,763 | 106,091 | 108,843 | 112,571 | 117,423 | 120,357 | 123,367 |
| 17 | 86,737 | 90,696 | 97,345 | 105,228 | 107,555 | 110,306 | 114,108 | 119,077 | 122,054 | 125,106 |
| 17a | 87,836 | 91,869 | 98,664 | 106,691 | 109,020 | 111,772 | 115,647 | 120,732 | 123,750 | 126,844 |
| 18 | 88,935 | 93,042 | 99,983 | 108,155 | 110,485 | 113,238 | 117,185 | 122,388 | 125,447 | 128,583 |
| 18a | 90,034 | 94,212 | 101,301 | 109,620 | 111,949 | 114,702 | 118,722 | 124,043 | 127,144 | 130,322 |
| 19 | 91,132 | 95,382 | 102,619 | 111,085 | 113,414 | 116,166 | 120,259 | 125,699 | 128,841 | 132,061 |
| 19a | 92,231 | 96,555 | 103,938 | 112,550 | 114,878 | 117,631 | 121,796 | 127,353 | 130,537 | 133,799 |
| 20 | 93,329 | 97,728 | 105,256 | 114,014 | 116,343 | 119,096 | 123,333 | 129,008 | 132,233 | 135,537 |

**APPENDIX D**

**2017-2018 Schedule (2016-2017 Schedule + 1.25%)**
**[Remaining half-increment granted]**

| Step | BA | BA15 | BA30 | MA | MA15 | MA30 | MA45 | MA60 | MA75 | DR |
|------|------|------|------|------|------|------|------|------|------|------|
| 1 | 53,716 | 55,027 | 57,252 | 61,017 | 62,933 | 65,719 | 67,134 | 68,608 | 71,360 | 74,114 |
| 2 | 55,199 | 56,821 | 59,225 | 63,020 | 65,156 | 67,945 | 69,538 | 71,130 | 73,852 | 76,577 |
| 3 | 56,681 | 58,613 | 61,196 | 65,022 | 67,380 | 70,169 | 71,940 | 73,648 | 76,341 | 79,037 |
| 4 | 58,907 | 60,986 | 63,866 | 67,987 | 70,346 | 73,133 | 75,054 | 77,002 | 79,577 | 82,152 |
| 5 | 61,129 | 63,360 | 66,534 | 70,955 | 73,312 | 76,100 | 78,166 | 80,350 | 82,809 | 85,264 |
| 6 | 63,354 | 65,732 | 69,203 | 73,919 | 76,277 | 79,065 | 81,281 | 83,702 | 86,043 | 88,380 |
| 7 | 65,578 | 68,108 | 71,874 | 76,887 | 79,242 | 82,032 | 84,395 | 87,051 | 89,274 | 91,493 |
| 8 | 67,803 | 70,478 | 74,542 | 79,850 | 82,207 | 84,997 | 87,511 | 90,408 | 92,667 | 94,984 |
| 9 | 70,028 | 72,850 | 77,212 | 82,815 | 85,175 | 87,963 | 90,624 | 93,758 | 96,102 | 98,506 |
| 10 | 72,251 | 75,223 | 79,881 | 85,781 | 88,140 | 90,927 | 93,738 | 97,110 | 99,538 | 102,026 |
| 11 | 74,476 | 77,595 | 82,550 | 88,745 | 91,107 | 93,895 | 96,851 | 100,459 | 102,970 | 105,545 |
| 12 | 76,698 | 79,969 | 85,220 | 91,713 | 94,072 | 96,859 | 99,965 | 103,811 | 106,405 | 109,065 |
| 13 | 78,922 | 82,341 | 87,885 | 94,680 | 97,037 | 99,825 | 103,080 | 107,162 | 109,839 | 112,588 |
| 14 | 81,147 | 84,712 | 90,557 | 97,646 | 100,003 | 102,790 | 106,194 | 110,512 | 113,275 | 116,107 |
| 15 | 83,372 | 87,084 | 93,224 | 100,611 | 102,968 | 105,757 | 109,307 | 113,866 | 116,711 | 119,629 |
| 16 | 85,599 | 89,458 | 95,896 | 103,577 | 105,935 | 108,723 | 112,422 | 117,216 | 120,143 | 123,149 |
| 17 | 87,821 | 91,830 | 98,562 | 106,543 | 108,899 | 111,685 | 115,535 | 120,565 | 123,579 | 126,670 |
| 18 | 90,047 | 94,205 | 101,233 | 109,507 | 111,866 | 114,654 | 118,650 | 123,918 | 127,015 | 130,190 |
| 19 | 92,271 | 96,574 | 103,901 | 112,474 | 114,831 | 117,618 | 121,762 | 127,270 | 130,451 | 133,712 |
| 20 | 94,495 | 98,949 | 106,572 | 115,439 | 117,797 | 120,585 | 124,875 | 130,620 | 133,886 | 137,231 |

## APPENDIX E

### Nurses Salary Schedules

| 2014-2015 96% | |
|---|---|
| **Step** | |
| **1** | 48,933 |
| **2** | 50,283 |
| **3** | 51,633 |
| **4** | 53,661 |
| **5** | 55,685 |
| **6** | 57,712 |
| **7** | 59,738 |
| **8** | 61,764 |
| **9** | 63,791 |
| **10** | 65,816 |
| **11** | 67,843 |
| **12** | 69,868 |
| **13** | 71,894 |
| **14** | 73,921 |
| **15** | 75,947 |
| **16** | 77,976 |
| **17** | 80,000 |
| **18** | 82,028 |
| **19** | 84,054 |
| **20** | 86,080 |

| 2015-2016 97% | |
|---|---|
| **Step** | |
| **1** | 50,851 |
| **2** | 52,255 |
| **3** | 53,658 |
| **4** | 55,765 |
| **5** | 57,869 |
| **6** | 59,975 |
| **7** | 62,081 |
| **8** | 64,186 |
| **9** | 66,293 |
| **10** | 68,397 |
| **11** | 70,504 |
| **12** | 72,607 |
| **13** | 74,713 |
| **14** | 76,819 |
| **15** | 78,925 |
| **16** | 81,033 |
| **17** | 83,137 |
| **18** | 85,244 |
| **19** | 87,350 |
| **20** | 89,456 |

| 2016-2017 98% | |
|---|---|
| **Step** | |
| **1** | 51,992 |
| **1a** | 52,710 |
| **2** | 53,427 |
| **2a** | 54,144 |
| **3** | 54,861 |
| **3a** | 55,939 |
| **4** | 57,016 |
| **4a** | 58,092 |
| **5** | 59,167 |
| **5a** | 60,244 |
| **6** | 61,321 |
| **6a** | 62,397 |
| **7** | 63,473 |
| **7a** | 64,550 |
| **8** | 65,626 |
| **8a** | 66,703 |
| **9** | 67,780 |
| **9a** | 68,856 |
| **10** | 69,932 |
| **10a** | 71,009 |
| **11** | 72,085 |
| **11a** | 73,161 |
| **12** | 74,236 |
| **12a** | 75,312 |
| **13** | 76,389 |
| **13a** | 77,466 |
| **14** | 78,543 |
| **14a** | 79,619 |
| **15** | 80,695 |
| **15a** | 81,773 |
| **16** | 82,851 |
| **16a** | 83,927 |
| **17** | 85,002 |
| **17a** | 86,079 |
| **18** | 87,157 |
| **18a** | 88,233 |
| **19** | 89,310 |
| **19a** | 90,386 |
| **20** | 91,462 |

| 2017-2018 98% | |
|---|---|
| **Step** | |
| **1** | 52,642 |
| **2** | 54,095 |
| **3** | 55,547 |
| **4** | 57,729 |
| **5** | 59,906 |
| **6** | 62,087 |
| **7** | 64,267 |
| **8** | 66,447 |
| **9** | 68,627 |
| **10** | 70,806 |
| **11** | 72,987 |
| **12** | 75,164 |
| **13** | 77,344 |
| **14** | 79,524 |
| **15** | 81,704 |
| **16** | 83,887 |
| **17** | 86,064 |
| **18** | 88,246 |
| **19** | 90,426 |
| **20** | 92,606 |

# F

Longevity

Those teachers identified in Attachment "3" of the Memorandum of Agreement between the District and the Union dated December 12, 2006 shall be granted an enhanced longevity award in place of the longevity awards referred to in Article 33(B) of the labor contract. Effective July 1, 2006, such teachers shall be entitled to the payment of longevity salary increases according to the following schedule, less any prior longevity payments made between July 1, 2006 and the date of execution of the labor contract between the parties which labor contract is for the period July 1, 2006 – June 30, 2010. No retroactive payments shall be made for those unit members who would have qualified for the aforesaid awards in prior years. Hence, eligible unit members shall begin receipt of the award in the amount indicated based on the indicated year of service. (For example, if a unit member has been employed for twenty-five (25) years, effective July 1, 2006, he/she shall begin receiving an enhanced longevity award in the amount of $3,300). Payment of the foregoing shall be in accordance with paragraph (B)(1) and (B)(3) of Article 33 of the labor contract.

| Completed Years of Service | Award |
|---|---|
| 15-19 | $800 |
| 20-24 | $2,300 |
| 25-29 | $3,300 |
| 30 or more | $4,300 |

Unit members not identified in Attachment "3" of the Memorandum of Agreement between the District and the Union dated December 12, 2006 shall be paid longevity as is currently set forth in Article 33(B) of the parties' labor contract.

Unit members identified in Attachment "3" of the Memorandum of Agreement between the District and the Union dated December 12, 2006 who have completed 10-14 years of service shall receive an increment adjustment of $500 and shall be placed on the enhanced longevity award set forth upon completion of 15 years of service.

APPENDIX G

**Teaching Assistants Salary Schedules**

| Step | 2014-2015 A | B | C | D |
|---|---|---|---|---|
| 1 | 25,154 | 25,941 | 26,750 | 28,141 |
| 2 | 25,941 | 26,750 | 27,584 | 29,017 |
| 3 | 26,750 | 27,584 | 28,444 | 29,920 |
| 4 | 27,584 | 28,444 | 29,330 | 30,849 |
| 5 | 28,439 | 29,326 | 30,239 | 31,805 |
| 6 | 29,365 | 30,238 | 31,179 | 32,795 |
| 7 | 30,236 | 31,178 | 32,149 | 33,814 |
| 8 | 31,176 | 32,148 | 33,149 | 34,866 |
| 9 | 32,145 | 33,148 | 34,179 | 35,950 |

| Step | 2015-2016 A | B | C | D |
|---|---|---|---|---|
| 1 | 25,871 | 26,680 | 27,513 | 28,943 |
| 2 | 26,680 | 27,513 | 28,371 | 29,844 |
| 3 | 27,513 | 28,371 | 29,255 | 30,773 |
| 4 | 28,371 | 29,255 | 30,166 | 31,728 |
| 5 | 29,250 | 30,161 | 31,101 | 32,712 |
| 6 | 30,202 | 31,100 | 32,068 | 33,729 |
| 7 | 31,098 | 32,067 | 33,065 | 34,778 |
| 8 | 32,064 | 33,064 | 34,093 | 35,860 |
| 9 | 33,061 | 34,093 | 35,153 | 36,975 |

| Step | 2016-2017 A | B | C | D |
|---|---|---|---|---|
| 1 | 26,181 | 27,000 | 27,843 | 29,290 |
| 2 | 27,000 | 27,843 | 28,711 | 30,202 |
| 3 | 27,843 | 28,711 | 29,606 | 31,142 |
| 4 | 28,711 | 29,606 | 30,528 | 32,109 |
| 5 | 29,601 | 30,523 | 31,474 | 33,104 |
| 6 | 30,564 | 31,473 | 32,452 | 34,134 |
| 7 | 31,471 | 32,451 | 33,462 | 35,195 |
| 8 | 32,449 | 33,461 | 34,502 | 36,290 |
| 9 | 33,458 | 34,502 | 35,575 | 37,418 |
| 10 | 34,498 | 35,575 | 36,681 | 38,582 |

| Step | 2017-2018 A | B | C | D |
|---|---|---|---|---|
| 1 | 26,509 | 27,338 | 28,191 | 29,656 |
| 2 | 27,338 | 28,191 | 29,070 | 30,580 |
| 3 | 28,191 | 29,070 | 29,976 | 31,531 |
| 4 | 29,070 | 29,976 | 30,909 | 32,510 |
| 5 | 29,971 | 30,905 | 31,867 | 33,518 |
| 6 | 30,946 | 31,866 | 32,858 | 34,561 |
| 7 | 31,864 | 32,857 | 33,880 | 35,635 |
| 8 | 32,855 | 33,879 | 34,934 | 36,744 |
| 9 | 33,876 | 34,933 | 36,020 | 37,886 |
| 10 | 34,929 | 36,020 | 37,140 | 39,064 |

# EXHIBIT D

# MITCHELL LAW

Jonathan F. Mitchell
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 tel
(512) 686-3941 fax
jonathan@mitchell.law

August 27, 2018

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

**Re:    Pellegrino v. New York State United Teachers, No. 2:18-cv-03439**

Dear Judge Azrack:

Our letter in response to the union defendants (ECF No. 33) explains why the plaintiffs' claims for declaratory and injunctive relief are not moot. We add the following observations in response to the school district's letter.

First, the school district is wrong to suggest that *Janus* "change[d]" the law or created a "new law." ECF No. 32 at 2. Courts do not make or change laws; they interpret and discover the meaning of laws enacted by others. That is why the Supreme Court always gives retroactive effect to rulings that interpret the Constitution or federal statutes, including rulings that overrule its earlier precedents. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 96 (1993). *Janus* did not "change" the law when it overruled *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977); it simply recognized that the Constitution had prohibited public-sector agency shops all along and that *Abood* had misinterpreted the Constitution from the get-go. *See Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2460 (2018) ("*Abood* was poorly reasoned."). An actual change in the law—such as a constitutional amendment outlawing public-sector agency shops or a repeal of the statutes that authorize this practice—would moot the plaintiffs' claims for injunctive relief. But voluntary cessation in response to a judicial interpretation of the Constitution does not moot ongoing litigation.

The defendants in this case are no different from the state officials who were litigating the constitutionality of their state's marriage laws at the time that *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), was decided. The States that were litigating these cases promptly complied with *Obergefell* and starting issuing marriage licenses to same-sex couples after the Supreme Court's ruling—but that did not moot the ongoing constitutional challenges to the state's marriage laws. *See, e.g., Rosenbrahn v. Daugaard*, 799 F.3d 918, 922 (8th Cir. 2015) ("South Dakota's assurances of compliance with *Obergefell* do not moot the case."); *Waters v. Ricketts*, 798 F.3d 682, 686 (8th Cir. 2015) ("Nebraska's assurances of compliance with *Obergefell* do not moot the case."); *Waters v. Ricketts*, 159 F. Supp. 3d

992, 999–1000 (D. Neb. 2016) (refusing to find the plaintiffs' constitutional challenge to Nebraska's laws moot because "no Court has yet declared Section 29 unconstitutional. . . . It has not been repealed and is still published as part of the Nebraska Constitution. . . . The *Obergefell* case struck down the marriage exclusions in Michigan, Kentucky, Ohio, and Tennessee. While precedent does in fact dictate the result in the case before this Court, Section 29 has not specifically been declared unconstitutional."); *Strawser v. Strange*, 190 F. Supp. 3d 1078, 1081 (S.D. Ala. 2016) ("[A] government ordinarily cannot establish mootness just by promising to sin no more." (citation and internal quotation marks omitted)).

The defendants in this case are in the same situation: They have stopped enforcing the statutes in response to an intervening Supreme Court decision, but the State has not repealed or amended the offending statutes. And there is nothing to stop the defendants from resuming enforcement of these statutes if the composition of the federal judiciary changes or if Congress enacts legislation to deprive the Supreme Court of jurisdiction over *Janus*-related claims. *See* Article III, § 2, ¶ 2. The defendants' voluntary cessation is rooted entirely in convenience — they know they will be sued and lose in court if they try to enforce the statutes at this time, so they are halting enforcement while leaving the statutes on the books for the possibility of future use.

Second, even if the school district court were right to say that *Janus* moots the claims for declaratory and injunctive relief, it is wrong to suggest that this also moots the plaintiffs' remaining claims for retrospective relief. *See* ECF No. 32 at 2 ("As a result of that decision, Plaintiff Pellegrino's argument that he was compelled to join the union because if he did not join he would have been forced to pay agency fees is eliminated. The *Janus* decision also moots all of Plaintiff Van Ostrand's claims. Based upon the foregoing, a justiciable controversy no longer remains and the case must be dismissed for lack of subject matter jurisdiction."). The school district — along with the union — is jointly and severally liable for any monetary judgment that might be imposed on account of this unconstitutional agency shop. To be sure, the indemnification clause in the collective-bargaining agreement would compel the union to reimburse the school district for any judgment that might be entered against it. *See* Complaint ¶ 15. But the school district remains a proper defendant with respect to the claims for monetary relief.

Third, the school district is wrong to assert that the plaintiffs lack "standing" under Article III. Standing is determined by events that existed at the time the complaint is filed, and both Pellegrino and Van Ostrand unquestionably had standing to seek declaratory and injunctive relief while the agency-shop arrangement was in effect. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991). The lack of "future injury" that the school district describes was caused by post-filing events, and that goes to mootness rather than standing. *Id.*

Finally, the complaint pleads all the facts needed to show how the plaintiffs are entitled to relief. The complaint alleges that the school district had enforced an agency shop in conjunction with the union, and it attaches the collective-bargaining agreement that

established this unconstitutional arrangement. That not only alleges but conclusively proves that the school district violated the constitutional rights of agency-fee payers and reluctant union members such as Mr. Pellegrino—all of whom are represented in the proposed classes of plaintiffs. The school district might believe that the plaintiffs' legal theory is defective, but there no defect in the amount of factual detail presented in the complaint.

Sincerely,

Jonathan F. Mitchell

JONATHAN F. MITCHELL *
Mitchell Law PLLC
*pro hac vice* application forthcoming

cc: All counsel (via ECF)