# Exhibit B

Case 2:18-cv-03439-NGG-RLM   Document 62-2   Filed 07/31/19   Page 2 of 45 PageID #: 986
Diamond v. Pennsylvania State Education Association, Slip Copy (2019)

2019 WL 2929875

2019 WL 2929875
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Arthur DIAMOND, on behalf of himself and others similarly situated, et al., Plaintiffs,
v.
PENNSYLVANIA STATE EDUCATION ASSOCIATION, et al., Defendants.

Case No. 3:18-cv-128
|
Signed 07/08/2019

**Attorneys and Law Firms**

Jonathan F. Mitchell, Pro Hac Vice, Mitchell Law PLLC, Austin, TX, Sean T. Logue, Sean Logue, PLLC, Carnegie, PA, Shannon Conway, Pro Hac Vice, Talcott Franklin, Pro Hac Vice, Talcott Franklin P.C., Dallas, TX, for Plaintiffs Arthur Diamond, Jeffrey Schawartz, Sandra H. Ziegler.

Shannon Conway, Pro Hac Vice, Talcott Franklin, Pro Hac Vice, Talcott Franklin P.C., Dallas, TX, Jonathan F. Mitchell, Mitchell Law PLLC, Austin, TX, for Plaintiffs Matthew Shively, Matthew Simkins, Douglas R. Kase, Justin Barry.

Amanda B. Bundick, Robert A. Eberle, Eberle & Bundick, LLC, Pittsburgh, PA, Adam Bellotti, Pro Hac Vice, Jacob Karabell, Pro Hac Vice, John West, Leon Dayan, Pro Hac Vice, Bredhoff & Kaiser, PLLC, Lubna A. Alam, Pro Hac Vice, National Education Association, Washington, DC, Joseph F. Canamucio, Pro Hac Vice, Pennsylvania State Education Association, Harrisburg, PA, for Defendants Pennsylvania State Education Association, Chestnut Ridge Education Association, National Education Association.

Sandra A. Kozlowski, Scott A. Bradley, Pennsylvania Office of Attorney General Civil Litigation Section, Pittsburgh, PA, for Defendants Josh Shapiro, James M. Darby, Albert Messaroba, Robert H. Shoop, Jr.

## MEMORANDUM OPINION

KIM R. GIBSON, UNITED STATES DISTRICT JUDGE

### I. Introduction

**\*1** Plaintiffs Arthur Diamond, Justin Barry, Douglas R. Kase, Jeffrey Schwartz, Matthew Shively, Matthew Simkins, and Sandra H. Ziegler (collectively, "Plaintiffs") bring this purported class-

action lawsuit against the Pennsylvania State Education Association, the Chestnut Ridge Education Association, and the National Education Association (collectively, "Union Defendants"), as well as Pennsylvania Attorney General Josh Shapiro, Chairman of the Pennsylvania Labor Relations Board James M. Darby, Members of the Pennsylvania Labor Relations Board Albert Mezzaroba and Robert H. Shoop, Jr., and Bedford County, Pennsylvania, District Attorney Lesley Childers-Potts (collectively, "Commonwealth Defendants"). Plaintiffs, who are all current or retired Pennsylvania public-school teachers, allege that Union Defendants violated Plaintiffs' constitutional rights by forcing Plaintiffs to pay fees to unions as a condition of their employment ("fair-share fees") under 71 Pa. Stat. § 575 ("Section 575"), even though Plaintiffs chose not to join the Pennsylvania State Education Association or its affiliate unions. Plaintiffs also claim that Commonwealth Defendants, who are charged in various ways with enforcing Pennsylvania's laws, must be enjoined from enforcing Section 575 in an unconstitutional manner. The outcome of this case turns in significant part on the application of *Janus v. American Federation of State, County, and Municipal Employees, Council 31,* 138 S. Ct. 2448 (2018), which was decided by the Supreme Court on June 27, 2018, less than two weeks after Plaintiffs filed their original Complaint in this matter. (*See* ECF No. 1.)

Pending before the Court are two Motions to Dismiss filed by Commonwealth Defendants and Union Defendants. (ECF Nos. 38, 40.) These Motions have been fully briefed (ECF Nos. 38, 39, 40, 41, 48, 51) and are now ripe for disposition.

For the reasons that follow, this Court will **GRANT** Defendants' Motions to Dismiss (ECF Nos. 38, 40).

## II. Venue [1]

Because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Western District of Pennsylvania, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## III. Background

### A. Background on the Constitutionality of Fair-Share Fees

Before discussing Plaintiffs' claims, the Court will briefly describe the law on the constitutionality of fair-share fees.

### 1. *Abood v. Detroit Board of Education*

In 1977, the Supreme Court issued a decision in *Abood v. Detroit Board of Education,* 431 U.S. 209 (1977). In *Abood,* the Court confronted a Michigan statute that allowed unions representing local-government employees to utilize "agency-shop" clauses in collective-bargaining agreements. *Id.* at 211. These clauses required every employee represented by a union, even those who declined to become union members for political or religious reasons, to pay union dues. *Id.* at 212. Pursuant to this statute, a union that represented teachers employed by the Detroit Board of Education (the "Board") entered into a collective-bargaining agreement with the Board that required non-union-member teachers to pay a charge to the union equal to the regular dues paid by union members. *Id.* The non-member teachers sued, alleging that the charges paid under the agency-shop clause were used to support political activities, as opposed to simply being used to defray the costs of the union's collective-bargaining activities, and that the clause thus violated the teachers' First Amendment rights. *Id.* at 213.

**\*2** The Court held that the charges were constitutional to the extent they were used to finance the union's collective-bargaining, contract-administration, and grievance activities. *Id.* at 225. The Court explained:

> A union-shop arrangement has been thought to distribute fairly the cost of [collective-bargaining] activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become 'free riders' to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees.

*Id.* at 221-22. Furthermore, the Court reasoned that agency-shop arrangements promote what later case law has dubbed "labor peace." *Janus,* 138 S. Ct. at 2465. The Court explained that designating one union as the exclusive representative of a group of employees "frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations." *Abood,* 431 U.S. at 221.

However, the Court also concluded that the agency-shop clause and fees were unconstitutional insofar as the clause compelled non-member teachers to pay fees to the union that supported the union's political activities. *Id.* at 234-36. Writing for the majority, Justice Stewart explained that "at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience, rather than coerced by the State." *Id.* at 234-35. Based on these First Amendment principles, the Court held that the Constitution prohibited the union from requiring a non-member "to contribute

to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." *Id.* at 235. The Court elaborated:

> We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

*Id.* at 235-36.

### 2. 71 Pa. Stat. § 575

In accordance with *Abood,* Pennsylvania enacted its own agency-shop statute for public employees in 1988, 71 Pa. Stat. § 575. According to Section 575, if mandated by the provisions of a collective-bargaining agreement, non-members of public-employee unions must pay fair-share fees to the unions. *Id.* § 575(b). These fees consist of the regular union-membership dues less "the cost for the previous fiscal year of [the unions'] activities or undertakings which were not reasonably employed to implement or effectuate the duties of the employe organization as exclusive representative." *Id.* § 575(a).

Section 575 also contains provisions (1) indicating how the public employer is to deduct the fair-share fees from non-members' paychecks, (2) describing union notice obligations to non-members, and (3) providing procedures for non-members to challenge the propriety of fair-share fees or the payment of fair-share fees on religious grounds. *Id.* § 575(c)-(h). In the event of a challenge on religious grounds, the non-member objector must pay the equivalent of the fair-share fee. *Id.* § 575(h). However, the union does not receive that payment—the fee goes "to a nonreligious charity agreed upon by the non[-]member and the [union]." *Id.*

**\*3** Finally, Section 575 contains penalty provisions. Particularly, "[a]ny employe organization which violates the provisions of this section or fails to file any required report or affidavit or files a false report or affidavit shall be subject to a fine of not more than two thousand dollars ($2,000)." *Id.* § 575(*l*). In addition, "[a]ny person who willfully violates this section, or who makes a false statement knowing it to be false, or who knowingly fails to disclose a material fact shall be fined

not more than one thousand dollars ($1,000) or undergo imprisonment for not more than thirty (30) days, or both." *Id.* § 575(m).

Consistent with *Abood,* the general propriety of the fair-share fees permitted under Section 575 withstood constitutional scrutiny for many years. *See Hohe v. Casey,* 740 F. Supp. 1092, 1094 (M.D. Pa. 1989) ("It is beyond doubt that agency shop fair-share fees, accompanied by appropriate procedural safeguards, are constitutional." (citing *Chi. Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292 (1986); *Ellis v. Ry. Clerks,* 466 U.S. 435 (1984); *Abood,* 431 U.S. at 209)), *vacated in part on other grounds,* 956 F.2d 399 (3d Cir. 1992). However, the Supreme Court slowly began to question its holding in *Abood. See Harris v. Quinn,* 134 S. Ct. 2618, 2627, 2632-38 (2014); *Knox v. Serv. Emps. Int'l Union, Local 1000,* 567 U.S. 298, 311 (2012) ("Acceptance of the free-rider argument as a justification for compelling non[-]members to pay a portion of union dues represents something of an anomaly...."). Then, the Court overruled *Abood* in June 2018 in *Janus. See Janus,* 138 S. Ct. at 2460. Based on *Janus,* the constitutionality of Section 575 is now challenged.

### 3. *Janus v. American Federation of State, County, and Municipal Employees, Council 31*

In *Janus,* the Court dealt again with a state law requiring non-union-member public employees to pay fees to the union to compensate the union for costs incurred in the collective-bargaining process. *See id.* at 2460-61. The Court held that the state law was unconstitutional. *Id.* at 2478, 2486.

The Court rejected the rationale in *Abood* because, among other reasons, *Abood'*s free-rider justification did not support upholding the fees. *Id.* at 2469. Specifically, the Court explained:

> In simple terms, the First Amendment does not permit the government to compel a person to pay for another party's speech just because the government thinks that the speech furthers the interests of the person who does not want to pay.

*Id.* at 2467.

Moreover, the Court rejected *Abood'*s "labor peace" argument. *Id.* at 2465-66. The Court explained that the *Abood* Court falsely assumed a close relationship between the designation of a union as the exclusive representative of a group of employees and the fees. *Id.* The Court noted that today, there are groups of public employees who are exclusively represented by one union but who are not compelled to pay such fees. *Id.* at 2466. "It is [thus] now undeniable that 'labor peace' can

readily be achieved 'through means significantly less restrictive of associational freedoms' than the assessment of agency fees." *Id.*

After concluding that the doctrine of *stare decisis* did not prohibit overruling *Abood,* the Court held that "States and public-sector unions may no longer extract agency fees from nonconsenting employees." *Id.* at 2486. "Neither an agency fee nor any other payment to the union may be deducted from a non[-]member's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay." *Id.*

Plaintiffs bring the present claims within this context.

### B. Factual and Procedural Background [2]

**\*4** Plaintiffs Arthur Diamond, Justin Barry, Douglas R. Kase, Jeffrey Schwartz, Matthew Shively, and Matthew Simkins are public-school teachers in various Pennsylvania school districts. (ECF No. 62 ¶¶ 17-22.) Plaintiff Sandra H. Ziegler is a retired public-school teacher who taught in a Pennsylvania school district for 24 years. (*Id.* ¶ 23.) Plaintiffs represent two distinct classes: the "agency-fee payers" and the "religious objectors," described below. (*Id.* at 2.)

Plaintiffs bring this purported class-action lawsuit against the following Defendants: the Pennsylvania State Education Association (the "PSEA"), a labor union; the Chestnut Ridge Education Association (the "CREA"), a local union chapter affiliated with the PSEA; the National Education Association (the "NEA"), a labor union affiliated with the PSEA; Josh Shapiro, the attorney general of Pennsylvania, in his official capacity; James M. Darby, the chairman of the Pennsylvania Labor Relations Board (the "PLRB"), in his official capacity; Albert Mezzaroba and Robert H. Shoop, Jr., members of the PLRB, in their official capacities; and Lesley Childers-Potts, the district attorney of Bedford County, Pennsylvania, in her official capacity and as a representative of the class of all district attorneys in Pennsylvania with the authority to prosecute violations of Section 575. (*Id.* ¶¶ 11-16.)

Mr. Diamond, who represents the agency-fee-payer class, refuses to join the PSEA or its affiliates because he disapproves of their political advocacy and the salaries paid to their members. (*Id.* ¶ 17.) However, the collective-bargaining agreements negotiated by the PSEA compelled Mr. Diamond and others like him to pay a fair-share fee to the PSEA and its affiliates as a condition of their employment. (*Id.* ¶¶ 24-25.) Pennsylvania law authorized the PSEA and its affiliates to extract these fair-share fees. (*Id.* ¶ 31); *see* 71 Pa. Stat. § 575.

Mr. Barry, Mr. Kase, Mr. Schwartz, Mr. Shively, Mr. Simkins, and Ms. Ziegler [3] represent the second class of Plaintiffs—the religious objectors. (ECF No. 62 at 2.) These Plaintiffs refuse to join the PSEA or its affiliates because the union advocates for policies that contradict their

religious beliefs. (*Id.* ¶¶ 18-23.) The collective-bargaining agreements negotiated by the PSEA compelled Plaintiffs and their fellow religious objectors to pay a fee for choosing not to join the union. (*Id.* ¶ 24.) Specifically, the religious-objector Plaintiffs paid the equivalent of a fair-share fee to nonreligious charities approved by the union. (*Id.*) This option was available only to those who objected to the union's activities on "bona fide religious grounds" and is also authorized by Pennsylvania law. (*Id.* ¶¶ 24, 31); *see* 71 Pa. Stat. § 575.

Plaintiffs claim that Union Defendants' "compelled extraction of money from the representative plaintiffs and their fellow class members violated their constitutional rights—regardless of whether the union kept the money for themselves or directed it toward a union-approved charity." (ECF No. 62 ¶ 28.) Plaintiffs bring this class-action lawsuit under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201. (*Id.* ¶ 53.) Plaintiffs also bring state-law causes of action against Union Defendants, including conversion, trespass to chattels, replevin, unjust enrichment, and restitution. (*Id.* ¶ 54.) Plaintiffs request that this Court:

**\*5**  (1) Certify plaintiff classes of agency-fee payers and religious objectors and defendant classes of all chapters and affiliates of the PSEA and of all district attorneys in Pennsylvania with the authority to prosecute violations of Section 575 (*id.* ¶ 55(a)-(d));

(2) Declare that Plaintiffs have a constitutional right to decline to join or financially support a public-employee union and that they cannot be penalized or forced to pay money to a union or third-party entity as a consequence of exercising this constitutional right (*id.* ¶ 55(e));

(3) Declare that all collective-bargaining agreements that compel non-union members to pay fair-share fees violate Plaintiffs' constitutional rights (*id.* ¶ 55(o));

(4) Declare Section 575 unconstitutional to the extent it allows public-employee unions to extract fair-share fees from non-members' salaries without first securing their consent (*id.* ¶ 55(g)-(h)) and to the extent it delineates punishments for those who refuse to join or financially support a public-employee union or pay money to a union-approved charity (*id.* ¶ 55(n));

(5) Declare Section 575 unconstitutional because it forces religious objectors to pay fees to union-approved charities and penalizes them for exercising their constitutional right not to join or financially support a union, and also because it disqualifies religious charities from receiving a non-union member's fair-share fees (*id.* ¶ 55(*l*)-(m));

(6) Declare the objection and arbitration provisions of Section 575 unconstitutional (*id.* ¶ 55(i)-(k));

(7) Enjoin the PSEA and its affiliates from enrolling Plaintiffs in union membership unless the union informs them of their constitutional rights and secures a waiver of those rights (*id.* ¶ 55(q));

(8) Enjoin the PSEA from entering into collective-bargaining agreements that compel employees to pay money to a union as a condition of employment, compel employees who decline union membership to pay money to third-party entities, or allow a union to enroll employees in union membership without informing them of their constitutional rights and securing a waiver (*id.* ¶ 55(r));

(9) Enjoin Defendants from enforcing provisions of collective-bargaining agreements that require payment as a consequence of exercising one's constitutional right not to join or financially support a public-employee union (*id.* ¶ 55(s));

(10) Enjoin Commonwealth Defendants from enforcing Section 575 in an unconstitutional manner (*id.* ¶ 55(g)-(n), (s));

(11) Order the PSEA, NEA, and their affiliates and chapters to repay all fair-share fees they extracted from Plaintiffs, regardless of whether Union Defendants kept those funds for themselves or diverted them to charities (*id.* ¶ 55(p)); and

(12) Award costs and attorneys' fees (*id.* ¶ 55(t)).

Plaintiffs initiated this lawsuit on June 15, 2018, by filing their Class Action Complaint. (ECF No. 1.) On August 20, 2018, Commonwealth Defendants and Union Defendants filed separate Motions to Dismiss with accompanying briefs. (ECF Nos. 30, 31, 32, 33.) In response, Plaintiffs filed a First Amended Complaint. (ECF No. 37.) Commonwealth Defendants and Union Defendants filed new Motions to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and briefs in support on September 19, 2018. [4] (ECF Nos. 38, 39, 40, 41.) Plaintiffs responded with their Brief in Opposition to the Defendants' Motions to Dismiss First Amended Complaint (ECF No. 48) on October 10, 2018. After receiving leave of court (*see* ECF No. 50), Union Defendants filed a Reply Brief in Support of Motion to Dismiss First Amended Complaint (ECF No. 51) on October 30, 2018. Union Defendants also submitted two Notices of Supplemental Authority (ECF Nos. 52, 53), directing this Court's attention to relevant cases that were decided after Union Defendants submitted their Reply Brief.

**\*6** On January 7, 2019, Plaintiffs filed a Motion for Leave to File a Second Amended Class-Action Complaint (ECF No. 58) and brief in support (ECF No. 59). After Union Defendants opposed the Motion (ECF No. 60), the Court granted in part and denied in part Plaintiffs' Motion on January 31, 2019. (*See* ECF No. 61.) Plaintiffs then filed their Second Amended Complaint (ECF No. 62)

on February 5, 2019. Per the Court's January 31, 2019, Memorandum Order, the Court treats the Motions to Dismiss Plaintiffs' First Amended Complaint (ECF Nos. 38, 40) as Motions to Dismiss Plaintiffs' Second Amended Complaint. (*See* ECF No. 61 at 5.) Since the filing of the Second Amended Complaint, Union Defendants have filed ten Notices of Supplemental Authority (ECF Nos. 63, 64, 65, 66, 67, 68, 69, 70, 71, 72) identifying new decisions that purportedly support Union Defendants' position in this matter.

## IV. Standard of Review

### A. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), under which a complaint may be dismissed for lack of subject-matter jurisdiction, puts the court's "very power to hear the case" at issue. *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)). There are two types of Rule 12(b)(1) challenges: facial and factual. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632-33 (3d Cir. 2017); *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016).

A facial challenge "attacks the complaint on its face without contesting its alleged facts." *Hartig,* 836 F.3d at 268. This type of challenge is treated like a Rule 12(b)(6) motion, discussed *infra,* in that the court must assume that the complaint's well-pleaded factual allegations are true. *Davis v. Wells Fargo,* 824 F.3d 333, 346 (3d Cir. 2016); *Hartig,* 836 F.3d at 268. Facial challenges address issues such as whether the complaint presents a question of federal law or pleads diversity jurisdiction, and such attacks can occur before the moving party has filed an answer. *Constitution Party of Pa. v. Aichele,* 757 F.3d 347, 358 (3d Cir. 2014).

In contract, a factual attack "is an argument that there is no subject matter jurisdiction because the facts of the case ... do not support the asserted jurisdiction." *Id.* This challenge "allows the defendant to present competing facts," *id.*; *see Davis,* 824 F.3d at 346, and the court does not assume that the plaintiff's allegations are true. *Davis,* 824 F.3d at 346. For example, "while diversity of citizenship might have been adequately pleaded by the plaintiff, the defendant can submit proof that, in fact, diversity is lacking." *Constitution Party,* 757 F.3d at 358.

In order to tell the difference between a facial and factual attack, the court looks to the stage of the proceedings: if a complaint is challenged under Rule 12(b)(1) before the defendant answered the complaint or otherwise presented competing facts, it is a facial attack. *Id.*; *Davis,* 824 F.3d at 2016.

Here, Commonwealth Defendants have not yet filed an answer or presented competing facts; therefore, their Motion to Dismiss, to the extent it is based on Rule 12(b)(1), must be treated as a

facial attack on this Court's subject-matter jurisdiction, a conclusion with which they agree. (*See* ECF No. 39 at 3.)

In contrast, in support of their Motion to Dismiss, Union Defendants submitted various sworn declarations. (ECF Nos. 41-1, 41-2, 41-3, 41-4, 41-5, 41-6, 41-7.) Union Defendants seem to assert that based on the submission of these declarations, their Motion to Dismiss under Rule 12(b)(1) must be treated as a factual attack on this Court's subject matter jurisdiction. (*See* ECF No. 41 at 10 n.1 (citing *Gould Elecs. v. United States,* 220 F.3d 169, 176-77 (3d Cir. 2000), which discussed treating a 12(b)(1) motion as a factual attack).) And Plaintiffs do not challenge this assertion. Therefore, when evaluating Union Defendants' 12(b)(1) grounds for dismissal, the Court may consider Union Defendants' affidavits.

### B. Federal Rule of Civil Procedure 12(b)(6)

**\*7** A complaint may be dismissed under Federal Rule of Civil Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal,* a court reviewing the sufficiency of a complaint must take three steps. [5] First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Ashcroft v. Iqbal,* 556 U.S. 662, 675 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Connelly,* 809 F.3d at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

## V. Discussion

### A. Commonwealth Defendants' Motion to Dismiss is granted.

In Commonwealth Defendants' Motion to Dismiss Amended Complaint (ECF No. 38) and brief in support thereof (ECF No. 39), Commonwealth Defendant move to dismiss Plaintiffs' Second

Amended Complaint because (1) Plaintiffs' § 1983 claim fails to specify which constitutional rights are at issue, (2) Plaintiffs' claims against Commonwealth Defendants are barred by the Eleventh Amendment, and (3) the chairman and members of the PLRB and Attorney General Shapiro are not appropriate defendants to this action. (*Id.*)

## 1. Plaintiffs' § 1983 claim states a claim even though it does not explicitly state which constitutional rights are at issue.

As an initial matter, the Court rejects Commonwealth Defendants' assertion that Plaintiffs' failure to specify the constitutional rights at issue is fatal to Plaintiffs' § 1983 claim. The Federal Rules of Civil Procedure require only that a complaint state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required — the complaint must simply contain enough information to give the defendants fair notice of the claim and the facts upon which the claim is based. *Twombly,* 550 U.S. at 555. Plaintiffs' Second Amended Complaint clearly gives notice of the constitutional rights at issue through its factual allegations and its reliance on *Janus.* The cases to which Commonwealth Defendants cite are inapposite, as they involved factual allegations that were not clear enough to implicate specific constitutional rights. *See, e.g., Culver v. Pennsylvania,* Civil No. 3:10-CV-382, 2010 WL 11531289, at *4 (M.D. Pa. May 19, 2010) ("Culver's claims against the Commonwealth of Pennsylvania do not allege in an intelligible fashion any cognizable violation of specific rights guaranteed by the Constitution or laws of the United States upon which relief can be granted."), *report and recommendation adopted by* 2010 WL 11537607 (M.D. Pa. July 28, 2010). Therefore, based on the Court's experience and common sense, *Iqbal,* 556 U.S. at 679, the Court declines to dismiss Plaintiffs' § 1983 claim as to Commonwealth Defendants for failure to specify the constitutional rights on which the claim is based.

## 2. Based on Eleventh Amendment immunity, Plaintiffs' claims against Commonwealth Defendants are dismissed.

**\*8** Commonwealth Defendants next move to dismiss Plaintiffs' claims against them because they are barred by the Eleventh Amendment. (ECF No. 39 at 6.) Commonwealth Defendants explain that the Eleventh Amendment protects Commonwealth Defendants from this lawsuit and that no exception to Eleventh Amendment immunity applies. (*Id.* at 8-10.)

In response, Plaintiffs do not dispute that Eleventh Amendment immunity generally applies to Commonwealth Defendants. Instead, Plaintiffs assert that their claims against Commonwealth Defendants fall within the *Ex parte Young* exception to Eleventh Amendment immunity because Plaintiffs seek prospective relief to enjoin violations of federal law. (ECF No. 48 at 29.)

### a. The Eleventh Amendment

The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[6] U.S. Const. amend. XI. The Supreme Court "has long 'understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms.' " *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 72-73 (2000) (citations omitted) (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996)). This presupposition is that "the States entered the federal system with their sovereignty intact [and] that the judicial authority in Article III is limited by this sovereignty." *Blatchford v. Native Vill. of Noatak & Circle Vill.,* 501 U.S. 775, 779 (1991) (citing *Welch v. Tex. Dep't of Highways and Pub. Transp.,* 483 U.S. 468, 472 (1987)). "Accordingly, for over a century now, [the Supreme Court has] made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel,* 528 U.S. at 73 (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 669–70 (1999)).

But "a state's Eleventh Amendment protection from federal suits—whether brought by citizens of their state or another — is not absolute." *Koslow v. Pennsylvania,* 302 F.3d 161, 168 (3d Cir. 2002). Federal courts recognize three exceptions to Eleventh Amendment sovereign immunity: (1) congressional abrogation, *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001); (2) waiver by the state, *Koslow,* 302 F.3d at 168 (citing *Coll. Sav. Bank,* 527 U.S. at 670); and (3) "suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law," which is the doctrine of *Ex parte Young,* 209 U.S. 123 (1908),[7] *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 323 (3d Cir. 2002); *see Kentucky v. Graham,* 473 U.S. 159, 167 (1985) (explaining that "official-capacity actions for prospective relief are not treated as actions against the State"); *see also Edelman v. Jordan,* 415 U.S. 651, 677 (1974) (holding that "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief").

**\*9** Here, Commonwealth Defendants assert that Congress did not abrogate states' immunity for the claims in this case and that the Commonwealth of Pennsylvania has not consented to suit. (ECF No. 39 at 8-9.) Plaintiffs do not contest these assertions. (ECF No. 48 at 29.) Therefore, the only dispute between Plaintiffs and Commonwealth Defendants is whether the *Ex parte Young* exception to sovereign immunity permits Plaintiffs to seek prospective relief from Commonwealth Defendants under the circumstances of this case.

"In determining whether the *Ex Parte Young* doctrine avoids an Eleventh Amendment bar, the Supreme Court has made it quite clear that 'a court need only conduct a "straightforward inquiry

Diamond v. Pennsylvania State Education Association, Slip Copy (2019)

2019 WL 2929875

into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." ' " *Hess,* 297 F.3d at 324 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

### b. Plaintiffs do not allege an ongoing violation of federal law with respect to Commonwealth Defendants.

Commonwealth Defendants argue that Plaintiffs fail to allege an ongoing violation of federal law with respect to Commonwealth Defendants. (ECF No. 39 at 10.) They contend that "[t]here is no claim that the Attorney General or any member of the PLRB has done or is doing anything to violate Plaintiffs' federal constitutional rights." (*Id.*) Plaintiffs do not directly respond to this argument, except to note that "[P]laintiffs' claims falls [sic] squarely within the *Ex parte Young* exception to sovereign immunity, as they seek prospective relief to enjoin violations of federal law." (ECF No. 48 at 30.)

The Court agrees with Commonwealth Defendants. Plaintiffs have not alleged any ongoing violations of federal law with respect to Commonwealth Defendants in the Second Amended Complaint. For example, Plaintiffs have not alleged that Commonwealth Defendants have enforced or continue to enforce Section 575 in an unconstitutional manner. *See Burns v. Alexander,* 776 F. Supp. 2d 57, 74 (W.D. Pa. 2011) (describing ongoing violations of federal law as "the *continued enforcement* of statutory provisions alleged to be unconstitutional"); *Haagensen v. Pa. State Police,* Civil Action No. 08-727, 2009 WL 3834007, at *14 (W.D. Pa. Oct. 22, 2009) ("The complaint does not in fact allege an ongoing violation; rather, it contains only Plaintiff's opinion that the statute as written could be applied to her again (and to others) in the manner in which it was applied to her."), *report and recommendation adopted in relevant part by* 2009 WL 3834004, at *3 (Nov. 16, 2009) (finding that the plaintiff "has not established an *ex parte Young* exception to the immunity because she has not pointed to any ongoing violations" but instead "relies only on the actions underlying her own case, which occurred in 2001"). The Second Amended Complaint simply claims that Commonwealth Defendants are charged with enforcing Section 575 (ECF No. 62 ¶¶ 14-16) which does not implicate the *Ex parte Young* exception to Eleventh Amendment immunity.

Because Plaintiffs sue Commonwealth Defendants without alleging that those Defendants continue to enforce an unconstitutional Pennsylvania statute, the Second Amended Complaint "is nominally against individual officers, [but] the state is the real, substantial party in interest and the suit in fact is against the state." *Hess,* 297 F.3d at 324. Therefore, this Court must dismiss Plaintiffs' claims against Commonwealth Defendants because there is no allegation of an ongoing violation of federal law, and the Eleventh Amendment thus bars suit against Commonwealth Defendants. *See Christ the King Manor, Inc. v. Sec'y U.S. Dept. of Health & Human Servs.*, 730 F.3d 291, 319

Diamond v. Pennsylvania State Education Association, Slip Copy (2019)

2019 WL 2929875

(3d Cir. 2013) (affirming the district court's grant of summary judgment to the state defendants because the plaintiffs did "not identify any ongoing conduct by the Secretary of DPW that must be enjoined to ensure the supremacy of federal law").

**\*10** Accordingly, the Court will dismiss Plaintiffs' claims against Commonwealth Defendants.

### 3. Plaintiffs' claims against Attorney General Shapiro and the members and chairman of the PLRB are also dismissed because these state officials are inappropriate defendants.

Commonwealth Defendants also argue that the members and chairman of the PLRB and Attorney General Shapiro must be dismissed from the lawsuit because they are not appropriate defendants in Plaintiffs' challenge to Section 575. (ECF No. 39 at 10.) Commonwealth Defendants assert that Section 575 does not impose any specific enforcement obligations on Attorney General Shapiro or the PLRB. (*Id.*) Moreover, if Plaintiffs seek relief against Attorney General Shapiro and the members and chairman of the PLRB's general enforcement powers, Commonwealth Defendants contend that (1) the PLRB and attorney general are not authorized to initiate criminal prosecutions under Section 575, and (2) there are no allegations attributing any specific conduct to Commonwealth Defendants with regard to the enforcement of Section 575. (*Id.* at 11-12.) Therefore, Commonwealth Defendants claim that Plaintiffs cannot seek injunctive and declaratory relief against them because there is no "close official connection" between the attorney general and PLRB and the enforcement of Section 575.[8] (*Id.* at 13-17.)

Plaintiffs disagree, claiming that "[t]he PLRB defendants enforce the State's collective bargaining laws, which include the agency shop provisions that the plaintiffs have challenged, and the attorney general is charged with enforcing all of the State's laws as the State's chief law enforcement officer." (ECF No. 48 at 30.)

According to *Ex parte Young*:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

> It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed ..., but that may possibly make the duty more clear; if it otherwise exist it is equally efficacious. The fact that the state officer, by virtue of his office, has some connection with the

enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.

*Ex parte Young,* 209 U.S. at 157.

The Third Circuit has elaborated that, in order for a state officer to have "some connection with the enforcement of the act," there must be "realistic potential" that the officer's "general power to enforce the laws of the state would have been applied" against the plaintiffs. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1208 (3d Cir. 1988). Specifically, "[a] plaintiff challenging the validity of a state statute may bring suit against the official who is charged with the statute's enforcement only if the official has either enforced, or threatened to enforce, the statute against the plaintiffs." *1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108, 113 (3d Cir. 1993). "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Id.*

**\*11**  Attorney General Shapiro has no connection with the enforcement of Section 575.

There is no enforcement role for the attorney general in the penalty provisions of Section 575. *See* 71 Pa. Stat. § 575(*l*) ("Any employe organization which violates the provisions of this section or fails to file any required report or affidavit or files a false report or affidavit shall be subject to a fine of not more than two thousand dollars ($2,000)."); *id.* § 575(m) ("Any person who willfully violates this section, or who makes a false statement knowing it to be false, or who knowingly fails to disclose a material fact shall be fined not more than one thousand dollars ($1,000) or undergo imprisonment for not more than thirty (30) days, or both. Each individual required to sign affidavits or reports under this section shall be personally responsible for filing such report or affidavit and for any statement contained therein he knows to be false.").

Under *Ex parte Young,* a state official's enforcement role need not be set out in the statute itself — the connection to enforcement may come from a different source, including "the general law." *See Ex parte Young,* 209 U.S. at 157. Yet, in this case, the attorney general's general authority to enforce the laws of the Commonwealth does not extend to Section 575. The attorney general's power comes from the Commonwealth Attorneys Act, 71 Pa. Stat. §§ 732-301 *et seq. See* 71 Pa. Stat. § 732-201(a) ("The Attorney General shall exercise such powers and perform such duties as are hereinafter set forth."); *Commonwealth v. Carsia,* 517 A.2d 956, 958 (Pa. 1986) (quoting 71 Pa. Stat. § 732-201(a) and explaining that "[t]his provision expressly states that the powers of the Attorney General are those which are set forth in the [Commonwealth Attorneys] Act itself"). No provisions of this Act would give the attorney general the authority to enforce Section 575 under the circumstances of this case.

For example, the attorney general's authority to initiate criminal prosecutions is governed by 71 Pa. Stat. § 732-205. *See Carsia,* 517 A.2d at 958 (explaining that 71 Pa. Stat. § 732-205 delineates

the kinds of cases over which the attorney general has prosecutorial authority). But none of the provisions of 71 Pa. Stat. § 732-205 give the attorney general the power to initiate a prosecution based on Section 575's penalty provisions, at least without a request from a district attorney or permission from a court. *See* 71 Pa. Stat. § 732-205. And Plaintiffs do not point to any provision of 71 Pa. Stat. § 732-205, the Commonwealth Attorneys Act in general, or other law that would give the attorney general an enforcement role in Section 575.

Moreover, even assuming that the attorney general would have general enforcement authority over violations of Section 575, Plaintiffs do not allege that the attorney general has enforced or threatened to enforce Section 575 against Plaintiffs. Without plausible allegations of enforcement or threat thereof, the attorney general is not an appropriate defendant in this matter. *See 1st Westco Corp.*, 6 F.3d at 113 (explaining that "[a] plaintiff challenging the validity of a state statute may bring suit against the official who is charged with the statute's enforcement only if the official has either enforced, or threatened to enforce, the statute against the plaintiffs").

 **\*12** Plaintiffs argue — with no citations to authority — that the attorney general is charged with enforcing all of the Commonwealth of Pennsylvania's laws. (ECF No. 48 at 30.) They assert that the attorney general's general enforcement powers make the attorney general an appropriate defendant, at least at the motion-to-dismiss stage. (ECF No. 48 at 30.)

The Court disagrees. As explained above, Plaintiffs have failed to identify any connection between the attorney general and the enforcement of Section 575. The conclusory allegation that the attorney general is charged with enforcing Section 575 is insufficient to survive a motion to dismiss. Without factual allegations that the attorney general has enforced or threatened to enforce Section 575 or citations that show that the attorney general has some connection to the enforcement of Section 575, this suit is simply another case of "a high policy official with a general duty to uphold the law [that] has been made a party to a suit where there is little likelihood that he actually would have enforced the particular statute at issue." *1st Westco Corp.*, 6. F.3d at 115.

In sum, the claims for declaratory and injunctive relief against Attorney General Shapiro must be dismissed because the attorney general is not an appropriate defendant in this challenge.

The Court also finds that Mr. Darby, the chairman of the PLRB, and Mr. Mezzaroba and Mr. Shoop, members of the PLRB, must be dismissed as defendants for similar reasons. Section 575 does not provide any role for the PLRB, its chairman, or its members in enforcing its provisions. *See* 71 Pa. Stat. § 575. Moreover, the PLRB does not have the power to enforce Section 575 pursuant to any other statutory provision. The Public Employe Relations Act (the "PERA"),[9] 43 Pa. Stat. §§ 1101.101 *et seq.*, which delineates the PLRB's authority with regard to public employers, specifies that the PLRB "shall exercise those powers and perform those duties which are specifically provided for in this act." *Id.* § 1101.501. The Court cannot locate any PERA

provision that would give the PLRB authority to enforce Section 575, nor have the parties identified any such provision. *See Lutz v. Morrisville Educ. Assoc.*, 31 PPER ¶ 31003 (P.L.R.B. 1999) (dismissing a charge of unfair practices filed with the PLRB alleging violations of Section 575 because "[n]othing in [Section 575] or in PERA vests the Board with jurisdiction to enforce the various provisions of the fair share fee legislation"). Further, Plaintiffs failed to plausibly allege that the PLRB chairman or its members have enforced or threatened to enforce Section 575 against Plaintiffs. *See 1st Westco Corp.*, 6 F.3d at 113. Therefore, the members and chairman of the PLRB are not appropriate defendants in this action, as they lack "some connection" with the enforcement of Section 575.

**\*13**  In summary, beyond Commonwealth Defendants' immunity, the claims against Attorney General Shapiro, Mr. Darby, Mr. Mezzaroba, and Mr. Shoop must be dismissed because these individuals are inappropriate defendants to this action.

### B. Union Defendants' Motion to Dismiss is granted.

Union Defendants move to dismiss Plaintiffs' claims for declaratory and injunctive relief due to mootness and lack of standing. (ECF No. 41 at 12-18.) Furthermore, Union Defendants seek dismissal of Plaintiffs' request for reimbursement of pre-*Janus* fair-share fees based on the good-faith defense to liability. (*Id.* at 18-25.) Union Defendants also request dismissal of Plaintiffs' state-tort-law claims because the Second Amended Complaint fails to state a claim in tort and the claims are barred by the good-faith defense. Finally, Union Defendants argue that Ms. Ziegler lacks standing to bring any claims and must be dismissed.

### 1. Plaintiffs' claims for declaratory and injunctive relief are moot and the demands for relief in paragraphs 55(q) and 55(r)(iii) of the Second Amended Complaint are dismissed for lack of standing.

Under Article III of the U.S. Constitution, federal court jurisdiction extends only to "cases" and "controversies." U.S. Const. art. III, § 2; *see Susan B. Anthony v. Driehaus,* 134 S. Ct. 2334, 2341 (2014); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000); *Arizonans for Official English v. Arizona,* 520 U.S. 43, 64 (1997); *N.J. Turnpike Auth. v. Jersey Cent. Power & Light,* 772 F.2d 25, 30 (3d Cir. 1985). "In our system of government, courts have 'no business' deciding legal disputes or expounding on law in the absence of such a case or controversy." *Already,* 568 U.S. at 90. This "case or controversy" requirement encompasses, *inter alia,* two doctrines that are relevant to the present dispute: mootness and standing. *See Susan B. Anthony,* 134 S. Ct. at 2341; *Friends of the Earth,* 528 U.S. at 180; *Arizonans for Official English,* 520 U.S. at 64, 67; *Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70 (1983).

Union Defendants argue that Plaintiffs' claims for declaratory and injunctive relief with respect to the constitutionality of fair-share fees are moot because of the Supreme Court's decision in *Janus*. (ECF No. 41 at 12-17.) Furthermore, Union Defendants contend that Plaintiffs have no standing to seek to impose conditions on the enrollment of union members. (*Id.* at 17-18.) The Court will thus address the doctrines of mootness and standing, in turn.

### a. Plaintiffs' claims for declaratory and injunctive relief are moot due to the Supreme Court's decision in *Janus* and Union Defendants' compliance with that decision.

Union Defendants argue that Plaintiffs' claims for declaratory and injunctive relief (ECF No. 62 ¶ 55(e)-(o), (r), (s)) are moot because of *Janus*. (ECF No. 41 at 6.) Union Defendants explain that they immediately acted to conform with *Janus* following the Supreme Court's decision.[10] (*Id.* at 7.)

**\*14**  On the day of the *Janus* decision, the PSEA notified every school employer with which a PSEA affiliate had a contractual fair-share clause of the *Janus* decision and instructed them to immediately cease deducting fair-share fees from their employees' paychecks. (ECF No. 41-1 ¶ 5(a).) Where school employers had already deducted and transmitted the portions of their employees' fees attributable to the period after the *Janus* decision, or were unable to modify a post-*Janus* payroll, the PSEA established a procedure to refund the fees to the non-member feepayers (including religious objectors) with interest. (*Id.* ¶ 5(b)-(c).)

On July 2, 2018, the PSEA sent a letter to every fair-share feepayer explaining the *Janus* decision. (*Id.* ¶ 5(d); *id.* at 7-8.) The letter informed them that the PSEA had asked employers to immediately stop fair-share-fee payroll deductions and that any fees that had been paid for the period after June 27, 2018, would be promptly refunded. (*Id.* ¶ 5(d); *id.* at 7-8.) Letters went to all Plaintiffs except Ms. Ziegler, who retired in 2013 and has not paid fair-share fees since then. (ECF No. 41-2 ¶¶ 5-7.) Plaintiffs were sent checks refunding the fair-share fees that had been deducted and transmitted by their school-district employers prior to June 27, 2018, but that were attributable to the period from June 27 to August 31, 2018. (ECF No. 41-1 ¶¶ 6-11.)

The school employers have recognized that statutory and contractual provisions authorizing fair-share requirements are no longer enforceable after *Janus*. (ECF No. 41-3 ¶ 3; ECF No. 41-4 ¶ 3; ECF No. 41-5 ¶ 3; ECF No. 41-6 ¶ 3; ECF No. 41-7 ¶ 3.) Representatives of the school districts that employ or employed plaintiffs have provided affidavits attesting that, as a result of the *Janus* decision, they have ceased deducting and transmitting fair-share fees and will not deduct and transmit such fees in the future. (ECF No. 41-3 ¶¶ 5-6; ECF No. 41-4 ¶¶ 5-6; ECF No. 41-5 ¶¶ 5-6; ECF No. 41-6 ¶¶ 5-6; ECF No. 41-7 ¶¶ 5-6.)

Union Defendants argue that Plaintiffs' claims for declaratory and injunctive relief are moot based on this response to *Janus* and the Supreme Court's determination in *Janus* that "States and public-sector unions may no longer extract agency fees from nonconsenting employees." *Janus,* 138 S. Ct. at 2486. Union Defendants assert that they and the school-district employers agree that the collection of fair-share fees by public-sector unions is unconstitutional. (ECF No. 41 at 13.) Further, Union Defendants assert that the voluntary-cessation exception to the mootness doctrine does not apply because Union Defendants did not voluntarily stop collecting fair-share fees in order to circumvent this Court's jurisdiction in the present lawsuit — they stopped collecting the fees in order to comply with the intervening Supreme Court decision in *Janus.* (*Id.* at 14.)

In response, Plaintiffs argue that Union Defendants' conduct post-*Janus* was voluntary and does not moot Plaintiffs' claims for injunctive and declaratory relief. (ECF No. 48 at 7.) Plaintiffs contend that Union Defendants' response was voluntary because (1) court rulings do not impose legal obligations on non-parties (*id.* at 8), (2) *Janus* did not change the law (*id.* at 9-13), and (3) *Janus* did not explicitly resolve the constitutionality of Union Defendants' treatment of religious objectors (*id.* at 13-15).

The Court agrees with Union Defendants and finds that Plaintiffs' claims for declaratory and injunctive relief are moot due to the Supreme Court's decision in *Janus* and Union Defendants' undisputed compliance therewith.

### i. Legal Standard

**\*15** "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' " *Arizonans for Official English,* 520 U.S. at 67 (quoting *Preiser v. Newkirk,* 422 U.S. 395, 401 (1975)); *see Already,* 568 U.S. at 90-91. An actual controversy does not exist, rendering a case moot, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already,* 568 U.S. at 91 (quoting *Murphy v. Hunt,* 455 U.S. 478, 481 (1982)); *N.J. Turnpike Auth.*, 772 F.2d at 31. A live controversy exists "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation." *Knox,* 567 U.S. at 307-08 (quoting *Ellis v. Ry. Clerks,* 466 U.S. 435, 442 (1984)).

However, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953); *see Already,* 568 U.S. at 91 ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."); *Knox,* 567 U.S. at 307; *Friends of the Earth,* 528 U.S. at 174, 189; *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 288 (1982).

This exception to the mootness doctrine exists because, in its absence, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already,* 565 U.S. at 91; *see Knox,* 567 U.S. at 307; *Friends of the Earth,* 528 U.S. at 189; *see also Aladdin's Castle,* 455 U.S. at 289.

The Supreme Court has announced the following standard for determining whether a case is moot due to the defendant's voluntary conduct: "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Exp. Assoc.,* 393 U.S. 199, 203 (1968)); *see W.T. Grant Co.,* 345 U.S. at 633; *N.J. Turnpike Auth.,* 772 F.2d at 31. The burden on the defendant in this circumstance "is a heavy one." *W.T. Grant Co.,* 345 U.S. at 633; *see Already,* 565 U.S. at 91 (describing the "formidable burden" on a defendant to show that the wrongful behavior will not recur).

## ii. Discussion

Here, there is no longer a controversy that needs adjudication. When the original Complaint was filed, there was a live controversy — whether Union Defendants could constitutionally collect fair-share fees from Plaintiffs pursuant to Section 575. However, this controversy was mooted by the intervening *Janus* decision, which held that fair-share fees are unconstitutional, and Union Defendants' undisputed compliance therewith. *See Janus,* 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a non[-]member's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay."). Based on *Janus* and Union Defendants' conduct, there is simply no live controversy regarding the constitutionality of collecting fair-share fees. In other words, there is no continuing conduct for this Court to enjoin or declare unconstitutional. Thus, Plaintiffs' claims for declaratory and injunctive relief are moot. *See Hartnett v. Pa. State Educ. Ass'n,* No. 1:17-cv-100, 2019 WL 2160404, at *6-7 (M.D. Pa. May 17, 2019) (finding comparable claims for declaratory and injunctive relief moot post-*Janus* because the "[p]laintiffs face no realistic possibility that they will be subject to the unlawful collection of 'fair share' fees"); *Cook v. Brown,* 364 F. Supp. 3d 1184, 1189 (D. Or. 2019) (finding a request for injunctive relief post-*Janus* moot because the union had already stopped collecting fair-share fees and thus there was "no live controversy ... necessitating injunctive relief"); *Lamberty v. Conn. State Police Union,* No. 3:15-cv-378, 2018 WL 5115559, at *9 (D. Conn. Oct. 19, 2018) (explaining that *Janus* mooted a challenge to the constitutionality of agency fees because there was "nothing for [the court] to order [the d]efendants to do now"); *Yohn v. Cal. Teachers Ass'n,* Case No. SACV 17-202-JLS-DFM, 2018 WL 5264076 (C.D. Cal. Sept. 28, 2018) (granting the union's motion to dismiss on mootness grounds after the union complied with *Janus*); *Danielson v. Inslee,* 345 F. Supp. 3d 1336, 1339-40 (W.D. Wash. 2018) (finding that *Janus* mooted a controversy when the State of Washington stopped collecting agency fees post-*Janus*);

Case 2:18-cv-03439-NGG-RLM  Document 62-2  Filed 07/31/19  Page 22 of 45 PageID #: 1006
Diamond v. Pennsylvania State Education Association, Slip Copy (2019)

2019 WL 2929875

*see also Grutzmacher v. Howard Cty.*, 851 F.3d 332, 349 (4th Cir. 2017) (finding a controversy regarding challenged policies moot based on a policy change and an affidavit indicating that the defendant would not revert to the challenged policies); *Ragsdale v. Turnock,* 841 F.2d 1358, 1365-66 (7th Cir. 1988) (explaining that a policy of non-enforcement of a statute based on Supreme Court precedent moots a statutory challenge, as "[f]ederal courts do not, as a rule, enjoin conduct which has been discontinued with no real prospect that it will be repeated"); *Smith v. Bieker,* Case No. 18-cv-05472-VC, 2019 WL 2576679, at *1 (N.D. Cal. June 13, 2019) (finding similar claims moot because the State did not plan to enforce the unconstitutional statute in light of *Janus*).

**\*16** Plaintiffs argue that Defendants' choice to stop collecting fair-share fees does not moot Plaintiffs' claims because of the voluntary-cessation exception to the mootness doctrine. (ECF No. 48 at 7.) However, the voluntary-cessation exception does not apply here. The circumstances of this case make it clear that the undisputedly wrongful behavior — the collection of fair-share fees — is not reasonably likely to recur. *Friends of the Earth,* 528 U.S. at 189. In particular, the Court finds the following circumstances significant: (1) *Janus*'s changing of the law; (2) the timing of and reason for Union Defendants' choice to stop collecting fair-share fees; and (3) the absence of any reason to think Union Defendants will resume collecting fair-share fees.

First, *Janus* clearly changed the law of the land. In the pre-*Janus* era, the Supreme Court's decision in *Abood* established the constitutionality of collecting fair-share fees. The Court held in *Abood* that dues paid pursuant to agency-shop clauses were constitutional if they were used to finance unions' collective-bargaining, contract-administration, and grievance activities. *See Abood,* 431 U.S. at 225. Although *Abood* was called into question over the past few years, *Janus* nevertheless represents a significant legal shift because it explicitly overruled *Abood* and held that the collection of fair-share fees was unconstitutional. *Janus,* 138 S. Ct. at 2486. "The law of the land thus has changed and there no longer is a legal dispute as to whether public sector unions can collect agency fees." *Lamberty,* 2018 WL 5115559, at *9. Complying with a Supreme Court decision cannot be considered "voluntary cessation." [11] *See id.* at *9 (explaining that there was "nothing voluntary" about the union's decision to comply with *Janus,* as *Janus* "announced a broad rule invalidating every state law permitting agency fees to be withheld"); *Cook,* 364 F. Supp. 3d at 1189 ("[A] reversal of Supreme Court precedent is analogous to a statutory change that 'bespeaks finality' and is not a change that could easily be altered. Therefore, the voluntary cessation doctrine is inapplicable."); *see also Christian Coal. of Ala. v. Cole,* 355 F.3d 1288, 1292 (11th Cir. 2004) (finding a controversy moot because an intervening Supreme Court decision "changed the legal landscape" on which the defendants based their initial position).

**\*17** Plaintiffs object that "[c]ourts do not make or change laws; they interpret and discover the meaning of laws enacted by others." (ECF No. 48 at 9.) Plaintiffs claim that "[a]n actual change in the law — such as a constitutional amendment outlawing public-sector agency shops or a repeal of the statutes that authorize this practice — would moot the plaintiffs' claims for injunctive

relief," but "voluntary cessation in response to a Supreme Court opinion does not moot ongoing litigation." (*Id.*)

In support of this claim, Plaintiffs cite to the line of cases that followed the Supreme Court's decision in *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015). These cases held that state compliance with *Obergefell* did not moot ongoing challenges to state marriage laws. *See, e.g., Jernigan v. Crane,* 796 F.3d 976, 979 (8th Cir. 2015); *Rosenbrahn v. Daugaard,* 799 F.3d 918, 922 (8th Cir. 2015); *Waters v. Ricketts,* 798 F.3d 682, 686 (8th Cir. 2015); *Waters v. Ricketts,* 159 F. Supp. 3d 992, 999-1000 (D. Neb. 2016); *Strawser v. Strange,* 190 F. Supp. 3d 1078, 1081 (S.D. Ala. 2016).

These cases are similar in that the post-*Obergefell* defendants did not dispute the merits of the plaintiffs' constitutional challenges, like Defendants here do not dispute that the collection of fair-share fees is unconstitutional. *See, e.g., Jernigan, 796* F.3d at 979 ("Arkansas no longer disputes the merits of the district court's ruling. The challenged laws are unconstitutional."). However, these cases are distinguishable from the present case in three notable respects.

First, the courts in these cases found that *Obergefell* was written very narrowly. *See Obergefell,* 135 S. Ct. at 2605 ("[T]he *State laws challenged by Petitioners in these cases* are now held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." (emphasis added)). In contrast, *Janus* broadly overruled *Abood* and determined that fair-share fees for public employees are unconstitutional. *See Janus,* 138 S. Ct. at 2486; *see also Lamberty,* 2018 WL 5115559, at *9 (describing the "broad rule" announced by *Janus); Danielson,* 345 F. Supp. 3d 1336 at 1340 ("*Janus* utilizes broad language in a lengthy discussion overturning precedent...."); *Lee v. Ohio Educ.* Assoc., 366 F. Supp. 3d 980, 982 (N.D. Ohio 2019) ("*Janus* ... used broad language that immediately made it unconstitutional for unions to extract agency fees from nonconsenting employees."). *Janus*'s broad language may moot controversies in ways *Obergefell*'s narrow holding did not.

Second, some of the post-*Obergefell* cases noted that the Supreme Court did not rule on all the issues raised by the plaintiffs in those cases. *See, e.g., Rosenbrahn,* 799 F.3d at 922 (describing issues such as name-changes on driver's licenses that *Obergefell* did not resolve). Here, *Janus*'s broad holding regarding the unconstitutionality of fair-share fees clearly resolves all of Plaintiffs' requests for declaratory and injunctive relief. As was explained previously, post-*Janus*, there is simply nothing left for this Court to declare or enjoin regarding fair-share fees in Pennsylvania. [12]

**\*18** Third, some of the post-*Obergefell* cases were not moot because courts had concerns about continued compliance with *Obergefell. See, e.g., Waters,* 159 F. Supp. 3d at 1000 ("Defendants' position regarding birth certificates does give plaintiffs cause to be concerned about other protections available to same-sex couples related to the right to marry...."); *Strawser,* 190 F. Supp. 3d at 1081-82 ("Given the actions by Alabama state and local officials, both before and after the

Supreme Court decided *Obergefell,* it cannot be said with assurance that there is no reasonable expectation that Alabama's unconstitutional marriage laws will not again be enforced."). In this case, however, Union Defendants have established that they will continue to comply with *Janus* even if Plaintiffs' claims for declaratory and injunctive relief are declared moot. *See Danielson,* 345 F. Supp. 3d at 1340 (distinguishing the post-*Obergefell* cases from a post-*Janus* case because "in the aftermath of *Obergefell,* there was reason to believe that some states would ignore the Supreme Court's binding precedent, unlike in this case").

Thus, this Court joins numerous courts in finding that the post-*Obergefell* cases are unpersuasive in the present dispute. *See Hartnett,* 2019 WL 2160404, at *6; *Danielson,* 345 F. Supp. 3d at 1340; *Yohn,* 2018 WL 5264076, at *6; *Ladley v. Pa. State Educ. Ass'n,* No. CIL14-08552, at *19-20 (Pa. Ct. C.P. Lancaster Cty. Oct. 29, 2018). In contrast to the unique circumstances surrounding *Obergefell,* in the instant case, compliance with an intervening Supreme Court decision does not implicate the voluntary-cessation exception to the mootness doctrine.

Instead of relying on the post-*Obergefell* cases, this Court finds a 2004 Eleventh Circuit decision, *Christian Coalition of Alabama v. Cole,* 355 F.3d 1288 (11th Cir. 2004), to be more persuasive under the present circumstances. In *Christian Coalition,* a few months before a general election, the Christian Coalition of Alabama (the "CCA") distributed questionnaires to Alabama judicial candidates asking for the candidates' opinions on numerous social and political issues. *Id.* at 1289-90. Two sitting judges who were running for reelection sought an opinion from the Alabama Judicial Inquiry Commission (the "JIC") as to whether responding to the questionnaires would comport with ethics rules. *Id.* at 1290. In an advisory opinion, the JIC indicated that judges would violate the Alabama Canons of Judicial Ethics by answering some of the questions on the questionnaires. *Id.* The CCA and three judicial candidates sued members of the JIC in federal court on First Amendment grounds. *Id.*

Before the district court made a decision on the merits, the Supreme Court decided *Republican Party of Minnesota v. White,* 536 U.S. 765 (2002), in which the Court held that "[t]he Minnesota Supreme Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment." *Id.* at 788. Based on this decision, the JIC withdrew its advisory opinion and filed a motion to dismiss the lawsuit on mootness grounds. *Christian Coal.,* 355 F.3d at 1290. The district court granted the motion to dismiss due to mootness, which the Eleventh Circuit affirmed. *Id.* at 1290, 1293.

The Eleventh Circuit relied in part on the JIC's intention, which was stated in the pleadings, that the JIC would not file charges against a judge for responding to the CCA questionnaire. *Id.* at 1292. The Eleventh Circuit found the JIC's assertion to be particularly persuasive because it was clearly not made to avoid a ruling by the district court in the present case. *Id.* "[T]he JIC's withdrawal of its [a]dvisory [o]pinion and its representation to the district court are a result of *subsequent*

*events out of the JIC's control that effected a change in its position* regarding the propriety of answering the CCA questionnaire." *Id.* (emphasis added). These "subsequent events" included the Supreme Court's intervening decision in *White* and the Alabama Supreme Court's Committee on the Canons' decision to modify the Canons based on *White. Id.* The Eleventh Circuit found that these two events "changed the legal landscape on which the JIC initially based its Advisory Opinion." *Id.* "Thus, the CCA ha[d] every reason to believe that the JIC's representation [was] genuine, and [could] reasonably expect that the JIC [would] not issue another opinion preventing judges from answering the questionnaire at issue...." *Id.* at 1292-93.

**\*19** The reasoning of *Christian Coalition* is persuasive when applied to the circumstances of this case. In response to a Supreme Court decision that "changed the legal landscape," Union Defendants ceased collecting fair-share fees, much like the JIC in *Christian Coalition* withdrew its advisory opinion based on *White.* The decision to stop collecting fair-share fees in this case was not voluntary because it was made based on intervening circumstances out of Union Defendants' control — namely, a Supreme Court decision — which the Eleventh Circuit found to be sufficient to moot the case in *Christian Coalition.* Based on Union Defendants' cessation of the offensive conduct and the Supreme Court's decision in *Janus* prohibiting that conduct, Plaintiffs now have every reason to believe Union Defendants' declarations that they will not resume the collection of fair-share fees. Thus, the Eleventh Circuit's decision in *Christian Coalition* supports this Court's conclusion that the present controversy is moot because complying with a Supreme Court decision cannot be considered "voluntary cessation" such that Plaintiffs can circumvent the mootness doctrine.

Plaintiffs claim that *Christian Coalition* is inapposite because "[it] was the Supreme Court's ruling in *White — combined with* the Alabama Supreme Court's decision to revise the judicial canons that undergirded the advisory opinion — that led the Eleventh Circuit to conclude that the Judicial Inquiry Commission's withdrawal of its opinion was not 'voluntary cessation.' " (ECF No. 48 at 12.) Plaintiffs argue that "neither *Christian Coalition* — nor any other case of which we are aware — allows the mere compliance with an intervening Supreme Court ruling to moot a case." (*Id.*) While Plaintiffs are correct that *Christian Coalition* is factually distinguishable, the differences between the circumstances in *Christian Coalition* and the present case do not change the Court's conclusion that the reasoning of *Christian Coalition* is persuasive. [13]

In sum, *Janus* changed the law of the land by overruling *Abood* and declaring the collection of fair-share fees to be unconstitutional. By complying with this change in the law, Defendants were not acting "voluntarily" for purposes of the voluntary-cessation exception to mootness—they were compelled to change their conduct based on a decision of our nation's highest court. It is therefore "absolutely clear" that Union Defendants' wrongful behavior "could not reasonably be expected to recur." *See Friends of the Earth,* 528 U.S. at 189.

The Court finds the voluntary-cessation exception to mootness inapplicable for a second reason: the timing of and reason for Union Defendants' cessation of fair-share-fee collection make it clear that Union Defendants did not cease the challenged conduct due to this litigation.

Union Defendants' undisputed account of its post-*Janus* actions indicates that on the day the Supreme Court announced its decision in *Janus,* the PSEA contacted affected employers and told them to stop deducting fair-share fees. (ECF No. 41-1 ¶ 5(a).) A few days later, the PSEA notified every fair-share feepayer of the *Janus* decision and told the feepayers that they were no longer required to pay fair-share fees. (*Id.* ¶ 5(d); *id.* at 7-8.) The timing of and reason for these actions make clear that Union Defendants did not cease the unconstitutional conduct in order to circumvent this Court's jurisdiction in the present case. Instead, Union Defendants acted to comply with *Janus.* [14]

**\*20** The voluntary-cessation exception to the mootness doctrine exists so that a defendant cannot "engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already,* 565 U.S. at 91; *see Knox,* 567 U.S. at 307. Here, because Union Defendants acted to comply with *Janus* as opposed to acting to avoid an undesirable decision by this Court, the purpose of the voluntary-cessation exception would not be served by applying the exception to this case. *See Lamberty,* 2018 WL 5115559, at *9 (finding the case moot and explaining that the defendants complied with *Janus* "not because they wanted to evade the Court's jurisdiction, ... but because the Supreme Court's new and controlling precedent not only affected the rights of the parties immediately before it (the state of Illinois) but also announced a broad rule invalidating every state law permitting agency fees to be withheld"); *Yohn,* 2018 WL 5264076, at *5 ("Defendants are obviously changing their behavior because of the holding in *Janus* and not because of this lawsuit."); *Danielson,* 345 F. Supp. 3d at 1339 ("[T]here can be no serious doubt that the policy change was made because of *Janus,* not because of this lawsuit, given the timing of the policy change and direct reliance on *Janus* as the stated basis for the change."); *see also Marcavage v. Nat'l Park Serv.,* 666 F.3d 856, 861 (3d Cir. 2012) (dismissing a case as moot because, in part, there was no indication that the relevant regulatory change "was adopted to avoid an adverse judgment in this case and [would] be abandoned once [the] case [became] final"); *Christian Coal.,* 355 F.3d at 1292 (acknowledging that the defendant ceased the conduct at issue because of an intervening Supreme Court decision); *Smith v. Univ. of Wash. Law Sch.,* 233 F.3d 1188, 1194 (5th Cir. 2000) (finding an issue moot because the relevant policy was clearly changed due to a change in the law and not due to the pending litigation); *Ragsdale,* 841 F.2d at 1365-66 ("We believe that the defendants' now public policy of non-enforcement of the hospitalization requirement, particularly in view of the reasons therefor (*i.e.,* that enforcement is barred by clear Supreme Court precedent), moots any challenge to that requirement."). Therefore, the Court will not apply the voluntary-cessation exception here. *See Friends of the Earth,* 528 U.S. at 189.

Finally, the voluntary-cessation exception to mootness does not apply to this case because there is no other reason for this Court to believe that Union Defendants will resume collecting fair-share fees. For example, Union Defendants do not continue to defend fair-share-fee collection on the merits. *See Knox,* 567 U.S. at 307 (declining to dismiss a case as moot because the union defendant continued to defend the legality of the at-issue fee). Nor have Plaintiffs alleged that Union Defendants attempted to collect fair-share fees since the *Janus* decision or that Union Defendants will resume the collection of fair-share fees. Instead, Union Defendants have admitted numerous times before this Court that the collection of fair-share fees is unconstitutional. (*See* ECF No. 41 at 16; ECF No. 51 at 5.) The Court finds that "[i]t is unreasonable to think that [Union Defendants] would resort to conduct that [they have] admitted in writing [is] constitutionally deficient," particularly when doing so would "subject [Union Defendants] to future litigation that [they] would clearly lose." [15] *Carlson v. United Academics,* 265 F.3d 778, 786-87 (9th Cir. 2001); *see Cook,* 364 F. Supp. 3d at 1189 (explaining that the voluntary-cessation exception did not apply and the case was moot because the Court saw "no reason to assume, without evidence, [the union's] willingness to flagrantly violate the law"). Therefore, the voluntary-cessation exception to the mootness doctrine does not apply in this case. Other courts have reached the same conclusion in similar cases. *See Yohn,* 2018 WL 5264076, at *3 (explaining that the case was moot because there was no evidence that the defendants attempted to collect fair-share fees in violation of *Janus*); *Danielson,* 345 F. Supp. 3d at 1339 (dismissing a case as moot and noting that "there is no evidence that the State has equivocated in its policy change to discontinue collecting agency fees"); *Carey v. Inslee,* 364 F. Supp. 3d 1220, 1227 (W.D. Wash. 2019) (finding that a post-*Janus* policy change rendered claims for injunctive relief moot because there was no evidence that the union had deviated from its new policy, and "it would be highly illogical for [the union] to revert its practices back to their pre-*Janus* state unless the Supreme Court again changed course" because such a reversion "would be inviting litigation by directly violating a constitutional decree"); *see also Grutzmacher,* 851 F.3d at 349 (finding a claim moot after "discern[ing] 'no hint' " that the defendant would reinstitute the challenged policy).

**\*21** In sum, Plaintiffs' claims seeking declaratory and injunctive relief (ECF No. 62 ¶ 55(e)-(o), (r), (s)) are moot as a result of the Supreme Court's decision in *Janus* and Union Defendants' undisputed compliance therewith. [16] The voluntary-cessation exception to the mootness doctrine does not save these claims from dismissal because (1) *Janus* changed of the law of the land, (2) Union Defendants complied with that change in the law, and (3) Plaintiffs have not alleged that Defendants will resume collecting fair-share fees in the future.

By finding Plaintiffs' claims for declaratory and injunctive relief moot, this Court agrees with various courts around the county who have dealt with this issue in the aftermath of *Janus.* These courts have concluded that the lawsuits are moot and that the voluntary-cessation exception to the mootness doctrine does not apply. *See Hartnett,* 2019 WL 2160404, at *6-7; *Babb v. Cal. Teachers Ass'n,* No. 8:18-cv-00994-JLS-DFM, 2019 WL 2022222, at *4 (C.D. Cal. May

Diamond v. Pennsylvania State Education Association, Slip Copy (2019)

2019 WL 2929875

8, 2019); *Wholean v. CSEA SEIU Local 2001,* 3:18-cv-1008(WWE), 2019 WL 1873021, at *3 (D. Conn. Apr. 26, 2019) (finding similar case moot because "a defendant cannot reasonably be expected to resume conduct that it acknowledges is contrary to binding precedent" (citation omitted)); *Akers v. Md. State Educ. Assoc.,* Civil Action No. RDB-18-1797, 2019 WL 1745980, at *5 (D. Md. Apr. 18, 2019) ("[The p]laintiffs' request for injunctive relief is moot because the union's communications are reliable evidence of a permanent shift in policy and the challenged conduct cannot be reasonably expected to recur, and declaratory relief is moot because there is no immediate legal controversy."); *Bermudez v. Serv. Emps. Int'l Union, Local 521,* Case No. 18-cv-04312-VC, 2019 WL 1615414, at *1 (N.D. Cal. Apr. 16, 2019); *Carey,* 364 F. Supp. 3d at 1225-27; *Lee,* 366 F. Supp. 3d at 981-82 (quoting *Lamberty,* 2018 WL 5115559, at *9); *Crockett v. NEW-Alaska,* 267 F. Supp. 3d 996, 1002 (D. Alaska 2019) ("Given that it is undisputed that the collection of fair-share fees ceased immediately after *Janus,* there is no actual, live controversy sufficient to establish this court's jurisdiction over [p]laintiffs' claims for prospective relief with respect to fair-share fees."); *Cook,* 364 F. Supp. 3d at 1188-90 (finding post-*Janus* claims for declaratory and injunctive relief against a public-sector union to be moot in light of *Janus* and the union's compliance with the mandates of *Janus*); *Danielson v. Am. Fed'n of State, Cty., and Mun. Emps., Council 28,* 340 F. Supp. 3d 1083, 1084 (W.D. Wash. 2018) (dismissing the plaintiffs' claims for declaratory and injunctive relief as moot because "there is no reasonable likelihood that agency fees will be used and collected from [the p]laintiffs"); *Lamberty,* 2018 WL 5115559, at *9 (explaining that *Janus* mooted a challenge to the constitutionality of agency fees because "there is nothing for [the court] to order [the d]efendants to do now"); *Yohn,* 2018 WL 5264076, at *4 (granting the union's motion to dismiss on mootness grounds after the union complied with *Janus); Danielson,* 345 F. Supp. 3d at 1340 (finding that *Janus* mooted a controversy when the State of Washington stopped collecting agency fees post-Janus); *Ladley,* No. CIL14-08552, at *20-21, *24 (dismissing a post-Janus challenge as moot and rejecting the application of the voluntary-cessation exception).

**\*22** Plaintiffs' claims seeking declaratory and injunctive relief (ECF No. 62 ¶ 55(e)-(o), (r), (s)) will therefore be **DISMISSED.**

### b. The demands for relief in paragraphs 55(q) and 55(r)(iii) of the Second Amended Complaint are dismissed for lack of standing.

Plaintiffs and Union Defendants agree that Plaintiffs do not have standing to seek the relief requested in paragraphs 55(q) and 55(r)(iii) of the Second Amended Complaint. (ECF No. 41 at 17-18; ECF No. 48 at 16.) The Court concurs and thus will **DISMISS** these requests for relief.

### 2. Plaintiffs' claim for repayment of previously paid fair-share fees is dismissed based on the good-faith defense.

In addition to declaratory and injunctive relief, Plaintiffs request that this Court order the NEA, the PSEA, and all of the PSEA's chapters and affiliates to repay the fair-share fees that Union Defendants extracted from Plaintiffs and their class members' paychecks, along with pre-and post-judgment interest. (ECF No. 62 ¶ 55(p).)

Union Defendants seek to dismiss this request for relief. (ECF No. 41 at 18.) Union Defendants argue that any fair-share fees that they extracted after the *Janus* decision have already been repaid with interest, and thus, to the extent Plaintiffs demand reimbursement for post-*Janus* extraction, their request is moot. (*Id.*) Plaintiffs do not appear to challenge this claim of mootness. The Court agrees that Plaintiffs' claims for post-*Janus* fair-share-fee reimbursement are moot, as these fees have undisputedly been repaid (ECF No. 41-1 ¶¶ 5(b)-(c), 6-11).

In addition, Union Defendants seek to dismiss Plaintiffs' request for repayment of pre-*Janus* fair-share fees. (ECF No. 41 at 18.) Union Defendants contend that the *Janus* decision is not retroactive because they collected the pre-*Janus* fees in good-faith reliance on *Abood* and Section 575. (*Id.* at 18-25.)

In response, Plaintiffs argue that when a defendant asserts a good-faith defense, courts are required to look to the common-law tort that is most analogous to the situation. (ECF No. 48 at 17.) If, when § 1983 was enacted, the analogous tort allowed for a similar defense, the court may recognize that defense to a claim for damages under § 1983. (*Id.*) Plaintiffs claim that the most analogous common-law tort in this case is conversion, which never incorporated a good-faith defense. (*Id.* at 18.) Thus, according to Plaintiffs, Union Defendants are foreclosed from asserting a good-faith defense to § 1983 liability.

Plaintiffs also assert that even if the good-faith defense applies in this case, Union Defendants cannot establish that they reasonably relied on Section 575 and *Abood.* (*Id.* at 21-24.) Nor have Union Defendants proven that they complied with *Abood* prior to the issuance of the *Janus* decision. (*Id.* at 24-25.)

Finally, Plaintiffs claim that their demand for a refund of previously paid fair-share fees can be characterized as an equitable claim for restitution or unjust enrichment, as opposed to a legal claim for damages. (*Id.* at 25.) According to Plaintiffs, "the union defendants cite no authority suggesting that their supposed 'good faith' defense should extend to an equitable demand for restitution." (*Id.*)

**\*23** Union Defendants filed a reply brief (ECF No. 51), in which they assert that (1) the application of the good-faith defense does not turn on the nature of an analogous common-law tort; (2) if it does, the most analogous common-law torts are abuse of process and interference with contract, both of which would allow for the assertion of a good-faith defense; and (3) Plaintiffs cannot escape the application of the good-faith defense by attempting to characterize their demand for relief as equitable. (*Id.* at 7-15.)

### a. Legal Standard

Retroactive application of a Supreme Court decision is the general rule: when the Supreme Court "applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97 (1993). Reasonable reliance on previously controlling law is not sufficient to overcome this rule of retroactive application. *See Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 753 (1995).

However, "as courts apply 'retroactively' a new rule of law to pending cases, they will find instances where that new rule, for well-established legal reasons, does not determine the outcome of the case." *Id.* at 758-59. For example, a court may find "a previously existing, independent legal basis (having nothing to do with retroactivity) for denying [retroactive] relief." *Id.* at 759.

In this case, Plaintiffs and Union Defendants dispute whether the good-faith defense to § 1983 liability for damages provides an independent legal basis. The Supreme Court first suggested that this defense might exist for private actors sued under § 1983 in the 1982 decision of *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982), in which the Court stated:

> Justice POWELL is concerned that private individuals who innocently make use of seemingly valid state laws would be responsible, if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing an affirmative defense. ... We need not reach the question of the availability of such a defense to private individuals at this juncture.

*Id.* at 942 n.23.

2019 WL 2929875

The Supreme Court then elaborated on this potential defense in *Wyatt v. Cole,* 504 U.S. 158 (1992). The Court determined that private individuals threatened with liability under § 1983 cannot take advantage of the qualified immunity that protects government officials. *Id.* at 159. However, the Court explained that "principles of equality and fairness may suggest ... that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability [under § 1983], as do their government counterparts." *Id.* at 168. While declining to reach the issue of the existence of such a good-faith defense because it was not before the Court, the Court also declined to "foreclose the possibility that private defendants faced with § 1983 liability ... could be entitled to an affirmative defense based on good faith and/or probable cause." *Id.* at 169; *see also Richardson v. McKnight,* 521 U.S. 399, 413-14 (1997) (declining to express a view on the availability of a good-faith defense to liability for private defendants sued under § 1983).

**\*24** Although the Supreme Court has never confirmed the existence of a good-faith defense, numerous circuit courts, applying *Lugar* and its progeny, have adopted some version of a good-faith defense for private parties facing § 1983 liability. *See Jarvis v. Cuomo,* 660 F. App'x 72, 75-76 (2d Cir. 2016); *Clement v. City of Glendale,* 518 F.3d 1090, 1097 (9th Cir. 2008); *Vector Research, Inc. v. Howard & Howard Att'ys P.C.,* 76 F.3d 692, 699 (6th Cir. 1996); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1276-77 (3d Cir. 1994); *Wyatt v. Cole,* 994 F.2d 1113, 1118 (5th Cir. 1993); *Duncan v. Peck,* 844 F.2d 1261, 1266-68 (6th Cir. 1988).

Most importantly for purposes of the present case, the Third Circuit adopted the good-faith defense for private parties in *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250 (3d Cir. 1994). In *Jordan,* the Third Circuit generally approved of the Fifth Circuit's conclusion that "[p]rivate defendants should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity." *Id.* at 1276 (quoting *Wyatt,* 994 F.2d at 1120). However, the Third Circuit added that " 'good faith' gives state actors a defense that depends on their subjective state of mind, rather than the more demanding objective standard of reasonable belief that governs qualified immunity." *Id.* at 1277.

### b. Discussion

Here, Union Defendants argue in a footnote that it is not clear that *Janus* would apply retroactively based on *Harper* because "the *Janus* decision did no more than overrule *Abood,* reverse the lower courts' order dismissing the complaint, and remand for further proceedings." (ECF No. 51 at 8.) The Court disagrees. According to *Harper,* when the Supreme Court applies a new rule of federal law to the parties before it, other courts must apply that decision retroactively. *Harper,* 509 U.S. at 90, 97. The Court in *Harper* did not explicitly define the circumstances in which it "applies a rule of federal law to the parties before it," but the Court has explained

in other decisions that a new principle of law is established "either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil v. Huson,* 404 U.S. 97, 106 (1971) (citations omitted); [17] *see Reynoldsville Casket,* 514 U.S. at 762 (Kennedy, J., concurring in the judgment). Based on this definition, *Janus* announced a new principle of law. *Janus* overruled "clear past precedent" (*Abood*), announced a new rule regarding the unconstitutionality of fair-share fees, and applied that rule to the case by reversing the Seventh Circuit's dismissal of the plaintiffs' complaint. *See Janus,* 138 S. Ct. at 2460, 2462. Therefore, *Haper*'s retroactivity rule applies to *Janus.*

However, there is an independent legal basis in this case for otherwise denying retroactive relief: the good-faith defense available to private parties who are sued under § 1983. *See Jordan,* 20 F.3d at 1276. Plaintiffs offer numerous arguments against the applicability of the good-faith defense. The Court addresses each argument in turn.

### i. The Court rejects Plaintiffs' most-analogous-common-law-tort argument.

 **\*25** Plaintiffs first argue, citing to the Supreme Court's decision in *Wyatt,* that the good-faith defense only applies if the most analogous common-law tort would have conferred similar immunities when § 1983 was enacted. (ECF No. 48 at 17.) Plaintiffs assert that the most analogous common-law tort in this case is conversion, a strict-liability tort that does not provide for a good-faith defense. (*Id.* at 18.)

The Court rejects Plaintiffs' most-analogous-tort argument because (1) *Wyatt* and *Jordan* do not require comparison to the most analogous common-law tort and (2) the most analogous common-law tort in this case would allow for a good-faith defense.

First, *Wyatt* does not require looking to the most analogous common-law tort when determining whether the good-faith defense applies. In fact, as Plaintiffs point out (*see* ECF No. 48 at 19), *Wyatt* did not conclusively resolve the issue of whether a good-faith defense to § 1983 liability exists at all. Instead, *Wyatt's* articulation of the most-analogous-common-law-tort rule dealt with qualified immunity. *Wyatt,* 504 U.S. at 164; *see Carey,* 364 F.Supp.3d at 1229; *Babb,* 2019 WL 2022222, at *6. The *Wyatt* court made clear that its holding was limited to the "very narrow" question of whether private persons can be protected from § 1983 liability based on qualified immunity. *Wyatt,* 504 U.S. at 168; *see also Mooney v. Ill. Educ. Assoc.*, 372 F. Supp. 3d 690, 702 (C.D. Ill. 2019) ("The Supreme Court was clear that 'the precise issue' decided in *Wyatt* was 'whether qualified immunity ... is available for private defendants faced with § 1983 liability under *Lugar.*' The Supreme Court answered in the negative but refused to 'foreclose the possibility that private defendants ... could be entitled to an affirmative defense based on good faith.' Therefore, all that *Wyatt* says about the good-faith defense is dicta." (citations omitted)); *Carey,* 364 F.Supp.3d

at 1229 ("The Court's holding in *Wyatt* was far narrower, and the dicta far murkier, than Plaintiffs present it. Justice O'Connor made clear the Court's ruling was limited to the 'very narrow' question of whether a private defendant could be shielded by qualified immunity.").

Furthermore, when the *Wyatt* Court suggests that a good-faith defense may be available to private parties exposed to § 1983 liability, the Court did not refer to analogous common-law torts. Instead, the Court discussed the "principles of equality and fairness" that may necessitate protecting private parties from § 1983 liability. *See Wyatt,* 504 U.S. at 168. Recent cases have persuasively discussed how these principles require that private individuals exposed to § 1983 liability be permitted to assert a good-faith defense, regardless of the common-law tort that is most analogous to the action. *See Mooney,* 372 F. Supp. 3d at 703 ("The principles of fairness and equality underlying the good-faith defense in the § 1983 context demand a private defendant relying in good faith on a presumptively constitutional statute not be abandoned and exposed when the law is subsequently held unconstitutional, while the State remains cloaked in sovereign immunity and its officials are shielded by the veil of qualified immunity. Quibbles over which tort as it existed at common law in 1871 is most analogous to the harm wrought by the statute in question would only undercut these purposes."); *Crockett,* 367 F. Supp. 3d at 1005 ("[T]he approach propounded by [the p]laintiffs 'would increase the potential for unfairness by permitting some defendants that rely on presumptively valid state laws to assert the [good-faith] defense while other could not, based solely on the elements of various nineteenth-century common law torts.' ").

 **\*26** Moreover, when the Third Circuit adopted the good-faith defense in *Jordan,* the Third Circuit did not indicate whether the application of the good-faith defense depends on an analogous common-law tort. And district court cases applying *Jordan* have not relied on common-law-tort analogs. *See, e.g., Egervary v. Rooney,* No. CIV. A. 96-3039, 2000 WL 1160720, at \*6 (E.D. Pa. Aug. 15, 2000); *Foster v. City of Phila.*, Civil Action No. 12-5851, 2014 WL 5821278, at \*21 (E.D. Pa. Nov. 10, 2014).

Therefore, this Court disagrees with Plaintiffs' assertion that "*Wyatt* compels courts to look to the most analogous common-law tort, and it allows courts to recognize a defense only if that tort would have conferred similar immunities when [§] 1983 was enacted." (ECF No. 48 at 17.) The Court agrees with the opinions of various district courts that have determined — when presented with indistinguishable facts — that the applicability of the good-faith defense does not require analyzing the most analogous common-law tort. *See Mooney,* 372 F. Supp. 3d at 703 & n.5; *Babb,* 2019 WL 2022222, at \*6; *Carey,* 364 F.Supp.3d at 1229; *Crockett,* 367 F. Supp. 3d at 1004-5; *Danielson,* 340 F. Supp. 3d at 1086.

Second, even if this Court were required to look to the most analogous common-law tort when determining whether the good-faith defense applies, conversion is not the most analogous tort. This is not a case in which "someone ... walk[ed] off with another's property." (ECF No. 48 at 18.)

Diamond v. Pennsylvania State Education Association, Slip Copy (2019)

2019 WL 2929875

Instead, this case involved Union Defendants compelling Plaintiffs to support particular speech through the state-created processes found in Section 575. (ECF No. 51 at 12.) Moreover, it involved Union Defendants' interference with Plaintiffs' contractual right to receive certain wages from their employers. (*Id.* at 13.) Therefore, as many district courts have found, the most analogous common-law tort here is either abuse of process, *see Wyatt,* 504 U.S. at 164, or tortious interference with contract. *See Crockett,* 367 F. Supp. 3d at 1005-6; *Carey,* 364 F. Supp. 3d at 1230; *Mooney,* 372 F. Supp. 3d at 703 n.5; *Babb,* 2019 WL 2022222, at *6; *Cook,* 364 F. Supp. 3d at 1191-92; *Danielson,* 340 F. Supp. 3d 1086. Both of these torts would allow for a good-faith defense under Plaintiffs' most-analogous-tort approach. *See Crockett,* 367 F. Supp. 3d at 1005-6; *Carey,* 364 F. Supp. 3d at 1230; *Mooney,* 372 F. Supp. 3d at 703 n.5; *Babb,* 2019 WL 2022222, at *6; *Cook,* 364 F. Supp. 3d at 1191-92; *Danielson,* 340 F. Supp. 3d at 1086.

### ii. Union Defendants objectively reasonably relied on Section 575 and *Abood.*

Plaintiffs next assert that even if the Court recognizes the applicability of a good-faith defense, Union Defendants cannot contend that they reasonably relied on Section 575's constitutionality and the Supreme Court's decision in *Abood* because "[t]he Supreme Court had repeatedly warned the union defendants that it had grave misgivings about the constitutionality of public-sector agency shops long before declaring them unconstitutional in *Janus.*" (ECF No. 48 at 21.)

The Court disagrees. It is objectively reasonable to rely on a state statute that is valid under controlling Supreme Court precedent. Regardless of how many times the Supreme Court questioned its holding in *Abood, Abood* was the law of the land until it was overturned in *Janus. See Janus v. Am. Fed'n of State, Cty. and Mun. Emps., Council 31,* Case No. 15 C 1235, 2019 WL 1239780, at *3 (N.D. Ill. Mar. 18, 2019) ("Despite these statements in *Janus* [explaining that unions have been on notice that the constitutionality of fair-share fees was being questioned], prior to the instant case *Abood* remained the law of the land."). By relying on this law, Union Defendants acted in good faith and are entitled to the protection of the good-faith defense as a matter of law. *See Janus,* 2019 WL 1239780, at *3; *Lee,* 366 F. Supp. 3d at 983 ("The facts are undisputed that [the union] collected fees under the binding precedent of *Abood* and the subsequent state statutes it spawned. As a matter of law, therefore, those collections efforts were done in good faith that they did not violate the United States Constitution."); *Carey,* 364 F. Supp. 3d at 1232 ("It ... does not matter how many 'warnings' the Court has given about its intention to overrule *Abood.* Until it actually did so, *Abood* was the law of the land and [the union's] conscious compliance with that ruling can establish its good faith as a matter of law."); *Akers,* 2019 WL 1745980, at *5 (explaining that the plaintiffs could assert a good-faith defense because they complied with and relied on presumptively-valid state law and controlling Supreme Court precedent); *Wholean,* 2019 WL 1873021, at *3; *Mooney,* 372 F. Supp. 3d at 706; *Bermudez,* 2019 WL 1615414; *Hough v.*

*SEIU Local 521,* Case No. 18-cv-04902-VC, 2019 WL 1785414, at *1 (N.D. Cal. Apr. 16, 2019); *Crockett,* 367 F. Supp. 3d at 1006-7.

**\*27** To conclude otherwise would undermine the equitable foundation of the good-faith defense. *See Wyatt,* 504 U.S. at 168 (explaining that "principles of equality and fairness" may suggest the existence of a good-faith defense for private parties facing liability under § 1983); *see also Cook,* 364 F. Supp. 3d at 1192 (explaining that holding a union liable for damages "because certain Justices had expressed doubt about *Abood*'s reasoning would be unworkable and highly inequitable"); *Babb,* 2019 WL 2022222, at *7 ("[I]n the qualified immunity context, state officials are entitled to rely on Supreme Court precedent even if the precedent's reasoning has been questioned; applying a higher standard to private individuals would be inequitable."); *Crockett,* 367 F. Supp. 3d at 1006 (discussing the inequity of holding the union defendants liable for pre-*Janus* fair-share fees when they collected the fees in accordance with state law and then-binding Supreme Court precedent).

Furthermore, Plaintiffs allege that Union Defendants expected the Supreme Court to overrule *Abood* in *Janus.* (ECF No. 62 ¶ 33.) But, as one court has explained, "such an expectation cannot produce subjective belief in unconstitutionality when the defendant is also aware that the prior holding has not been overruled." *Carey,* 364 F. Supp. 3d at 1229; *see Babb,* 2019 WL 2022222, at *7. [18] Assuming this allegation is true, it does not change the reasonableness of relying on Section 575 and *Abood* — the law as it existed when Union Defendants collected the fair-share fees — rather than any individuals' subjective beliefs about how the law might change in the future. *See Lee,* 366 F. Supp. 3d at 982-83 ("Even if an employee strongly belied that *Abood* was wrongly decided, it would not make reliance on that decision any less good-faith reliance. Rather, regardless of personal opinions, individuals are entitled to rely upon binding United States Supreme Court precedent.").

Thus, it was objectively reasonable for Union Defendants to rely on Section 575 and *Abood* before the Supreme Court's decision in *Janus.*

### iii. Union Defendants need not prove that they complied with *Abood.*

Plaintiffs next assert that, in order to establish their good-faith defense, Union Defendants must prove that they complied with *Abood* in terms of how they spent the collected fair-share fees prior to *Janus.* (ECF No. 48 at 24-25.) Plaintiffs claim that compliance with *Abood* is a factual question that cannot be resolved on a Rule 12(b)(6) motion.

The Court rejects this argument. Union Defendants' good-faith defense depends on whether the unconstitutional conduct alleged in the Second Amended Complaint — the collection of fair-share

fees — was done in good faith. *See Mooney,* 372 F. Supp. 3d at 706. It does not depend on whether Union Defendants' other actions — including the spending of the collected fees — were done in good faith. *See id.* The Court will not allow the Second Amended Complaint to survive a motion to dismiss so Plaintiffs can establish facts that are unrelated to Union Defendants' good-faith defense. Other district courts have reached the same conclusion in indistinguishable cases. *See, e.g., Babb,* 2019 WL 2022222, at *7-8; *Carey,* 364 F. Supp. 3d at 1232; *Mooney,* 372 F. Supp. 3d at 705-6; *Lee,* 366 F. Supp. 3d at 983; *Crockett,* 367 F. Supp. 3d at 1007.


### iv. The relief Plaintiffs seek sounds in law, not equity.


Finally, Plaintiffs argue that the relief they seek can be characterized as equitable and that the good-faith defense does not apply to claims seeking relief in equity. (ECF No. 48 at 25-26.) In response, Union Defendants assert that Plaintiffs do not allege that the previously collected fair-share fees were kept in a specific fund against which a constructive lien could be enforced. (ECF No. 51 at 14-15.) Thus, Union Defendants explain that if Plaintiffs have a claim for the repayment of fair-share fees, that claim is a personal claim against Union Defendants' general assets which sounds in law instead of in equity. (*Id.*)


**\*28** As the Supreme Court has explained, a plaintiff's claim sounds in law if he seeks to impose personal liability on a defendant to pay a sum of money. *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213 (2002). In contrast, a claim sounds in equity "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* "But where 'the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor,' and the plaintiff 'cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant].' " *Id.* (alterations in original) (citation omitted). Moreover, restitution claims seeking money are generally legal claims. *See Knudson,* 534 U.S. at 210; *Gidley v. Reinhart Foodservice, L.L.C.,* No. 4:14-cv-0800, 2015 WL 1136447, at *5 (M.D. Pa. Mar. 12, 2015) ("Plaintiff requests only monetary relief, which is clearly not equitable in nature...."); *Dastgheib v. Genentech, Inc.,* 457 F. Supp. 2d 536, 544 (E.D. Pa. 2006).


The Court finds that Plaintiffs seek a legal remedy as opposed to an equitable remedy.


Plaintiffs' claim for the repayment of previously paid fair-share fees seeks monetary relief, which sounds in law unless that money can be clearly traced to particular funds or property possessed by Union Defendants. *See Knudson,* 534 U.S. at 210; *Dastgheib,* 457 F. Supp. 2d at 544. The face of Plaintiffs' Second Amended Complaint makes clear that Plaintiffs seek the repayment of previously paid fair-share fees not from "particular funds or property in the defendant's possession," *Knudson,* 534 U.S. at 213, but from Union Defendants' general assets. Specifically, Plaintiffs fail to allege

that the fair-share fees they paid are being held by Union Defendants in a specific fund. Also, Plaintiffs seek to have Union Defendants repay the fair-share fees that were paid directly to the Union *and* fees that were directed *to union-approved charities.* (ECF No. 62 ¶¶ 24, 26, 55(p).) Union Defendants either never possessed the fees that were directed to charities or they possessed those fees originally but now no longer have them in their possession. Because Plaintiffs seek recovery of funds that Union Defendants no longer have in their possession, Plaintiffs seek recovery from Union Defendants' general assets.

Moreover, as district courts have explained in comparable cases, the crux of Plaintiffs' Second Amended Complaint is that Union Defendants used collected fees to fund union activities pursuant to Section 575 and thus that Plaintiffs could not recover the specific funds that they paid to Union Defendants. *See Mooney,* 372 F. Supp. 3d at 700 (noting "the presupposition in cases like the one at hand" that "all identifiable money was used to fund union activities and, consequently, has already been dissipated"); *Carey,* 364 F. Supp. 3d at 1232-33 ("Here, Plaintiffs' entire case is premised on [the union] taking their money and using it to fund union activities. This presupposes that Plaintiffs' money could not 'clearly be traced,' meaning restitution cannot 'lie in equity.' " (citation omitted)); *Crockett,* 367 F. Supp. 3d at 1006 (finding, at the motion-to-dismiss stage, that the fair-share fees at issue "paid for ongoing costs of representation the Union Defendants provided on [the plaintiffs'] behalf" and that "[t]here is no segregated fund to which Plaintiffs' payments can now be traced, and therefore any relief would be paid from the Union Defendants' general assets"); *Babb,* 2019 WL 2022222, at *8 (same).

Therefore, regardless of Plaintiffs' attempt to characterize its claim as equitable, Plaintiffs' claim for the repayment of previously paid fair-share fees is a claim for legal relief. *See Carey,* 364 F. Supp. 3d at 1232 ("A plaintiff may not circumvent qualified immunity or the good faith defense simply by labeling a claim for legal damages as one for equitable restitution."). Thus, the Court rejects Plaintiffs' argument that the good-faith defense cannot apply because Plaintiffs' claim can be characterized as equitable. This conclusion comports with various district-court decisions on this issue. *See Carey,* 364 F. Supp. 3d at 1232-33; *Mooney,* 372 F. Supp. 3d at 700-1; *Babb,* 2019 WL 2022222, at *8, *Crockett,* 367 F. Supp. 3d at 1006.

### v. Union Defendants are entitled to assert the good-faith defense as a matter of law.

**\*29** After rejecting Plaintiffs' various arguments against Union Defendants' good-faith defense, the Court finds that the good-faith defense applies to Plaintiffs' claims for repayment of previously paid fair-share fees as a matter of law.

In *Jordan,* the Third Circuit explained that " 'good faith' gives state actors a defense that depends on their subjective state of mind, rather than the more demanding standard of reasonable belief that governs qualified immunity." *Jordan,* 20 F.3d at 1277.

Here, it was objectively reasonable for Union Defendants to rely on a state statute that was constitutional under controlling Supreme Court precedent when collecting fair-share fees from Plaintiffs. By establishing objective reasonableness as a matter of law, Union Defendants have met the less demanding subjective standard articulated by the Third Circuit in *Jordan.* Union Defendants are therefore entitled to the dismissal of Plaintiffs' § 1983 claim to the extent Plaintiffs seek repayment of pre-*Janus* fair-share fees.

### 3. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims.

Plaintiffs bring state-law tort claims against Defendants, including for conversion, trespass to chattels, replevin, unjust enrichment, and restitution. (ECF No. 62 ¶ 54.) Plaintiffs urge this Court to exercise supplemental jurisdiction over these state-law claims. (*Id.*)

"In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if — ... the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). "If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances." *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976).

As explained previously, this Court will dismiss Plaintiffs' claims under 42 U.S.C. § 1983 and 28 U.S.C. § 2201. Therefore, all the claims over which this Court has original jurisdiction will be dismissed. And the Court finds no "extraordinary circumstances" in this case that justify exercising supplemental jurisdiction over the remaining state-law claims. This Court thus declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims, and these claims will be dismissed. *See Mooney,* 372 F. Supp. 3d at 708-9 (declining, in comparable case, to exercise supplemental jurisdiction over state-law claims after all federal claims were dismissed); *Akers,* 2019 WL 1745980, at *8 (same); *Wholean,* 2019 WL 1873021, at *4 (same).

Because the Court declines to exercise supplemental jurisdiction over these claims, the Court will not address Defendants' various arguments as to why the state-law claims should be dismissed under Rule 12(b)(6). (*See* ECF No. 41 at 30.)

### 4. The Court will dismiss Ms. Ziegler and CREA.

**\*30**  Finally, Union Defendants claim that Ms. Ziegler retired from teaching on June 5, 2013. (*Id.*) Thus, she has not paid any fair-share fees since 2013. (*Id.*) According to Union Defendants, Ms. Ziegler has no standing to seek prospective or retrospective relief because (1) she is not threatened with any injury that the Second Amended Complaint seeks to enjoin, and (2) any fees she previously paid were paid beyond the two-year statute of limitations period applicable to the § 1983 and tort claims. (*Id.* at 31.) Moreover, Union Defendants argue that Defendant CREA must be dismissed because only Ms. Ziegler alleged claims against it. (*Id.*)

In response, Plaintiffs claim that issues regarding the statute of limitations go to the merits as opposed to a plaintiff's standing. (ECF No. 48 at 28.) And while Plaintiffs do not dispute that Ms. Ziegler retired in 2013, Plaintiffs explain that Ms. Ziegler was recently notified by the union that her previously paid fair-share fees were sitting in an account waiting to be donated. (*Id.* at 28-29.) According to Plaintiffs, Ms. Ziegler wants to ensure that if those funds cannot be recovered, they are sent to a charity of her choice. (*Id.* at 29.) Plaintiffs further assert that CREA should not be dismissed because Plaintiffs sue CREA as a representative of the PSEA's local chapters and affiliates. (*Id.*)

Even if the Court had not already dismissed Plaintiffs' claims against Union Defendants on mootness and good-faith grounds, the Court would still dismiss Ms. Ziegler's claims. Ms. Ziegler has no standing to seek declaratory and injunctive relief, and the two-year statute of limitations bars her claim for damages.

"Standing is a jurisdictional matter." *Davis v. Wells Fargo,* 824 F.3d 333, 346 (3d Cir. 2016). "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (citing *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 296 (3d Cir. 2003)).

As the Third Circuit recently noted,

The Supreme Court's well-known standing test sets forth an "irreducible constitutional minimum" of three elements that a plaintiff must satisfy: (1) "the plaintiff must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and

2019 WL 2929875

particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court[,]" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

*Manuel v. NRA Grp. LLC,* 722 F. App'x 141, 145 (3d Cir. 2018) (alteration in original).

Here, Ms. Ziegler seeks declaratory and injunctive relief and the repayment of previously paid fair-share fees.

With regard to Ms. Ziegler's claims for declaratory and injunctive relief, Plaintiffs do not contest that Ms. Ziegler lacks standing to pursue these claims. Nor could they. It is undisputed that Ms. Ziegler is no longer a public-school teacher and that she has not been required to pay fair-share fees since 2013.[19] (ECF No. 62 ¶¶ 23, 27; ECF No. 41-2 ¶¶ 5-7; ECF No. ECF No. 48 at 28.) Thus, there is no imminent, concrete threat that Ms. Ziegler will be subjected to the unconstitutional collection of fair-share fees. *See McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) ("When ... prospective relief is sought, the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct."); *Khodara Envtl., Inc. v. Blakey,* 376 F.3d 187, 193-94 (3d Cir. 2004) (explaining that when pursuing a declaratory judgment, "a plaintiff has Article III standing if 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment' " (quoting *St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands,* 218 F.3d 232, 240 (3d Cir. 2000))). Because Ms. Ziegler is not facing any imminent injury, declaring fair-share fees to be unconstitutional or enjoining Union Defendants from collecting those fees from Ms. Ziegler would not redress anything.

**\*31** Next, with regard to the repayment of previously paid fair-share fees, Ms. Ziegler has standing to assert such a claim. According to the Second Amended Complaint, she suffered a concrete injury — fair-share fees were deducted from her paycheck due to Union Defendants' conduct. If the Court were to order Union Defendants to repay those fees to Ms. Ziegler, her injury would be redressed. Thus, she has standing to assert the § 1983 claim to the extent she seeks the repayment of previously paid fair-share fees.

Union Defendants argue that Ms. Ziegler does not have standing to seek repayment of previously paid fees because those fees were collected beyond the applicable two-year statute-of-limitations period. (ECF No. 41 at 31.) However, standing and the statute of limitations are two distinct concepts that must be raised in different ways. While standing is a jurisdictional matter than can be raised through a Rule 12(b)(1) motion, the statute of limitations is an affirmative defense that is generally raised in the defendant's answer. *Compare* Fed. R. Civ. P. 12(b)(1) (allowing a party to

assert lack of subject-matter jurisdiction by motion), *with* Fed. R. Civ. P. 8(c) (stating that a party must state a statute-of-limitations defense in his responsive pleading), *and Robinson v. Johnson,* 313 F.3d 128, 134-35 (3d Cir. 2002) (explaining that the defendant must generally assert available affirmative defenses, including the statute of limitations, in his answer). Thus, to the extent Union Defendants attempt to use Rule 12(b)(1) to preemptively raise a statute-of-limitations defense, the Court rejects this approach.

Union Defendants then imply that if the statute-of-limitations defense is not considered under Rule 12(b)(1), the Court may consider the issue under Rule 12(b)(6). Generally, a defense based on the statute of limitations cannot be raised with a Rule 12(b)(6) motion unless the face of the complaint reveals that the applicable statute of limitations would bar the claims. *Webb v. Susquehanna Twp. Sch. Dist.*, 93 F. Supp. 3d 343, 349 (M.D. Pa. 2015) (citing *Robinson,* 313 F.3d at 135; *Frasier-Kane v. City of Phila.*, 517 F. App'x 104, 107 n.1 (3d Cir. 2013)). Here, the Second Amended Complaint simply indicates that Ms. Ziegler is retired — it does not say when she retired. Thus, this Court cannot conclusively determine that the applicable two-year statute of limitations would bar Ms. Ziegler's claim for repayment of fair-share fees based on the face of the Second Amended Complaint.

In seeming anticipation of this conclusion, Union Defendants suggest that the Court treat Union Defendants' Motion to Dismiss as a motion for summary judgment and consider a declaration filed by Union Defendants. (ECF No. 41 at 31 n.8.) The declaration indicates that Ms. Ziegler retired on June 5, 2013, and that she has not been required to pay fair-share fees since her retirement. (ECF No. 41-2 ¶¶ 6-7.)

Plaintiffs do not contest the facts in the declaration. (ECF No. 48 at 28.) However, Plaintiffs oppose summary judgment against Ms. Ziegler because she was "recently" notified by the union that her fair-share fees were sitting in an account waiting to be donated. (*Id.* at 28-29.) According to Plaintiffs, Ms. Ziegler wants to ensure that those funds are at least sent to a charity she chooses instead of being diverted to the union. (*Id.* at 29.) "[P]laintiffs believe it would be premature to dismiss Ms. Ziegler from the case, even if the Court concludes that she cannot recover damages or restitution from the union given the statute of limitations." (*Id.*)

 **\*32**  The Court agrees with Union Defendants. Rule 12(d) allows a court to treat a motion under Rule 12(b)(6) as a motion for summary judgment if matters outside the pleadings are presented to and not excluded by the court. *See* Fed. R. Civ. P. 12(d). Although this kind of treatment is generally not warranted if the parties have not yet conducted discovery, *see Black v. N. Hills Sch. Dist.*, Civil Action No. 06-807, 2007 WL 2728601, at \*1 (W.D. Pa. Sept. 17, 2007), the Court finds that treating Union Defendants' Motion to Dismiss as a motion for summary judgment as to the discrete issue of whether the statute-of-limitations defense bars Ms. Ziegler's claim for damages is appropriate under the particular circumstances of this case because (1) Plaintiffs explicitly state

2019 WL 2929875

that they do not contest the outside evidence introduced by Union Defendants, and (2) Plaintiffs do not oppose treating Union Defendants' Motion to Dismiss as a motion for summary judgment as to this issue.[20] (*See* ECF No. 48 at 28.)

The Court finds that summary judgment is warranted on Ms. Ziegler's claim for monetary damages. The parties do not dispute the applicability of a two-year statute of limitations. And, based on the undisputed facts that Ms. Ziegler retired on June 5, 2013, and did not pay fair-share fees after that date (ECF No. 41-2 ¶¶ 6-7; ECF No. 48 at 28), the statute of limitations required Ms. Ziegler to bring her claim for monetary damages before June 5, 2015. The present lawsuit was filed on June 15, 2018. (*See* ECF No. 1.) Ms. Ziegler's claim for repayment of previously paid fair-share fees is thus barred by the statute of limitations, and Union Defendants are entitled to judgment as a matter of law on Ms. Ziegler's claim for repayment of previously paid fair-share fees. *See* Fed. R. Civ. P. 56 (explaining that a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law).

Plaintiffs do not seem to contest the foregoing analysis. Instead, Plaintiffs simply oppose summary judgment because Ms. Ziegler wants to ensure that her previously paid fair-share fees are sent to the charity of her choice. (ECF No. 48 at 29.) Plaintiffs thus "believe it would be premature to dismiss Ms. Ziegler from the case, even if the Court concludes that she cannot recover damages or restitution from the union given the statute of limitations." (*Id.*)

The Court disagrees. Because Ms. Ziegler's claims for declaratory and injunctive relief must be dismissed, and because Union Defendants are entitled to summary judgment on Ms. Ziegler's claims for monetary damages, it is not premature to dismiss Ms. Ziegler from this lawsuit. Ms. Ziegler can utilize the procedures the union has to donate her previously paid fair-share fees to the charity of her choice.

Because Ms. Ziegler is the only Plaintiff to assert claims against CREA, dismissal of Ms. Ziegler's claims mandates that CREA be dismissed as well.

## VI. Conclusion

**\*33**  In summary, Commonwealth Defendants and Union Defendants' Motions to Dismiss will be **GRANTED.** All claims in Plaintiffs' Second Amended Complaint will be **DISMISSED WITHOUT PREJUDICE** excluding Plaintiffs' claims for the repayment of previously-paid fair-share fees. Those claims will be **DISMISSED WITH PREJUDICE** because amendment of those claims would not cure the aforementioned deficiencies.

An appropriate order follows.

## ORDER

**NOW,** this 8th day of July, 2019, upon consideration of Union Defendants' Motion to Dismiss (ECF No. 40) and Commonwealth Defendants' Motion to Dismiss (ECF No. 38), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Union Defendants' Motion to Dismiss is **GRANTED** and Commonwealth Defendants' Motion to Dismiss is **GRANTED.** Plaintiffs' Second Amended Complaint (ECF No. 62) is **DISMISSED WITHOUT PREJUDICE,** excluding Plaintiffs' claims for the repayment of previously paid fair-share fees, which are **DISMISSED WITH PREJUDICE.**

**All Citations**

Slip Copy, 2019 WL 2929875

Footnotes

1   Issues with subject-matter jurisdiction are discussed in Section V.

2   The factual allegations are taken from Plaintiffs' Second Amended Complaint. (ECF No. 62.)

3   Ms. Ziegler differs slightly from the other religious objectors. When she became subject to fair-share fees and chose to be treated as a religious objector, Ms. Ziegler refused to specify a charity to which her fees would be donated and refused to authorize the union to release the fees it had taken from her paycheck. (ECF No. 62 ¶ 27.) Shortly before her retirement, Ms. Ziegler received a letter from the union informing her that her previously paid fair-share fees were in an account waiting to be donated. (*Id.*)

4   Upon receipt of the new Motions to Dismiss, the Court denied the original Motions to Dismiss as moot. (*See* ECF No. 42.)

5   Although the Supreme Court described the process as a "two-pronged approach," *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009), the Court noted the elements of the pertinent claim before proceeding with that approach, *id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly,* 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010)).

6   The Supreme the Court has long held that "the Eleventh Amendment bars a citizen from bringing suit against the citizen's own State in federal court, even though the express terms of the Amendment refer only to suits by citizens of another State." *Welch v. Tex. Dep't of Highways & Pub. Transp.,* 483 U.S. 468, 472 (1987) (citing *Hans v. Louisiana,* 134 U.S. 1, 10 (1890)). Furthermore, courts have also extended Eleventh Amendment protection to state agencies, departments, and officials when the state is the real party in interest. *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 323 (3d Cir. 2002).

7   As the Supreme Court has noted, *Ex Parte Young* rests on the "obvious fiction" that an official-capacity suit seeking prospective injunctive relief "is not really against the State, but rather against an individual who has been 'stripped of his official representative character' because of his unlawful conduct." *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 267 (2011) (quoting *Ex Parte Young,* 209 U.S. at 159-60.) Thus, "*Ex parte Young* also rests on the 'well-recognized irony that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment.' " *Stewart,* 563 U.S. at 272 (quotation marks omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 105 (1984)).

8   The Court notes that Commonwealth Defendants do not appear to seek dismissal of the claims against Ms. Childer-Potts, the district attorney of Bedford County, Pennsylvania, on these bases. (*See* ECF No. 39 at 17 (arguing that the claims against the members of the PLRB and the attorney general must be dismissed).) Therefore, the Court will not address whether Ms. Childer-Potts is an appropriate defendant in this case.

9   While Commonwealth Defendants cite to the Pennsylvania Labor Relations Act (the "PLRA"), 43 Pa. Stat. §§ 211.1 *et seq.,* as delineating the PLRB's authority in this case, the PLRA applies to private employers, not public employers. See *id.* § 211.3(c)

(defining "employer" but excluding "the Commonwealth, or any political subdivision thereof, or any municipal authority" from the definition). The PERA specifies the PLRB's authority in the context of public employers. *See* 43 Pa. Stat. § 1101.301(1); *Lutz v. Morrisville Educ. Assoc.*, 31 PPER ¶ 31003 (P.L.R.B. 1999) (discussing the application of the PERA in the context of a public-school union). However, even if the PLRA applies to the PLRB in this case, the PLRB still does not have the authority to enforce Section 575. Under the PLRA, the PLRB is empowered "to prevent any person from engaging in any unfair labor practice." 43 Pa. Stat. § 211.8(a). "Unfair labor practice[s]" are defined by Section 211.6, and none of this Section's provisions relate to the collection of fair-share fees under Section 575. *See id.* § 211.6.

10    The following facts are taken from the affidavits submitted with the Brief in Support of Union Defendants' Motion to Dismiss First Amended Complaint (ECF No. 41). The Court may consider these affidavits pursuant to the rules regarding factual challenges under Federal Rule of Civil Procedure 12(b)(1), discussed *supra*. The Court notes that Plaintiffs do not contest the accuracy of the affidavits. (*See, e.g.*, ECF No. 48 at 7 ("The union defendants were enforcing an unconstitutional agency shop when the plaintiffs sued, and they stopped while the litigation was ongoing."); *id.* at 8 ("The unions chose to conform their conduct to *Janus* to avoid these post-*Janus* lawsuits.").)

11    Along similar lines, Plaintiffs argue that because "[n]one of those unions were parties to the *Janus* litigation, ... they had no formal legal obligation to obey a court judgment that was entered in a case that they were not involved in." (ECF No. 48 at 8.) The Court generally agrees that Union Defendants were not parties to *Janus* and that "[i]t would have been legal for the [U]nion [D]efendants to continue enforcing their agency shops after *Janus* until a litigant sued them to enjoin the practice." (*Id.*) However, while legal, "[i]t is unreasonable to think that the Union would resort to conduct that it had admitted in writing was constitutionally deficient and had attempted to correct," particularly when resuming the unconstitutional conduct would "subject it[ ] to future litigation that it would clearly lose." *Carlson v. United Academics,* 265 F.3d 778, 786-87 (9th Cir. 2001). Moreover, the existence or non-existence of "formal legal obligation[s]" is not the test for mootness. The test is whether subsequent events have made it absolutely clear that Union Defendants could not reasonably be expected to resume collection of fair-share fees. *See Friends of the Earth*, 528 U.S. at 189. As discussed in this subsection, the Court concludes that this standard is met in this case, and the Court declines to entertain Plaintiffs' plea for a new mootness standard that depends on "formal legal obligation[s] to obey a court judgment" (ECF No. 48 at 8) and would render the mootness standard nearly impossible to meet.

12    Plaintiffs argue that *Janus* does not moot the present case because "*Janus* never explicitly rule[d] on the constitutionality of Pennsylvania's treatment of religious objectors." (ECF No. 48 at 13.) While it is true that the facts of *Janus* did not present the Supreme Court with an opportunity to rule explicitly on the constitutionality of Section 575's religious-objector provisions, *Janus* nevertheless resolves this issue with its broad holding that "States and public-sector unions may no longer extract agency fees from nonconsenting employees." *Janus,* 138 S. Ct. at 1486. Now that Section 575's fair-share fees are clearly unconstitutional, objecting on religious grounds to those fees is unnecessary and any attempt to force religious objectors to pay the equivalent of a fair-share fee would be unconstitutional under *Janus*. Although Plaintiffs claim that "it is *possible* to argue that Pennsylvania's religious-objector regime can survive *Janus*" (ECF No. 48 at 14 (emphasis added)), Plaintiffs also recognize that "any effort to impose a financial penalty on employees who decline union membership is unconstitutional, regardless of whether the money is remitted to a union or a charity." (*Id.*) Thus, the status of religious objectors after *Janus* is distinguishable from the issues remaining for litigants after *Obergefell,* and the Court is not persuaded that the status of religious objectors in this case presents a live controversy.

13    Plaintiffs also argue that *Christian Coalition* is distinguishable because the defendants in that case were state officials and were thus presumed to act in good faith when they ceased the offensive conduct and represented that they would not file charges against a judge for responding to the CCA questionnaire. (ECF No. 48 at 12.) In contrast, Plaintiffs assert, "labor unions get no such indulgence from the courts, and they cannot moot a case without showing that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur.' " (*Id.* at 13.) While the Court agrees with Plaintiffs' articulation of the mootness standard that applies to Union Defendants in this case, the Court finds this distinction between *Christian Coalition* and the present case to be unpersuasive. First, it is not clear that the court in *Christian Coalition* based its opinion on the presumption that state officials act in good faith. Second, even if this presumption did form the basis for the Eleventh Circuit's decision, this Court still concludes that this case meets the more stringent mootness standard articulated by Plaintiffs, as explained throughout this subsection.

14    Plaintiffs, while claiming that the voluntary-cessation exception applies to the facts of this case, repeatedly refer to Union Defendants' "response to *Janus*" (*see* ECF No. 48 at 7-9) and recognize that Union Defendants stopped collecting fair-share fees "in response to a Supreme Court opinion" (*id.* at 9). Plaintiffs thus seemingly recognize that Union Defendants' actions post-*Janus* were not done to circumvent this Court's jurisdiction, but were instead done to comply with new law.

15    Furthermore, in order to resume the collection of fair-share fees, Union Defendants would need the assistance of Plaintiffs' public-school employers to deduct the fees from non-members' paychecks. However, these employers have declared that they have stopped collecting fair-share fees and that they will not deduct or transmit fair-share fees in the future. (*See* ECF Nos. 41-3, 41-4, 41-5, 41-6, 41-7.) "Government officials are presumed to act in good faith." *Bridge v. U.S. Parole Comm'n,* 981 F.3d 97, 106 (3d Cir. 1992). The

employers' changed behavior, their representations that they will not resume the unconstitutional collection of fair-share fees, and the presumption that they act in good faith — all combined with the lack of any allegation that the employers are acting in bad faith — make it unreasonable to expect that the employers will collect fair-share fees in violation of *Janus* in the future. *See Marcavage, 666 F.3d at 861*. Because Union Defendants seemingly cannot collect fair-share fees without the employers' assistance, the employers' declarations support the conclusion that there is no reason to expect Union Defendants to resume fair-share-fee collection. And while the employers are not foreclosed from collecting fair-share fees based on their declarations, as Plaintiffs argue (*see* ECF No. 48 at 15), Plaintiffs fail to acknowledge the good-faith presumption and the fact that Plaintiffs have not alleged that the employers are acting in bad faith and that they will resume collecting fair-share fees. Moreover, Plaintiffs do not explain how Union Defendants could collect fair-share fees without the employers' assistance. Finally, Plaintiffs offer no other compelling reason why the good-faith presumption should not apply to the employers in this case. Thus, the Court finds Plaintiffs' contention that Union Defendants "cannot piggyback off the good-faith presumption that attaches when government officials cease their unlawful conduct in the midst of a lawsuit" unpersuasive. (*Id.*)

16    Moreover, the Court agrees with Union Defendants that even if constitutional mootness does not apply to this case, "dismissal of the requests for injunctive and declaratory relief on ground of prudential mootness [is] warranted." *Marcavage, 666 F.3d at 862 n.1*; (*see* ECF No. 41 at 16 n.2). The Supreme Court's decision in *Janus* and Union Defendants' cessation of the collection of fair-share fees in compliance with that decision has "forestalled any occasion for meaningful [declaratory and injunctive] relief." *Int'l Bhd. Of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Kelly, 815 F.2d 912 (3d Cir. 1987)* (quoting *Jersey Cent. Power & Light Co. v. New Jersey, 772 F.2d 35, 39 (3d Cir. 1985)*).

17    Although various parts of *Chevron Oil* are no longer followed, this Court has no reason to question this definition of a "new principle of law."

18    Other courts have discussed various problems with Plaintiffs' argument which this Court will not repeat but incorporates herein. *See Danielson, 340 F. Supp. 3d at 1086-8; Carey, 364 F. Supp. 3d at 1231; Cook, 364 F. Supp. 3d at 1192-93; Babb, 2019 WL 2022222, at *7; Mooney, 372 F. Supp. 3d at 706; Crockett, 367 F. Supp. 3d at 1007; Janus, 2019 WL 1239780, at *3*.

19    Because standing is a jurisdictional issue that is raised pursuant to a Rule 12(b)(1) motion, the Court may consider the Declaration of Nadine Glass (ECF No. 41-2) as part of Union Defendants' factual challenge to Ms. Ziegler's standing. *See supra* note 10.

20    Moreover, although notice to the parties is generally required before the Court may exercise its discretion and treat a motion to dismiss as a motion for summary judgment, *see* Fed. R. Civ. P. 12(d); *Black, 2007 WL 2728601, at *2 n.2*, a review of Union Defendants' request that this Court convert the Motion to Dismiss into a motion for summary judgment (ECF No. 41 at 31 n.8) and Plaintiffs' acknowledgement of and response to this request (ECF No. 48 at 28-29) convinces this Court that Plaintiffs have been given a "reasonable opportunity to present all the material that is pertinent to the motion," Fed. R. Civ. P. 12(d), and have declined to present such material. *See PAPCO, Inc. v. United States, 814 F. Supp. 2d 477, 483 (W.D. Pa. 2011); Kurta v. Borough of Glassport, Civil Action No. 10-195, 2010 WL 1664907, at *2 (W.D. Pa. Apr. 23, 2010)*.

---